No. 22-15827

# In the United States Court of Appeals for the Ninth Circuit

FELLOWSHIP OF CHRISTIAN ATHLETES, AN OKLAHOMA CORPORATION, ET AL.,
Plaintiffs-Appellants,

v.

SAN JOSE UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.,
Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of California
Honorable Haywood S. Gilliam, Jr.
(4:20-cv-02798-HSG)

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

KIMBERLEE WOOD COLBY
CENTER FOR LAW & RELIGIOUS
  FREEDOM
8001 Braddock Road, Suite 302
Springfield, VA 22151
(703) 642-1070
*kcolby@clsnet.org*

CHRISTOPHER J. SCHWEICKERT
SETO WOOD & SCHWEICKERT LLP
2300 Contra Costa Boulevard
  Suite 310
Pleasant Hill, CA 94523
(925) 938-6100
*cjs@wcjuris.com*

DANIEL H. BLOMBERG
  *Counsel of Record*
ERIC S. BAXTER
NICHOLAS R. REAVES
ABIGAIL E. SMITH
JAMES J. KIM
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*dblomberg@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Fellowship of Christian Athletes represents that it has no parent corporation and does not issue stock. Fellowship of Christian Athletes of Pioneer High School is an unincorporated association that has no parent corporation and issues no stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES....................................................iv

INTRODUCTION ....................................................... 1

JURISDICTIONAL STATEMENT ..................................... 3

STATEMENT OF THE ISSUES.................................... 3

STATEMENT OF THE CASE ....................................... 4

    A. Fellowship of Christian Athletes ....................................... 4

    B. The District's Forum for Student Groups ...................... 5

    C. The District's Nondiscrimination Policies........................ 6

    D. The District's Revocation of FCA's Recognition............................ 9

    E. The District's "All-Comers" Policy ...................................... 13

    F. FCA Clubs under the "All-Comers" Policy .................................... 17

    G. Procedural History ....................................................... 19

STANDARD OF REVIEW.................................................... 20

SUMMARY OF ARGUMENT .................................................. 21

ARGUMENT ............................................................. 23

I.    The District's Actions Violate the Equal Access Act......................... 23

    A. The District's targeting and harassment of FCA
       because of its religious speech violates the EAA......................... 25

    B. Exclusion of FCA based on its religious
       leadership requirement violates the EAA. ................................ 27

II.    The District's Actions Violate the Free Exercise Clause. ................ 31

A. The District's broad discretion to deviate from the policy renders the policy not generally applicable. ...................... 33

B. The District's exemptions to the policy render it not generally applicable. ........................................................ 36

C. The District is not neutral toward FCA's religious beliefs. ........................................................................ 39

D. The district court's contrary ruling was in error. ........................ 42

III. The District's Actions Violate the Free Speech and Assembly Clauses. .................................................... 47

A. The District's exclusion of FCA is unreasonable. ........................ 48

B. The District is discriminating based on viewpoint ...................... 50

IV. The District's Actions Fail Strict Scrutiny. ..................................... 54

V. The District's Actions Violate the Religion Clauses ........................ 55

VI. The Remaining Injunction Factors Favor Granting Relief ............................................................................ 57

VII. The District Court Improperly Rejected Plaintiffs' Supplemental Evidence. .................................................. 60

CONCLUSION .......................................................................... 62

CERTIFICATE OF COMPLIANCE ........................................... 63

CERTIFICATE OF SERVICE .................................................... 64

ADDENDUM .............................................................................. 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFDI v. SMART,*
    978 F.3d 481 (6th Cir. 2020) ................................................................ 49

*Agency for Int'l Dev. v. AOSI,*
    570 U.S. 205 (2013) ............................................................................. 44

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ....................................................... 23, 57

*Alpha Delta Chi-Delta Chapter v. Reed,*
    648 F.3d 790 (9th Cir. 2011) ............................................................... 52

*Am. Beverage Ass'n v. City & County of S.F.,*
    916 F.3d 749 (9th Cir. 2019) ............................................................... 59

*Amalgamated Transit Union Loc. 1015 v. Spokane Transit
    Auth.,*
    929 F.3d 643 (9th Cir. 2019) ............................................................... 49

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021) ......................................................................... 53

*Bd. of Educ. v. Mergens,*
    496 U.S. 226 (1990) ...................................................................23-24, 31

*Bible Believers v. Wayne County,*
    805 F.3d 228 (6th Cir. 2015) ............................................................... 53

*Bible Club v. Placentia-Yorba Linda Sch. Dist.,*
    573 F. Supp. 2d 1291 (C.D. Cal. 2008) ......................................... 26, 58

*BLinC v. Univ. of Iowa,*
    991 F.3d 969 (8th Cir. 2021) ......................................................... 51, 52

*BLinC v. Univ. of Iowa,*
    No. 17-80, 2018 WL 4701879 (S.D. Iowa Jan. 23, 2018) ................... 37

*Boyer v. City of Simi Valley*,
   978 F.3d 618 (9th Cir. 2020)........................................................28, 30

*Cal. Democratic Party v. Jones*,
   530 U.S. 567 (2000).............................................................................27

*Calvary Chapel Dayton Valley v. Sisolak*,
   982 F.3d 1228 (9th Cir. 2020)........................................................32, 54

*Carson v. Makin*,
   __ S.Ct. __, No. 20-1088, 2022 WL 2203333
   (June 21, 2022) ...............................................................................44, 46

*Ceniceros v. Bd. of Trs. of the San Diego Unified Sch. Dist.*,
   106 F.3d 878 (9th Cir. 1997)..............................................................24

*Christian Legal Soc'y v. Walker*,
   453 F.3d 853 (7th Cir. 2006)..................................................47, 56, 58

*Christian Legal Society v. Martinez*,
   561 U.S. 661 (2010).................................................................... *passim*

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993).............................................................32, 41, 45

*City of Dallas v. Stanglin*,
   490 U.S. 19 (1989)..............................................................................47

*Colin v. Orange Unified Sch. Dist.*,
   83 F. Supp. 2d 1135 (C.D. Cal. 2000) .................................25-26, 31, 59

*Conlon v. InterVarsity Christian Fellowship*,
   777 F.3d 829 (6th Cir. 2015)..........................................................56, 57

*Cox v. Louisiana*,
   379 U.S. 536 (1965).............................................................................53

*CTIA v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019).............................................................58

*Ctr. for Bio-Ethical Reform v. L.A. County*,
   533 F.3d 780 (9th Cir. 2008).............................................................53

*Davis v. HSBC Bank Nev.*,
    691 F.3d 1152 (9th Cir. 2012) ............................................................. 21

*Doe #1 v. Trump*,
    984 F.3d 848 (9th Cir. 2020) ............................................................... 20

*Doe v. San Diego Unified Sch. Dist.*,
    No. 21-56259, 2021 WL 5600620 (9th Cir. Nov. 28, 2021) ................ 37

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ................................................................. *passim*

*Gerlich v. Leath*,
    861 F.3d 697 (8th Cir. 2017) ............................................................... 54

*Gonzalez v. Sch. Bd. of Okeechobee Cnty.*,
    571 F. Supp. 2d 1257 (S.D. Fla. 2008) ............................................... 31

*Good News Club v. Milford Cent. Sch.*,
    533 U.S. 98 (2001) .............................................................................. 51

*Healy v. James*,
    408 U.S. 169 (1972) ............................................................................ 53

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ............................................................... 23

*Hopper v. City of Pasco*,
    241 F.3d 1067 (9th Cir. 2001) ........................................................ 49-50

*Hosanna-Tabor v. EEOC*,
    565 U.S. 171 (2012) ...................................................................... 28, 49

*Hsu v. Roslyn Union Free Sch. Dist.*,
    85 F.3d 839 (2d Cir. 1996) ...................................................... 28, 29, 60

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
    515 U.S. 557 (1995) ............................................................................ 27

*Hurn v. Ret. Fund Tr.*,
    648 F.2d 1252 (9th Cir. 1981) ............................................................. 42

*InterVarsity Christian Fellowship v. Univ. of Iowa,*
    408 F. Supp. 3d 960 (S.D. Iowa 2019) .................................................. 55

*Intervarsity Christian Fellowship v. Univ. of Iowa,*
    5 F.4th 855 (8th Cir. 2021) ........................................................... 58-59

*InterVarsity Christian Fellowship/USA v. Bd. of Governors
of Wayne State Univ.,*
    534 F. Supp. 3d 785 (E.D. Mich. 2021) ............................ 47, 49, 56, 57

*Kennedy v. Bremerton Sch. Dist.,*
    __ S.Ct. __, No. 21-418, 2022 WL 2295034 (June 27, 2022)............... 42

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993) ....................................................................... 50, 51

*Los Angeles Cnty. v. Humphries,*
    562 U.S. 29 (2010) ............................................................................... 29

*Mahanoy Area Sch. Dist. v. B.L.,*
    141 S. Ct. 2038 (2021) ........................................................................ 31

*Masterpiece Cakeshop Ltd. v. Colorado Civil Rights
Commission,*
    138 S. Ct. 1719 (2018) ............................................................. 32, 39, 41

*Minn. Voters All. v. Mansky,*
    138 S. Ct. 1876 (2018) ................................................................... 50, 51

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health
Dep't,*
    984 F.3d 477 (6th Cir. 2020) .............................................................. 45

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................ 59

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) ............................................................................ 39

*Ocean Beauty Seafoods v. Pac. Seafood Grp.,*
    611 F. App'x 385 (9th Cir. 2015) ................................................... 61-62

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ........................................................ 56

*Prince v. Jacoby,*
    303 F.3d 1074 (9th Cir. 2002) ...................................... 24, 30

*Puri v. Khalsa,*
    844 F.3d 1152 (9th Cir. 2017) ............................................ 56

*Ramirez v. Collier,*
    142 S.Ct. 1264 (2022) ........................................................ 55

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ...................................................... 28, 30

*Resilient Floor Covering v. Michael's Floor Covering,*
    801 F.3d 1079 (9th Cir. 2015) ............................................ 62

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) .............................................. 22, 36, 58

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) .............................................. 22, 47, 50

*Sammartano v. First Jud. Dist. Ct.,*
    303 F.3d 959 (9th Cir. 2002) ........................................ 51, 52

*Serbian E. Orthodox Diocese v. Milivojevich,*
    426 U.S. 696 (1976) ...................................................... 55, 56

*Singh v. Carter,*
    168 F. Supp. 3d 216 (D.D.C. 2016) .................................... 59

*Straights & Gays for Equal. v. Osseo Area Schs.,*
    471 F.3d 908 (8th Cir. 2006) .................................. 31, 58, 59

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ................................................ *passim*

*Tandon v. Newsom,*
    992 F.3d 916 (9th Cir. 2021) .............................................. 45

viii

*Trinity Lutheran Church v. Comer,*
  137 S. Ct. 2012 (2017) .................................................................. 31-32, 54

*Truth v. Kent Sch. Dist.,*
  542 F.3d 634 (9th Cir. 2008), ............................................................ 29

*Turner Broad. Sys. v. F.C.C.,*
  512 U.S. 622 (1994) ........................................................................ 28

*Victory Processing, LLC v. Fox,*
  937 F.3d 1218 (9th Cir. 2019) ....................................................... 25, 30

*Walz v. Tax Comm'n,*
  397 U.S. 664, 696 (1970) .................................................................. 44

*Warsoldier v. Woodford,*
  418 F.3d 989 (9th Cir. 2005) ............................................................ 55

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................ 51

## Statutes

20 U.S.C. § 4071 ............................................................................ 2, 24

28 U.S.C. § 1291 .............................................................................. 3

28 U.S.C. § 1292 .............................................................................. 3

28 U.S.C. § 1331 .............................................................................. 3

28 U.S.C. § 1343 .............................................................................. 3

## INTRODUCTION

Like schoolchildren at thousands of other campuses nationwide, students in the San José Unified School District led well-respected clubs affiliated with the Fellowship of Christian Athletes for over a decade. But that changed when a District teacher announced that FCA's "views" about marriage "are bullshit," that these "views needed to be barred from a public high school campus," and that "attacking these views" was necessary to have a "better campus."

In short order, District officials denied official club status and benefits to FCA clubs District-wide, called for on-campus protests against FCA, recognized a new student club—The Satanic Temple Club—formed specifically to openly mock FCA's beliefs, and supported student protests that took place outside almost every FCA meeting.

This was the first and only time the District derecognized a student club for asking its leaders to embrace the club's views. The District strictly applied its nondiscrimination and "all comers" policies to FCA to reach this result, but allowed exceptions for girls clubs, academic clubs, and sports teams to exclude students. For instance, while academic clubs can exclude *members* based on *secular* views of "good moral character," FCA cannot require even its *leaders* to abide by its *religious* views of "character." Moreover, the District retains and exercises broad discretion

to run programs and activities that, though subject to the same nondiscrimination policies as FCA, discriminate based on grounds such as sex, race, gender identity, and ethnicity.

This is a textbook violation of the Equal Access Act—a federal statute prohibiting school districts from derecognizing clubs "on the basis of the religious … content of the[ir] speech." 20 U.S.C. § 4071(a). It is a violation of the Free Exercise Clause, as it is the opposite of government action that is "neutral" and "generally applicable" toward religion. It is also a violation of the Free Speech and Assembly Clauses, because the punishment of FCA is both viewpoint-based and unreasonable in light of the purpose of the student club forum. *And* it violates the Religion Clauses by interfering with the internal management of a religious group.

Faced with this obvious violation of its legal rights, FCA in July 2021 asked the district court for a preliminary injunction so it could remain a recognized student group during the 2021-2022 school year. But the district court did not rule on this request until June 2022, leaving the group excluded for the entire school year. And when it finally ruled on the request, the court denied it.

Without injunctive relief, FCA's current students face ongoing violations of their First Amendment and statutory rights. More students will be marginalized because of their religious views. And the Pioneer FCA club itself, facing continued government pressure and dwindling student attendance, may cease to exist.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). The district court issued its preliminary injunction decision on June 1, 2022, 1-ER-22, and Plaintiffs-Appellants timely filed their notice of appeal of that order and an intertwined prior dismissal order, 1-ER-53, on June 6, 2022. ECF 196.

## STATEMENT OF THE ISSUES

1. Whether Defendants are violating the Equal Access Act by excluding FCA from official recognition as a club approved by the Associated Student Body (ASB).

2. Whether Defendants are violating the Free Exercise Clause of the First Amendment by excluding FCA from ASB-approved status.

3. Whether Defendants are violating the Free Speech and Assembly Clauses of the First Amendment by excluding FCA from ASB-approved status.

4. Whether Defendants are violating the Religion Clauses of the First Amendment by excluding FCA from ASB-approved status.

## STATEMENT OF THE CASE

### A. Fellowship of Christian Athletes

Founded in 1954, FCA is an international religious ministry with more than 7,000 student chapters at middle schools, high schools, and colleges across the United States. 10-ER-2017 ¶8. FCA and its affiliated Student FCA Chapters invite all students to attend and participate in their meetings and welcome all to become members of their clubs. 10-ER-2018 ¶13. Before the events at issue here, students led FCA clubs on three campuses in the Appellee San José Unified School District (the "District"), including at Pioneer High School, where Appellant Pioneer FCA meets and where Appellants Charlotte Klarke and Elizabeth Sinclair were student leaders. These FCA clubs hosted regular meetings featuring games, religious instruction, testimonies of student leaders' faith, worship, and prayer. 10-ER-1987–88 ¶¶4, 5, 6; 10-ER-2017 ¶8; 10-ER-2021 ¶25. In addition to weekly meetings, student FCA Chapters also served their community by leading Christian sports camps and donating sports equipment to children in need. *Id.* ¶12. District officials have recognized that "FCA does great things on campus" and is led by "great students." 10-ER-1926.

FCA embraces a core set of religious beliefs identified in the FCA Statement of Faith, including key Christian doctrines regarding the inerrancy of the Bible, the death and resurrection of Jesus, God's design for marriage, and the belief "that every person should be treated with love,

4

dignity and respect." 10-ER-2019 ¶18; 10-ER-2087; 10-ER-2100. FCA's student leaders are asked to affirm these beliefs because they represent FCA on their campuses by leading prayer, worship, and religious instruction. 10-ER-2018–19. All applicants who sincerely affirm and conduct themselves according to FCA's Statement of Faith are eligible for leadership. 10-ER-2020. No District high school student has ever complained that he or she wanted to hold a leadership role but was ineligible due to FCA's religious leadership requirements. 10-ER-2022; 7-ER-1266.

### B. The District's Forum for Student Groups

Since the early 2000s, FCA clubs have participated in the District's program for recognized student organizations, known as the Associated Student Body (ASB) program. 10-ER-2016–17 ¶5; 10-ER-2021 ¶24. This program provides a forum for student clubs to organize around students' "own personal interests" in a manner that "give[s] students practice in self-governance, and provide[s] social and recreational activities," as well as "honor[ing] outstanding student achievement," and "enhanc[ing] school spirit and student sense of belonging." 9-ER-1590–91; 8-ER-1377, 1379; *see also* 7-ER-1098–99 (purpose of ASB program is for students to "feel connected to other students that are like them"). Through the ASB program, the District has recognized hundreds of diverse student clubs founded on common viewpoints, including the Chess Club, Communism Club, Gay-Straight Alliance (GSA), Interact Club, Key Club, National Honor Society (NHS), Politics Club, and The Satanic Temple Club. 9-ER-

1801–02. The ASB program also governs District athletic teams' funding. 7-ER-1136. Club applications are submitted to the ASB for approval, but school officials have the "final say." 5-ER-741, 5-ER-794; 7-ER-1255.

Students value ASB approval because it marks their club as an equal member of the school community and provides several important benefits. 9-ER-1561; 9-ER-1590–91. For instance, only ASB-approved clubs are (1) included on their school's official print and online club lists, an important recruiting tool; (2) featured in the yearbook, another key recruiting tool; (3) provided ASB financial accounts, where they can deposit and withdraw funds; (4) given access to ASB funding; (5) allowed to conduct ASB-approved fundraisers both on and off campus; (6) allowed to have an official campus advisor; and (7) given priority access to campus meeting space. 9-ER-1561–62; 9-ER-1608–1609; 6-ER-1026–27; 7-ER-1109; 7-ER-1210–12; 8-ER-1373.

Student groups lacking ASB approval do not have access to these significant benefits. 7-ER-1114; 7-ER-1118; 5-ER-805; 5-ER-848–49; 5-ER-850; 9-ER-1592; *see also* 6-ER-1027. Unapproved groups also have more difficulty hosting events, procuring meeting space, and communicating with school administrators. 9-ER-1608–09.

## C. The District's Nondiscrimination Policies

All District programs and activities are covered by "comprehensive, district-wide polic[ies]" that forbid discrimination based on criteria such as race, sex, sexual orientation, and religion. 1-ER-4–5; 8-ER-1361; 9-ER-

1724. These policies apply "equally" to both the District and the ASB program. 9-ER-1724; 6-ER-1048–49 (policies apply to all "District programs and activities" including ASB). No rules for the ASB programs can be inconsistent with those policies. 9-ER-1706.

Every school year, student clubs apply for ASB approval. 7-ER-1084. School officials review applications for compliance with District policies, including nondiscrimination policies. 6-ER-994–1002. During the initial review process, District officials sometimes dig deeper into applications if they deem them "controversial." 5-ER-801; 5-ER-802–03; 5-ER-853. Once a club is approved, schools do not normally monitor or enforce compliance with their nondiscrimination requirements absent complaints. 5-ER-863–64; 7-ER-1164–65; 9-ER-1677–78; 9-ER-1682.

The District reserves substantial discretion about whether and how to apply its nondiscrimination policies to its own programs and activities. Defs.' Prelim. Inj. Opp'n at 18-20, No. 20-2798 (N.D. Cal. Sept. 3, 2021), ECF 111 ("SJUSD Br.") (admitting the "fact" that the District does not apply the policies "to all District programs and activities, or to all in precisely the same way"). By its own admission, the District exercises discretion to permit discrimination—based on otherwise forbidden criteria—where it determines that certain "governmental interests" are sufficiently "compelling" to justify "treat[ing] different students differently." *Id.* Where "different contexts" purportedly call for "different means," the District sanctions "reasonable pedagogical distinctions" that violate the

terms of its policies. *Id*. at 18-20. At least part of the basis for this discretion is the District's equity policy, which allows the District's schools latitude to "look at groups of students" based on "race, ethnicity, gender, sexual orientation, language, disability, and socioeconomic status" to ensure that "students get what they need." ECF 102-4 at 102-03.

The District has repeatedly exercised this broad discretion. For example, consistent with its equity policy, the District offers a "multitude of programs" like the "Latino Male Mentor Group" for "ninth-grade Latino male students" to achieve "success" in school, and the "Girls' Circle" group for "female-identifying students" to "build connections with each other." 9-ER-1816; 9-ER-1641; 9-ER-1644–47; 9-ER-1653; 9-ER-1728–29; 10-ER-1941; SJUSD Br.20. The District also permits sex-segregated student events, such as Leland's "Mr. GQ" contest (the school's "annual male pageant show"), Pioneer's similar "Mr. Mustang" contest, and "Mustang Madness" games during spirit week that sex segregate. 10-ER-1966; 10-ER-1968; 10-ER-1970; 10-ER-1865; 6-ER-1008. In employment, and pursuant to its equity policy, the District discriminates based on race to achieve sufficient "educators of color" and proper "demographic[s]." 9-ER-1632; 10-ER-1849. Other District programs also discriminate on sex (10-ER-1855–57), pregnancy or parental status (10-ER-1850–54; 9-ER-1728), and immigration status (10-ER-1858). And District officials have allowed ASB-approved student clubs to make distinctions on grounds forbidden by the nondiscrimination policies. *See infra* at 14-16.

## D. The District's Revocation of FCA's Recognition

In April 2019, Pioneer teacher Peter Glasser obtained what he assumed to be a statement of FCA's religious beliefs. Without talking to FCA's student leaders—two of whom were his students—Glasser taped the statement to his classroom whiteboard to highlight FCA's "moral stances" and "views" regarding marriage and sexuality that he found "objectionable." 10-ER-1920; 10-ER-2005–07. He wrote a message to his students beneath it: "I am deeply saddened that a club on Pioneer's campus asks its members to affirm these statements." 10-ER-2015. Glasser wanted to stop what he considered an "implicit message that Pioneer as an institution approves of [FCA's] values" by allowing it "to have a photo in the yearbook, or to use [Pioneer facilities] for a guest speaker at lunch." 10-ER-1919–20.

To that end, on April 22, Glasser sent the Statement of Faith to Principal Herbert Espiritu, admitting that he didn't "really know anything about the club or [the beliefs]," but that a student was "very upset" about what FCA "requires of its members." 6-ER-1053. A week later, on April 29, he sent a lengthy email to Espiritu arguing that "FCA's views need to be barred from a public high school campus," that "attacking these views is the only way to make a better campus," and describing FCA's student leaders as "collateral damage." 10-ER-1926–27. Glasser further urged that "there's only one thing to say that will protect our students who are so victimized by religious views that discriminate against them: I am an

adult on your campus, and these views are bullshit to me," "have no validity," and cannot be justified by " 'religious freedom.' " 10-ER-1926.

On April 30, Espiritu and Glasser participated in a meeting of the school leadership committee—the "Climate Committee"—to discuss what to do about the "FCA club on campus." 7-ER-1270; 7-ER-1273. (Another member of the committee, Michelle Bowman, wrote later that she viewed "evangelicals like FCA" as "charlatans" who "choose darkness over knowledge." 10-ER-1897.) Espiritu said that FCA's views "go[] against core values of [Pioneer]" of "open-mindedness" and being "inclusive," and that the committee should "take a united stance" against FCA. 7-ER-1273. The committee agreed. 7-ER-1273. Principal Espiritu then contacted District administrators to derecognize Pioneer FCA. 5-ER-751–52; 5-ER-828.

On May 2, just two days after the Climate Committee meeting, Espiritu told Pioneer FCA's student leadership that the District was immediately stripping their club of ASB approval. 8-ER-1510–11. Espiritu announced in the school newspaper that "the Climate Committee and District officials" had made the decision to "no longer be affiliated with" FCA because Pioneer "disagree[d] with" FCA's beliefs and saw them as being "of a discriminatory nature." 6-ER-1008. Their decision was made without consulting FCA or its student leaders, and was based in part on the District's mistaken belief that affirming FCA's Statement of Faith was required of members (not just leaders) and that FCA automatically

banned LGBTQ students from leadership (it did not). 8-ER-1396–97. For Espiritu, the "fact that [FCA's beliefs] existed" was alone "enough" to de-recognize FCA. 6-ER-919. This was the first time any Pioneer club had lost ASB approval, 7-ER-1089, and the first time the District had approved revoking ASB approval of any club, 5-ER-871.

Immediately upon revoking FCA's ASB approval, District officials shunted the group into a made-for-FCA category called "student interest groups," a category that had not previously existed at Pioneer. 7-ER-1211–12. Student interest groups are not ASB approved and lack all accompanying benefits, but are still permitted to meet on campus. 6-ER-1027. Thus, "[as] a consequence of that derecognition," FCA was "no longer allowed to have an ASB account or fundraise on campus," they were not listed in the yearbook, they were not eligible to be included on the lists of approved clubs, they lost priority access to room usage, and they could not receive support from the ASB clerk. 9-ER-1627; 9-ER-1561–62; 6-ER-1017. Espiritu testified that he treated FCA the same way he would have treated a KKK club: He was obligated to let them meet on campus, but he withheld ASB approval. 5-ER-815.

But District officials pressed for even more. Glasser wanted to "ban FCA completely from campus," and so repeatedly suggested that Principal Espiritu accuse Pioneer FCA of "sexual harassment" based solely on the content of their religious beliefs. 4-ER-639–40. Likewise, GSA's faculty advisor publicly lamented that Pioneer FCA was allowed to remain

11

"on campus" despite its "hurtful" beliefs, and said the "best way" to change that "is to have students rally[] against the issue." 10-ER-1922.

And rally they did, with teacher support. At the same time Pioneer FCA was (again) denied ASB recognition in Fall 2019, Pioneer officials recognized The Satanic Temple Club, which was formed to "openly mock" FCA's beliefs. 10-ER-2003. The club was led by the same student who initially complained to Defendant Glasser about FCA's religious beliefs, and was advised by Bowman, the same faculty member of the Climate Committee who supported "taking a stand" against FCA. 5-ER-844; 4-ER-574–75; 10-ER-2002–03; 6-ER-1006; 6-ER-1060; 10-ER-1897. When Pioneer FCA tried to meet in Fall 2019, students held protests immediately outside FCA's meetings with signs deriding its beliefs as "HA-TRED." *See* 10-ER-1932; 10-ER-1973–81; 6-ER-1058–59; 10-ER-1947–48. GSA's other faculty advisor attended the protests, telling the school newspaper that the protests were "an act of love," and that FCA must choose between "hold[ing] events on campus" and its "statement of faith." 10-ER-1912. Virtually all of Pioneer FCA's on-campus meetings that school year were protested. 4-ER-642–43.

Nor was protesting enough. Glasser confronted an FCA guest speaker about FCA's religious beliefs in an effort to dissuade him from presenting. ECF 137-5 at 6 ¶20. Reporters from the school newspaper—itself a District program—entered an FCA meeting and took hundreds of pictures of FCA students, standing within feet or inches of them. 8-ER-1523; 10-ER-

1888–90. A Pioneer teacher in attendance told Espiritu that this was "intimidating" and left FCA students visibly "embarrassed, harassed, and scared." 10-ER-1889. The teacher reported that FCA students were being "marginalized and socially ostracized for what they believe in," and that he had "never seen a club, sports team, or class so targeted by Pioneer's Newspaper." 10-ER-1889. The newspaper's faculty advisor, who called one of his reporters an "idiot" for "feel[ing] bad" for FCA, also stated that newspaper staff had been caught "verbally abusing" FCA members. 10-ER-1892; 8-ER-1523.

## E. The District's "All-Comers" Policy

Due to COVID, student club activities stopped in Spring 2020, and clubs did not meet in person until April 2021. 6-ER-1027–30; 6-ER-1047–49. For the 2020-21 school year, Pioneer granted a modified conditional approval to all student clubs, including Pioneer FCA. 7-ER-1239–40.

But for the 2021-2022 academic year, the District altered its nondiscrimination requirements applicable to all the District's "programs and activities," including all ASB-approved clubs. 4-ER-702; 9-ER-1702–03. The District labeled the updated policy an "All-Comers Policy," requiring ASB clubs "to permit any student to become a member or leader." 6-ER-1048. Any clubs seeking ASB recognition must sign an "Affirmation statement" agreeing that "any currently enrolled student at the school [may] participate in, become a member of, and seek or hold leadership positions in the organization." 6-ER-1049. The policy's guidelines state

that it is intended to "be implemented and construed in accordance with the all comers policy" in *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010). 4-ER-702. Per the District, the purpose of this new all-comers policy is to ensure "all of our campus communities" are "welcoming to all students." 6-ER-1048; *see also* 5-ER-781 (under policy, "if you're going to form a club here at school, it has to be free to all"); 8-ER-1498 (policy requires that "whatever the club does, all students are welcome to participate in it, whether that's membership, leadership, activities, [or] fundraisers[.]").

But the all-comers policy allows broad exemptions both expressly and in practice. For instance, the policy explicitly permits ASB-approved clubs to exclude students based on so-called "non-discriminatory criteria." Certain criteria—including age, GPA, and enrolled student status— are preapproved as "non-discriminatory." 6-ER-1049; 9-ER-1737–38; 9-ER-1938–39, 7-ER-1249. Similarly, the District permits ASB-approved sports clubs to select based on "athletic competency," 9-ER-1741–42, and choral clubs can select "members on the basis of their singing ability," 7-ER-1213. But the District does not define "non-discriminatory," leaving enforcement instead to the "common sense" discretion of officials at each school to apply on a "case-by-case basis." 9-ER-1739–40; 7-ER-1202, 7-ER-1249.

Clubs can thus also exclude students based on the clubs' assessment of whether they have "good moral character." 7-ER-1215 . Several leading

14

District clubs have done so for decades, as required by their national or-
ganizations. 4-ER-504–10 (NHS excludes based on "character," "GPA,"
"leadership," and "service"); 7-ER-1279 (Interact Club, "good character");
4-ER-664 (California Scholarship Federation, "[ ]worthy citizen"). [1]
Glasser personally enforced NHS's character (and other) restrictions for
18 years, relying on assessments by school officials and denying access to
membership where he perceived a lack of "character." 4-ER-506–07.

The District has also long approved student group applications that
exclude students based on criteria such as sex or ethnicity. For example,
clubs such as the Big Sister/Little Sister club have been allowed to select
members and leaders based on sex. 9-ER-1677; 5-ER-851–53. And the
District has left interpretation of these policies to the discretion of each
school's activity director without providing any guidance or training
when challenging questions arise. 7-ER-1144 (Activities Director ap-
proved all female clubs in part because no one complained); 7-ER-1172–
73, 7-ER-1196 (Activities Directors did not receive any training in appli-
cation of District policies or application of EAA's requirements). Since
announcing the all-comers policy, District schools also continued to grant

---

[1] *See also How to Become a Member,* National Honor Society,
https://perma.cc/S2ZN-D65K; 4-ER-660 (Interact Club, "good charac-
ter"); *Standard Interact Club Constitution*, Interact Handbook,
https://perma.cc/K4HS-FU8M; 4-ER-664 (California Scholarship Feder-
ation, "worthy citizen"); *Membership*, California Scholarship Federation,
https://perma.cc/34DX-AR8D ("Poor citizenship may disqualify students
from membership.").

recognition to clubs such as Senior Women, which is open only to "seniors who identify as female," and the South Asian Heritage Club, which "prioritize[s] south asian" membership.  2-ER-103; 2-ER-109; 7-ER-1217 (Pioneer Activities Director testifying she would provide ASB approval to student clubs that limit their membership based on gender under the District's updated policy).

Further, the District's own programs exclude students and employees on a variety of bases otherwise prohibited by the all-comers policy and the District's nondiscrimination policies. For example, the Latino Male Mentoring Group at Pioneer is a program where male Latino seniors mentor male Latino freshmen, which was publicly praised by Espiritu in February 2020 as a means to set up "ninth grade Latino male students … for success" in high school and college. 9-ER-1816; 9-ER-1641; 9-ER-1644–47; 9-ER-1728–29. Likewise, the Male Summit Conference is an event coordinated by District employees for "[o]nly males," intended to encourage graduation and higher education for boys. 9-ER-1821; 9-ER-1646–47. The District also permits gender or gender-identity segregation in the classroom during "class discussions" or for "sexual education." 9-ER-1733–36; 6-ER-998–1002. And the District exempts student athletic teams from the all-comers policy even though they have ASB accounts, thus allowing District schools to have single-gender athletic teams. 7-ER-1287–88; 10-ER-1990 ¶24; 5-ER-869–70. Similarly, separate District policies allow cheerleading groups to select members based on whether a

student identifies as male or female. 6-ER-998–99; 6-ER-893–94; 7-ER-1176–77, 7-ER-1180, 7-ER-1212. All these programs violate the District's nondiscrimination policies, which prohibit the District from discriminating on the basis of race, gender, and ethnicity in its "activities and programs." 4-ER-702.

### F. FCA Clubs under the "All-Comers" Policy

FCA clubs are not eligible for ASB approval under the all comers policy because, in the District's view, they discriminate both based on religion (by requiring leaders to hold certain religious beliefs, such as that Jesus is the son of God) and sexual orientation (by requiring leaders to hold religious beliefs regarding marriage and sexual conduct). 9-ER-1750–51; 9-ER-1759, 9-ER-1779–80; 10-ER-1989–90; 8-ER-1401, 7-ER-1265. Principal Espiritu, who has the "final say" on approving Pioneer clubs, also confirmed that Pioneer FCA would be ineligible for ASB approval if it maintained its "same leadership requirements." 5-ER-782; 6-ER-911. Pioneer FCA's leadership requirements are unchanged. 10-ER-2019.

Losing ASB approval has severely harmed FCA. There used to be three thriving clubs on District campuses; now there is only one club, and it is struggling to stay afloat. 4-ER-647–48; 10-ER-2021-22 ¶¶26-27. Before, club meetings could draw over a hundred students; now, the surviving club's largest meetings this past year have drawn just a handful. 2-ER-55–56.

17

The District has taken no action to prevent future harm to FCA students. 9-ER-1587. To the contrary, Glasser told Principal Espiritu he "would do the same all over again" and that he felt "morally and professionally bound" to do so. 10-ER-1864–65; 3-ER-416–17; 3-ER-390–91. No District employee has ever been reprimanded for the actions taken against FCA students. 3-ER-332–33; 3-ER-371–72; 3-ER-380; 3-ER-395–96. Instead, District officials continue to impose made-for-FCA hurdles on the club, requiring a club leader to meet privately with Principal Espiritu before the student activities fair, 3-ER-420–22, and repeatedly checking in on club meetings, a "rare" occurrence before derecognition. 2-ER-56.

When the California Department of Education instructed the District to investigate complaints from FCA parents about teacher misconduct, District officials made false statements to both the Department of Education and Plaintiffs, telling them that investigations were ongoing— when in fact no investigation was ever initiated or performed, and there was no intent that an investigation ever would be performed. 3-ER-278–79 (admitting that "there was no investigation"); *accord* 3-ER-248; *compare id.* at 3-ER-278–79 (admitting "the Unified School District [did not] conduct the required investigation"), 3-ER-277 ("no investigation was actually performed"); *with* 3-ER-305 (representing to the state Department of Education, "[o]n behalf of [Defendant] Albarran and the San Jose Uni-

fied School District," that the District was in the midst of its "investigation process" and asking the Department of Education to provide "the full opportunity to investigate this and issue a decision"). To date, Defendants have provided no evidence they ever informed the State that they lied about this investigation, and they openly admit they have no plans to pursue an investigation now or in the future. 3-ER-262–64. Even so, Defendants continue to insist that "the system worked in the way it's supposed to work." 3-ER-284.

### G. Procedural History

Facing the loss of provisional recognized status obtained during the remote 2020-21 school year, and with students returning for in-person instruction again in Fall 2021, Plaintiffs sought a preliminary injunction on July 30, 2021, requesting an order allowing Pioneer FCA to retain its recognized status. ECF 102. After Judge Koh's elevation, this case was reassigned to Judge Gilliam on January 21, 2022. ECF 152. On January 28, Plaintiffs re-noticed their pending motion for preliminary injunction and moved to expedite consideration. ECF 153, 154. Three days later, Judge Gilliam denied Plaintiffs' request to expedite. ECF 155.

On April 22, Plaintiffs moved to supplement the preliminary injunction record with excerpts of documents produced by Defendants at the close of discovery, after Plaintiffs' preliminary injunction was fully briefed. On May 12, Judge Gilliam held oral argument on Plaintiffs' pre-

liminary injunction motion. ECF 190. On May 22, Plaintiffs filed a motion to supplement the injunction record demonstrating that Pioneer FCA was facing targeting by the school at its meetings. ECF 192. On June 1, Judge Gilliam denied the motion for preliminary injunction. 1-ER-21. He also denied Plaintiffs' October 22 and May 22 Motions to Supplement but granted Plaintiffs' April 22 Motion to Supplement. 1-ER-21–22.

Plaintiffs filed an appeal and moved in the district court for an injunction pending appeal on June 6, which was denied on June 8. ECF 198, 203. Plaintiffs also moved on June 7 for an injunction pending appeal in this Court. On June 13, a motions panel of this Court expedited the briefing schedule of Plaintiffs' preliminary injunction appeal and referred Plaintiffs' motion for an injunction pending appeal to the panel assigned to decide the merits. In addition to the denial of Plaintiff's motion for a preliminary injunction, this Court also has before it a prior order from Judge Koh, affirmed by Judge Gilliam, granting in part and denying in part Defendants' first motion to dismiss. ECF 49; 1-ER-43–50.

## STANDARD OF REVIEW

The district court's denial of a preliminary injunction and of a motion to supplement the record is reviewed for abuse of discretion. *See*, *e.g.*, *Doe #1 v. Trump*, 984 F.3d 848, 861 (9th Cir. 2020). "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an

error of law." *Id.* (citation omitted). A grant of a motion to dismiss under Rule 12(b)(6) is also reviewed de novo. *Davis v. HSBC Bank Nev.*, 691 F.3d 1152, 1159 (9th Cir. 2012).

## SUMMARY OF ARGUMENT

Plaintiffs have shown a likelihood of success on their Equal Access Act (EAA) and First Amendment arguments. And the remaining injunction factors strongly favor relief.

**I.** Under the EAA, public secondary schools that receive federal funding may not discriminate against student groups based on the content of their speech. The District discriminated against FCA's speech in two ways. First, Defendants explicitly condemned FCA's religious beliefs and excluded FCA from the District's student group forum because of the content of FCA's religious beliefs and religious speech. Second, Defendants are regulating the content of FCA's speech by banning FCA from selecting leaders who embrace its faith.

**II.** Under the Free Exercise Clause, the government must satisfy strict scrutiny unless the burden on religious exercise is both neutral and generally applicable. *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1877-1879 (2021). Here, the District's actions are neither, for three independent reasons: the District retains discretion to grant individualized exceptions from its policies; the District treats comparable secular activity more favorably than FCA's religious activity; and the District has acted with overt hostility toward FCA's religious beliefs.

**III.** Under free speech and assembly doctrine, once a public school has created a limited-public forum, it may not "exclude speech" where doing so is either "'[un]reasonable in light of the purpose served by the forum,'" or "discriminate[s] against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995). The District is unreasonably preventing FCA from selecting religious leaders in a limited public forum with the express purpose of allowing like-minded students to organize around shared views. It is also discriminating against FCA's religious viewpoint while leaving secular viewpoints on the same subjects untouched.

**IV.** The District's actions trigger strict scrutiny under the First Amendment's protections for religion, speech, and assembly. The District cannot pass that scrutiny.

**V.** The Religion Clauses forbid governments from interfering with the internal management decisions of religious institutions. By banning FCA from selecting leaders who embrace its faith, the District is unconstitutionally entangling itself in FCA's internal affairs and controlling who will lead FCA clubs in prayer and religious worship.

**VI.** The remaining injunction factors all strongly favor relief. Deprivation of religious exercise is itself irreparable harm, and the equities and public interest favor protection of religious liberty. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020).

22

**VII.** The district court abused its discretion in denying two of FCA's motions to supplement the record. The court offered no reasons for their denial, and the reasons it gave for granting one of FCA's motions apply to the other two.

## ARGUMENT

A preliminary injunction is appropriate when the plaintiff shows (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent relief, (3) the equities favor relief, and (4) relief is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1130 (9th Cir. 2011). When "the balance of hardships tips sharply in the plaintiff's favor," plaintiff need show only "serious questions going to the merits." *Id.* at 1134-35. And because FCA seeks resumed equal access to ASB-approved status—a return to the status quo—the requested injunction here is "a classic form of prohibitory injunction" that "prevents future constitutional violations." *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017).

The district court abused its discretion, and an injunction should be granted because FCA is very likely to succeed on its claims, and the remaining injunction factors are sharply in FCA's favor.

## I. The District's Actions Violate the Equal Access Act.

Congress enacted the Equal Access Act in 1984 with a "broad legislative purpose" to address "widespread discrimination against religious speech in public schools." *Bd. of Educ. v. Mergens*, 496 U.S. 226, 239

(1990). Under the EAA, if a public secondary school allows even one non-curriculum related student club to meet on campus during noninstructional time, it has created a "limited open forum" and is prohibited from denying other student clubs equal access to that forum based on the "religious, political, philosophical, or other content" of the other clubs' speech. 20 U.S.C. § 4071(a)-(b); *Mergens*, 496 U.S. at 236 (once "one 'non-curriculum related student group'" is allowed "to meet, the Act's obligations are triggered"); *Ceniceros v. Bd. of Trs. of the San Diego Unified Sch. Dist.*, 106 F.3d 878, 881 (9th Cir. 1997) (same). Notably, Congress chose not to incorporate into the EAA either the First Amendment's heightened viewpoint-discrimination requirement or its strict-scrutiny test. *See Mergens*, 496 U.S. at 242 (noting the EAA created the "limited open forum," an "artificial construct" distinct from the First Amendment "limited public forum" analysis). Thus, showing a content-based speech regulation alone is enough to require relief. *Prince v. Jacoby*, 303 F.3d 1074, 1078-79 (9th Cir. 2002); *Mergens*, 496 U.S. at 236.

Here, the District is undisputedly subject to the EAA and has established a limited open forum. 1-ER-14. And, as explained below, the District's exclusion of FCA is based on the *content* of FCA's religious speech. These two facts alone are all that is required to grant relief under the EAA. Yet the district court concluded that Defendants' actions were not content based, first by ignoring Plaintiffs' evidence of direct content discrimination, and second by eliding the difference—already recognized by

24

this Court—between religious *leadership* and *membership* requirements. That conclusion was in error. The record shows that Defendants' actions were taken in direct response to the content of FCA's religious speech, and the caselaw from this Circuit and the Supreme Court confirms that restrictions on leadership selection regulates the content of a group's speech.

## A. The District's targeting and harassment of FCA because of its religious speech violates the EAA.

The record confirms that Defendants targeted FCA's religious message for harassment and exclusion, denigrating FCA's religious speech and creating bespoke rules in response to FCA's attempt to obtain equal treatment in the District. This singling out of FCA based on the content of its religious speech is unlawful content discrimination in violation of the EAA.

Excluding a student club because of the message its speech conveys is textbook content discrimination. While a law may appear "'facially content neutral,'" government still violates content-regulation principles if it adopts or enforces a law "because the government disagreed with the message the regulated speech conveyed." *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019). For instance, *Colin v. Orange Unified School District* found that defendants' inflammatory statements, targeted changes in Board policy, and extended review of the Gay-Straight Alliance club's application demonstrated content-based discrimination

under the EAA. 83 F.Supp.2d 1135, 1148-49 (C.D. Cal. 2000). Similarly, the court in *Bible Club* found that government action targeting a disfavored group is "anathema to the EAA" and requires preliminary injunctive relief. *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F.Supp.2d 1291, 1300 (C.D. Cal. 2008) (school "only began enforcing its policy when it was faced with an application from a religiously oriented group" and enacted "closed-campus policy in response to an application from a Bible Club").

Here, District officials openly expressed their hostility to the content of FCA's religious beliefs and took actions to marginalize FCA because of them. District officials called FCA students' beliefs about marriage and sexuality "bullshit," declared that "evangelicals, like FCA" are "charlatans" who "choose darkness over knowledge," and agreed to present a "united front" against FCA students' beliefs. 10-ER-1897–98, 10-ER-1924–27. Principal Espiritu announced to the entire campus that "the Climate Committee and District officials" decided FCA was "no longer" welcome because Pioneer "disagree[d] with" FCA's beliefs and saw them as being "of a discriminatory nature." 6-ER-1008. And he testified that the "fact that [FCA's beliefs] existed" was alone "enough" to derecognize FCA. 6-ER-918–20.

Other District officials—including the District's 30(b)(6) witness—have similarly justified both their actions and FCA's derecognition by reference to the content of FCA's religious beliefs. *E.g.*, 7-ER-1229 (Mayhew

26

confirming that "the concern was that student leaders would have to agree with the belief that marriage is between one man and one woman"); 9-ER-1751–52, 9-ER-1756–57, 9-ER-1777 (District 30(b)(6) witness testifying that requiring applicant to "affirm a belief in Christianity" or any belief in any "key elements of the Christian faith" "in order to run for a leadership of the club" "violate[s] the all-comers policy"); 6-ER-1008 (GSA faculty advisor told school newspaper that FCA's beliefs were "a hurtful message"); *supra* 12-13.

By targeting the religious message conveyed by FCA's speech, District officials have plainly discriminated based on the content of FCA's speech. Under the EAA, such content discrimination is all that is needed to warrant an injunction ordering the District to provide Pioneer FCA with equal access to ASB benefits.

### B. Exclusion of FCA based on its religious leadership requirement violates the EAA.

The leadership of an expressive association inherently influences the expression of the group: "*who* speaks on [a club's] behalf … colors *what* concept is conveyed." *Martinez*, 561 U.S. at 680. Indeed, an expressive organization's "choice of a candidate is the most effective way in which that [organization] can communicate." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 570 (1995) (determining *who* marches in a parade is an expressive act protected by the Free Speech Clause).

27

This "principle applies with special force with respect to religious groups," since they are the "archetype of associations formed for expressive purposes," and "the *content* … of a religion's *message* depend[s] vitally on the character" of its leaders. *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 200-01 (2012) (Alito, J., joined by Kagan, J., concurring). Because "there can be no doubt that the messenger matters" when it comes to the "expression" of religious belief, *id.*, banning a religious group from having religious leaders inescapably regulates the content of its message.

Indeed, even outside the leadership context, both the Supreme Court and this Court have recognized that a government preference for certain *speakers* can be an impermissible proxy for a government preference for certain *speech*. *E.g.*, *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 658 (1994) ("[L]aws favoring some speakers over others demand strict scrutiny when the [government's] speaker preference reflects a content preference."); *Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020) ("[S]peaker-based regulations 'are all too often' content-based regulations in disguise." (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015))).

Accordingly, the leading case to consider application of a nondiscrimination policy to ban religious leadership selection, *Hsu v. Roslyn Union Free Sch. Dist.*, concluded the policy was impermissibly content-based. 85 F.3d 839 (2d Cir. 1996). As *Hsu* explained, leadership is "essential to the

expressive content of the [club's] meetings," and thus a rule against religious leadership "will affect the 'religious … content of the speech at [a club's] meetings,' within the meaning of the [EAA]." *Id.* at 848, 858.

This Court's decision in *Truth v. Kent School District* confirmed its consistency with *Hsu* and again noted the connection between leadership selection and the content of a group's speech. 542 F.3d 634, 647 (9th Cir. 2008), *overruled on other grounds by Los Angeles County v. Humphries*, 562 U.S. 29 (2010). Thus, while the district court was right that "*Truth* dealt with membership restrictions and this case concerns alleged leadership restrictions," 1-ER-15, it was wrong to conclude that this distinction is immaterial. *Compare* 1-ER-15 (treating leadership and membership restrictions as identical); *with Truth*, 542 F.3d at 647 ("The court's decision in *Hsu* is readily distinguishable from the case at hand. In *Hsu*, a Christian group was seeking to impose a religious test for all of its *leadership* positions. … In contrast, we are only concerned with *Truth*'s general *membership* requirements."). Indeed, neither the district court nor the District identified any EAA case to the contrary. 1-ER-16–18; 1-ER-44–45.

Nor could they on these facts. The District readily admits that club leaders are "essential" to a club's "direction," required to "communicate [its] message," and "should represent the club's purpose" and "viewpoints." 9-ER-1599–1600; 10-ER-2039. And this is certainly true for Pioneer FCA, as its leaders not only express its beliefs in religious teaching,

worship, and prayer, but also exemplify its beliefs with their lives. 10-ER-2018–19. "FCA's student leaders are the primary embodiment of FCA's faith and Christian message to the campuses where they serve, and their ministry determines the content of the FCA student groups' message." 10-ER-2019. Indeed, the "core function" of FCA's student leaders "is to express, message, and model FCA's faith." 10-ER-2019. For student leaders to "attempt to express [FCA's] faith without personally accepting it would compromise" the group's "mission" and "its message." 10-ER-2019.

What is more, there is no dispute that FCA lost ASB-approved status *because of* its religious leadership requirement. Principal Espiritu, who has the "final say" on approving Pioneer clubs, confirmed that Pioneer FCA would be ineligible for ASB benefits as long as it maintained the "same leadership requirements." 5-ER-782; 6-ER-911. These requirements remain unchanged. 10-ER-2019.[2]

---

[2] Further, *contra* the district court, 1-ER-14–15 and 1-ER-33–46, this analysis does not turn on evidence of government animus or hostility. Rather, "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech," a restriction is "content based" if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed,* 576 U.S. at 164, 165; *Prince*, 303 F.3d at 1080-81; *Fox*, 937 F.3d at 1227 (same); *Boyer*, 978 F.3d at 623. The District permits leadership selectivity generally. It forbids FCA's leadership selectivity because it is *religious*. That is content-based.

Thus, by admittedly excluding FCA based on its religious leadership requirements, the District has violated the EAA.

* * * *

While originally passed to protect religious student groups, the EAA has provided important protections to *all* student groups. A school's protection of student expression "must include the protection of unpopular ideas, for popular ideas have less need for protection" *Mahanoy Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038, 2046 (2021). In his *Mergens* concurrence, Justice Kennedy explained that "one of the consequences of the statute, as we now interpret it, is that clubs of a most controversial character might have access to the student life of high schools that in the past have given official recognition only to clubs of a more conventional kind." 496 U.S. at 259; *see also Colin*, 83 F.Supp.2d at 1142 (EAA protects the right of gay students to form a club on campus); *Straights & Gays for Equal. v. Osseo Area Schs.*, 471 F.3d 908, 909 (8th Cir. 2006) (same); *Gonzalez v. Sch. Bd. of Okeechobee Cnty.*, 571 F.Supp.2d 1257, 1270 (S.D. Fla. 2008) (same). If the District's open hostility to unpopular religious beliefs and its complete ban on religious leadership are allowed to stand, that will drastically weaken the EAA's longstanding and widespread success.

## II. The District's Actions Violate the Free Exercise Clause.

The District's denial of ASB approval to FCA also violates the Free Exercise Clause, which "'protect[s] religious observers against unequal

31

treatment' and subjects to the strictest scrutiny laws" that disfavor religion. *Trinity Lutheran Church v. Comer*, 137 S.Ct. 2012, 2019 (2017); *accord Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1232 (9th Cir. 2020). To avoid strict scrutiny, "laws burdening religious practice must" be both generally applicable and neutral. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993). The District's actions here are neither.

The District triggers strict scrutiny in three independent ways. First, the District has retained broad discretion to make individualized exemptions from its policy and has exercised that discretion, triggering scrutiny under *Fulton*, 141 S.Ct. at 1877, 1879 (2021). Second, the District treats comparable secular activity more favorably than FCA's religious activity, triggering scrutiny under *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021). Third, the District acted with overt hostility toward FCA's beliefs, which is fatal under *Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission*, 138 S.Ct. 1719 (2018).

The district court's contrary decision is in error. The district court cabined *Fulton* to its facts instead of following its clear reasoning. The court mentioned *Tandon* only in passing and instead erroneously relied on decade-old decisions that barely grappled with free-exercise caselaw, despite this Court's recognition that recent Supreme Court precedent like *Tandon* "represented a seismic shift in Free Exercise law." *Calvary Chapel*, 982 F.3d at 1232. And the district court completely ignored *Masterpiece*.

32

Each error requires reversal.

### A. The District's broad discretion to deviate from the policy renders the policy not generally applicable.

Under *Fulton*, a policy "is not generally applicable if it invites the government to consider the particular reasons" underlying requests for "individualized exemptions," because that invitation allows government officials "to decide which reasons for not complying with the policy are worthy of solicitude." 141 S.Ct. at 1877, 1879 (cleaned up). Such a policy must pass strict scrutiny, even where it only "incidentally" burdens religious exercise and it otherwise serves "weighty" interests. *Id.* at 1876, 1882.

In *Fulton*, Philadelphia applied a nondiscrimination policy to a Catholic contractor in a manner that burdened the contractor's religious exercise concerning same-sex marriage. *Id.* at 1875-76. Because Philadelphia had discretion to "grant exemptions [from the policy] based on the circumstances underlying each" situation, the policy was not generally applicable under the Free Exercise Clause and the City was required to satisfy strict scrutiny. *Id.* at 1877.

Here, the District's policies invite individualized government discretion in at least three ways, each of which defeats general applicability.

***First***, the District retains discretion when applying its nondiscrimination policy to its own programs and activities. On its face, the policy is a "comprehensive, district-wide policy," 8-ER-1361, which governs not

33

only student clubs but also the District and all of its activities and programs. 6-ER-1048; 4-ER-673; 9-ER-1724, 9-ER-1726. But while the District has applied its policy strictly to FCA, it admittedly retains discretion regarding how and even whether to apply the same policy to its own programs and activities. *Supra* 5; SJUSD Br.17-20. This discretion allows the District to "treat different students differently" based on criteria such as race, ethnicity, and sex whenever District officials believe their interest in doing so is sufficiently "compelling." SJUSD Br.18, 20 n.12; 9-ER-1653.

The District and its individual schools obtain this discretion in part from the District's "Board-adopted equity policy," which allows the District to pursue "high-quality outcomes for students" based on "factors that [District officials] believe may influence the students' ability to be successful in the system." 9-ER-1629–32; *accord* 9-ER-1654–55. This allows the District to "look at groups of students" based on "race, ethnicity, gender, sexual orientation, language, disability, and socioeconomic status" to ensure that "students get what they need." 9-ER-1629–30.

The mere existence of this discretion is sufficient to find a lack of general applicability. *Fulton*, 141 S.Ct. at 1879-80. But the District has also *exercised* this discretion, making this case even more straightforward. The District provides a "multitude" of programs that, while formally subject to the policy, in fact make distinctions based on criteria otherwise forbidden by it. 9-ER-1653. The Latino Male Mentorship

34

group was lauded by Principal Espiritu precisely *because* it discriminated based on sex and ethnicity, as it "helps, under the equity policy, individuals who need specific support from the school system." 9-ER-1816; 9-ER-1641; 9-ER-1644–47; 9-ER-1728–29. Similarly, the "Male Summit Conference" was for "[o]nly males," since "males usually do not get a higher education," a purpose that was "aligned" with the equity policy. 9-ER-1821; 9-ER-1646–47.

The District has also exercised its discretion for its sports and athletics programs, deviating from the nondiscrimination policy to allow dozens of sports teams to reject students based on their sex or gender identity, to obtain access to sports leagues that require single-sex competition. 7-ER-1287–88; 10-ER-1990 ¶24; 5-ER-869–70 (noting student sports teams have ASB accounts); 4-ER-670. *See also* 6-ER-998–99; 6-ER-893–94; 7-ER-1176–77; 7-ER-1180; 7-ER-1212 (cheerleading can select based on sex).

**Second**, at a more granular level, the District retains discretion to deny recognition to new student groups if they believe a club is "controversial." 5-ER-801–04; 5-ER-853. For instance, Principal Espiritu testified he would "rely heavily" on the "general climate of the school" in determining "whether to approve an ASB club." 5-ER-803. Exercising this discretion, he approved The Satanic Temple Club while declining approval to the "Make America Great Again" club. 5-ER-802–03, 854–55.

35

***Third***, the District retains discretion to permit student groups to exclude other students, fatally undermining its asserted interest in maintaining an "all comers" policy. The District allows each school to permit ASB-approved clubs to exclude students based on "non-discriminatory criteria." *Supra* at 14-15. The District leaves the determination of what qualifies as "non-discriminatory criteria" to the "common sense" discretion of each school's activities directors and principals. 9-ER-1739–40; 7-ER-1202; 7-ER-1249.

The District's history of exercising its discretion in each of these three ways makes this case even easier than the 9-0 decision in *Fulton*. There, the city had never exercised its discretion to grant an exemption from its nondiscrimination policy. Here, however, the District regularly and unapologetically exercises its discretion and has no intent to stop. *Supra* 18-19. And there, the government tried to pass strict scrutiny. Here, the District made no such effort. *Fulton* requires reversal.

### B. The District's exemptions to the policy render it not generally applicable.

"[T]reat[ing] *any* comparable secular activity more favorably than religious exercise" likewise "trigger[s] strict scrutiny." *Tandon*, 141 S.Ct. at 1296; *accord Diocese of Brooklyn*, 141 S.Ct. at 67. Comparability is assessed by looking at the harm to the government's asserted interests. *Id.* A policy that treats religious activities less favorably than "secular

conduct that undermines the government's asserted interests in a similar way" "lacks general applicability." *Fulton*, 141 S.Ct. at 1877.

***The District's Interests***. The District has asserted that FCA may not require its student leaders to share its religious beliefs, because that would violate the District's all-comers policy. 9-ER-1726; 8-ER-1361. And the District has explained that the interests it is protecting with that policy are ensuring "equal access for all students to all programs," 9-ER-1722, and prohibiting discrimination on "enumerated bases" in "all" school programs and activities 9-ER-1726; 8-ER-1361.

***Comparable Activities***. Under *Tandon*, a single exemption for a "comparable secular activity" is enough to defeat general applicability. *Tandon*, 141 S.Ct. at 1296; *Doe v. San Diego Unified Sch. Dist.*, No. 21-56259, 2021 WL 5600620 (9th Cir. Nov. 28, 2021) (granting injunction pending appeal in Free Exercise case on the basis of a single categorical exemption to school district's challenged rule); *BLinC v. Univ. of Iowa*, No. 17-80, 2018 WL 4701879, at *15 (S.D. Iowa Jan. 23, 2018) (possible exemption for single club justified injunction). Here, the District permits several exemptions for comparable programs which directly undermine both its purported "all comers" interest and its claimed non-discrimination interest.

First, contrary to the all-comers policy, the District allows clubs to exclude students from leadership and membership opportunities based on criteria (like club participation, GPA, character, athletic and choral

ability, and competitive skill) that the District acknowledges are important to the success of these clubs and programs. *See*, *e.g.*, 6-ER-1049; 6-ER-998 ("Eligibility for choral and cheerleading groups shall be determined solely on the basis of objective competencies."). At the same time, the District prevents religious groups from requiring that their leaders agree with the groups' religious beliefs—arguably the *most* important criteria for the success of a religious student group.

Second, the District also unevenly applied its nondiscrimination policy to clubs. Pioneer's school activities director testified that Pioneer would allow, and previously had allowed, clubs to exclude male students as both members and leaders because all-female clubs help girls feel comfortable. 7-ER-1143–44; 7-ER-1217; see 10-ER-1935–45; 10-ER-2008–13; *supra* 15-16. The Senior Women club at Leland High expressly wrote into this past year's ASB application that it only accepts female-identifying students and that it excludes non-female-identifying students. 2-ER-164. And Leland's South Asian Heritage Club maintains a preference for members with South Asian heritage. 2-ER-109.

Third, the District has granted exemptions from its nondiscrimination policy to a "multitude" of District-operated programs and activities for students that are permitted to make distinctions and grant preferences based on race, sex, marital status, and parental status. *See, e.g.*, 7-ER-1287 ("single-gender [athletics] teams"); 9-ER-1639–41 (explaining that the District "identif[ies] systemic issues" on the basis of race

38

and gender, among other characteristics, and tailors specific programs to address those specific racial and gendered groups); SJUSD Br.20 n.12; 9-ER-1816 (Latino Male Mentor Group); 10-ER-1941 (Girls' Circle); 10-ER-1966 ("Mr. GQ"); 10-ER-1968 ("Mr. Mustang"); 6-ER-1008 ("Mustang Madness").

*Application*. The District asserts its interest in maintaining the all-comers policy is ensuring "equal access for all students to all programs," 9-ER-1722, and its interest in the nondiscrimination policy is prohibiting discrimination on "enumerated bases" in "all" school programs and activities 9-ER-1726; 8-ER-1361. "All" means "all." The District strictly enforces those policies against FCA, but allows secular exemptions that harm the purported interests far more than FCA does. Under *Tandon*, that makes the policy not generally applicable and requires strict scrutiny.

## C. The District is not neutral toward FCA's religious beliefs.

The government triggers strict scrutiny under the Free Exercise Clause's independent neutrality requirement if its actions raise "even slight suspicion" they "stem from animosity to religion or distrust of its practices." *Masterpiece*, 138 S.Ct. at 1731. The District's exclusion of FCA students because of their "decent and honorable" religious beliefs about marriage and sexuality accordingly violates the First Amendment. *Obergefell v. Hodges*, 576 U.S. 644, 672, 679-80 (2015).

Indeed, this case is even easier than *Masterpiece* because Defendants' animus is not merely suspected, but overt. Glasser disparaged FCA's beliefs in writing on his classroom whiteboard during school hours. 4-ER-575–76; 3-ER-415. Glasser and other District employees with authority over FCA's student leaders called FCA's religious beliefs "bullshit," "of a discriminatory nature," and "a hurtful message and a problem." SJUSD Br.6, 19. Pioneer's "Climate Committee" took "a united stance" against FCA because FCA's Statement of Faith "goes against core values" of Pioneer. 7-ER-1273. Principal Espiritu himself admitted that the mere existence of FCA's religious beliefs was sufficient in his mind to deny FCA recognition. 6-ER-919–20.

Far from being just a few "stray remarks" with no influence on the derecognition decision, Glasser's and others' derogatory and hostile statements were made by influential school officials during the District's extremely short ten-day decision-making process. The District acknowledges that Espiritu and his staff share responsibility for the initial derecognition decision and for future recognition decisions. 8-ER-1320–21; 8-ER-1333; 8-ER-1347–48; 8-ER-1403. Espiritu's initial investigation into Pioneer FCA was instigated by Glasser, 6-ER-1053; 3-ER-368–69, who lobbied Espiritu during the short decisional process to derecognize Pioneer FCA due to its "bullshit" beliefs. 3-ER-404. Glasser and other District officials continuously disparaged FCA's Christian beliefs to

Espiritu, District employees, and students in a successful effort to persuade them to derecognize and marginalize Pioneer FCA. 4-ER-575–76; 4-ER-590; 4-ER-614; *see also* 3-ER-401–07 (suggesting accusing Pioneer FCA of sexual harassment to "gain leverage to push the FCA into getting rid of the leadership requirements" and to "ban FCA completely from campus").

Espiritu admits he never took any steps to correct Glasser or any other teachers—despite Glasser's announcement that he was "professionally bound" to do the same against FCA in the future—and testified that Glasser's actions were permitted by District policy. 3-ER-371–72; 3-ER-380–81; 3-ER-396; 3-ER-416; 4-ER-683. District employees testified that they targeted and derecognized FCA because of the group's religious beliefs, specifically "two beliefs" about marriage and sexuality. 4-ER-575–76; 4-ER-604–05 (admitting that the statements he attacked were "statement[s] of religious belief"); 6-ER-914, 195:10-19 ("The FCA sexual purity statement is what prompted us to derecognize FCA as an official club.").

All of this violates the Free Exercise Clause. As Justice Kennedy emphasized, "the government, if it is to respect the Constitution's guarantee of free exercise … cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece*, 138 S.Ct. at 1731 (discussing *Lukumi*, 508 U.S. at 534). Cursing students' religious beliefs while conspiring to expel their group certainly

counts. So does announcing to the whole campus that a students' group was being expelled because the school "disagree[d] with" the students' religious beliefs and saw them as being "of a discriminatory nature." Approving a new student group formed to harass these students for their religious beliefs does too. Summoning a freshman girl to the principal's office as the price of doing what other clubs can do automatically—even after being warned by the school counselor that the student was anxious and afraid—counts as well. 3-ER-420-22. Without even reaching strict scrutiny, then, the District's actions must be enjoined. *Kennedy v. Bremerton Sch. Dist.*, __ S.Ct. __, No. 21-418, 2022 WL 2295034, at *9 n.1 (June 27, 2022) (citing *Masterpiece*).

### D. The district court's contrary ruling was in error.

The district court failed to address FCA's neutrality arguments. *See* ECF 102 at 27-28; ECF 115 at 15-18. The court never mentioned, much less distinguished, *Masterpiece*. Its only analysis of neutrality came in the context of the free speech and EAA arguments. That alone is grounds for reversal. *Hurn v. Ret. Fund Tr.*, 648 F.2d 1252, 1254 (9th Cir. 1981) ("a denial without stated reasons, where the reasons are not readily apparent, constitutes an abuse of discretion").

The court's general applicability analysis likewise erred, in four ways.

***First***, the district court refused to take the District at its word that it was regulating FCA under an "All Comers Policy" meant to "be imple-

mented and construed in accordance with the all comers policy" in *Martinez*. 4-ER-702. The words "All Comers Policy" don't even show up in the court's opinion, which instead treated the only relevant policy as concerning nondiscrimination based on "protected classifications." 1-ER-11. But that's not what the text of the policy says, 6-ER-1048, not what District officials testified to, 9-ER-1695, and not what Defendants argued below. SJUSD Br.1.

***Second***, the district court erred by cabining *Fulton* to only policies that expressly allow exemptions on their face. 1-ER-16. But what *Fulton* said triggered strict scrutiny was a scheme that "invites the government to decide which reasons for not complying with the policy are worthy of solicitude." 141 S.Ct. at 1879 (cleaned up). And that's precisely what the District has admitted exists here—it reserves the discretion to determine that some reasons for departing from the policy are sufficiently "compelling." SJUSD Br.18, 20 n.12.

The district court's *Fulton* analysis further erred because there *is* a policy that blesses the District's unfettered discretion: the "Board-adopted equity policy," which supports District officials engaging in otherwise forbidden discrimination where they "believe" it "may influence the students' ability to be successful." 9-ER-1626–32; 8-ER-1499.

***Third***, the district court improperly "limit[ed] its analysis to student groups seeking ASB recognition," treating them as the sole relevant comparators. 1-ER-17. The only rationale the court offered was that this

43

limit was proper under the EAA, *id.*, but it then applied that limit to its Free Exercise analysis. *id.* at 14-15 (reviewing only exceptions for "ASB clubs"). But "for purposes of the Free Exercise Clause," "whether two activities are comparable … *must* be judged against the asserted government interest that justifies the regulation at issue," *Tandon*, 141 S.Ct. at 1296 (emphasis added), not in the gerrymandered lines the government artificially draws around disfavored religious groups. *See Carson v. Makin*, __ S.Ct. __, 2022 WL 2203333, at *9 (June 21, 2022) (Courts "must survey meticulously the circumstances of governmental categories to eliminate … religious gerrymanders" (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring))). And the stated non-discrimination policy interests here expressly apply not just to ASB clubs, but to *all* District programs and activities.

This would be true if the policies applied to FCA did not expressly apply to all other District programs and activities. Even then, they would still be relevant comparators for purposes of the District's claimed interest in preventing certain specific forms of discrimination against students. The "definition of a particular program can always be manipulated" to attempt to avoid free exercise scrutiny, which would leave "the First Amendment reduced to a simple semantic exercise." *Id.* at *9 (quoting *Agency for Int'l Dev. v. AOSI*, 570 U.S. 205, 215 (2013) (cleaned up)).

Thus, for instance, *Lukumi* looked not only to the specific "ordinances prohibiting" religious exercise for express exemptions, but also to conduct that "the ordinances did not regulate" but which still "posed a similar hazard" to the government's "claimed" interests. *Fulton*, 141 S.Ct. at 1877 (citing 508 U.S. at 524, 544-45). And *Tandon* "summarily rejected" a ruling that artificially compared only secular and religious in-home gatherings for purposes of the government's interests in controlling COVID, and which refused to consider "commercial activity in public buildings" that equally threatened the government's interests. *Compare* 141 S.Ct. at 1297, *with* 992 F.3d 916, 923 (9th Cir. 2021). As the Sixth Circuit explained, a "myopic focus solely on the provision that regulates religious conduct," and not on other forms of unregulated secular conduct that similarly threatens the government's claimed interests, would "allow for easy evasion of the Free Exercise guarantee of equal treatment." *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 481 (6th Cir. 2020).

If anything, the District's broad exemptions for *its own* programs and activities undermines the District's asserted interests far more than FCA ever could. These broad forms of discrimination carry the District's own "imprimatur," SJUSD Br.19, and exclude countless more students than a single student club. How can the District legitimately care more that a private religious group asks its leaders to agree with its religion

than it does that District employees exclude Black girls from the Latino male mentorship group?

Further, many District programs are not meaningfully distinguishable from standard student clubs for purposes of the District's claimed interests. Girls' Circle has student "members," meets at the same time as student clubs, and is meant to "create[] a safe conversation space" that allows "students to build connections with each other." Yet the District claims that gender discrimination by Girls Circle is permissible because it is a *District* student group instead of a *private* one. *Supra* 8. That is not the law; the "substance of free exercise protections" does not turn on "the presence or absence of magic words." *Carson*, 2022 WL 2203333 at *9.

**Fourth**, and finally, the district court unpersuasively distinguished exemptions made for ASB-approved student clubs. For instance, the district court quibbled with the South Asian group's racial preference because, while the group intended to "prioritize" South Asian members, it was "fine" for non-South Asians to join. 1-ER-19. But preferring students based on their ethnicity is still a facial violation of the District's policy. 6-ER-1048. The court also speculated that the "Senior *Women*" club didn't really mean to restrict their club to women despite hand-writing onto their approved ASB application that they would accept only "female-identifying members," *and* hand-writing that they would *exclude*

any non-female-identifying individuals. 1-ER-18. But the District produced no evidence that it had confirmed as much, nor why the form's boilerplate was enough to assuage any concerns. And that incuriousness only points up a major First Amendment problem in the District's whole scheme: favored groups get a presumption of innocence; FCA gets the third degree. *See infra* 54.

## III. The District's Actions Violate the Free Speech and Assembly Clauses.

The First Amendment problems with the District's actions do not stop with the Free Exercise Clause. Instead, by "withhold[ing] benefits from [FCA clubs] because of their religious outlook," the District is also violating both the Free Speech and Assembly Clauses. *Martinez*, 561 U.S. at 685 (speech and association); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 864 (7th Cir. 2006) (same); *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (assembly); *InterVarsity Christian Fellowship v. Bd. of Governors of Wayne State Univ.*, 534 F.Supp.3d 785, 827 (E.D. Mich. 2021) (analyzing "assembly claim in conjunction with … speech and association claims.").

Under decades of precedent governing student-group fora, once a public school has opened a limited-public forum, it may neither "exclude speech" where doing so is "'[un]reasonable in light of the purpose served by the forum,'" nor "discriminate against speech on the basis of its viewpoint." *Rosenberger,* 515 U.S. at 829. The District does both.

**A. The District's exclusion of FCA is unreasonable.**

A content-based limitation is reasonable only if it "respect[s] the lawful boundaries [the forum] has itself set." *Id.* For example, a forum dedicated to the exchange of *students'* ideas about *art* can reasonably exclude *non*-student speech about *science*. *Martinez*, 561 U.S. at 703 (Kennedy, J., concurring). But it cannot make "other content-based judgments" that disrespect the forum's own boundaries. *Id.*

The District runs directly contrary to this principle. It created a forum in which ASB-recognized clubs have "rights to express ideas and opinions, take stands on issues, and support causes, even when such speech is controversial or unpopular," and mandates that no student shall be disciplined "solely on the basis of speech … that would be constitutionally protected when engaged in outside of school." 4-ER-652. It applied that principle to accommodate the speech of *other* clubs protesting *against* FCA, 6-ER-965–96, and to approve The Satanic Temple Club despite acknowledging that it could be considered controversial. 5-ER-802. Because it created a limited public forum with the express purpose of allowing like-minded students to organize around shared interests, *supra* 5-6—including protected speech and beliefs that are "controversial or unpopular," Blomberg Decl., Ex. A (BP 5145.2); 9-ER-1706 (ASB policies must obey Board policies)—the District's refusal to recognize student FCA groups because FCA requires its leaders to share its religious beliefs is not reasonable. Students cannot associate around hidden beliefs, and an

organization—especially a religious one—cannot survive without leaders who agree with and promote those beliefs. *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., joined by Kagan, J., concurring) ("A religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses."); 9-ER-1598; 10-ER-2018–20 ¶¶15, 16, 20.

Nor is it any answer, as the district court thought (1-ER-10), that students might find FCA's criteria offensive. That is not only content-based, but also expressly forbidden by Board policies guaranteeing students "rights to express ideas … *even when such speech is controversial or unpopular*." 10-ER-1833 (emphasis added). Moreover, allowing secular groups to require agreement with *secular* beliefs, but banning religious groups from requiring agreement with *religious* beliefs, is exactly the kind of content-based limitation on a student-group forum forbidden by the reasonableness standard. *Wayne State*, 534 F.Supp.3d at 819.

The District's policy is also not reasonable because it fails to employ a "'definite and objective'" standard that "'prevent[s] arbitrary or discriminatory enforcement.'" *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 651 (9th Cir. 2019); *accord Wayne State*, 534 F.Supp.3d at 819 (failure to create "objective, workable standard" flunked reasonableness test for student-group forum (quoting *AFDI v. SMART*, 978 F.3d 481, 497 (6th Cir. 2020)). Without such "objective standards, government officials may use their discretion to interpret the policy as a

pretext for censorship." *Hopper v. City of Pasco*, 241 F.3d 1067, 1077 (9th Cir. 2001). As described above, the District's amorphous "nondiscriminatory policy," replete with its hodgepodge of inscrutable exceptions and exacerbated by the District's failure to train employees on its operation, leaves officials with standardless discretion to find groups in violation when they see fit. *Supra* II.A.

**B. The District is discriminating based on viewpoint.**

Viewpoint discrimination is a "blatant" and "egregious" violation of free speech that is "presumptively" unconstitutional. *Rosenberger*, 515 U.S. at 829-30. Public schools engage in viewpoint discrimination when their actions turn on the "ideology or the opinion or perspective of the speaker," *id.* at 829, or where there is "an effort to suppress expression merely because public officials oppose the speaker's view,'" *Minn. Voters All. v. Mansky*, 138 S.Ct. 1876, 1885 (2018). Here, the District has engaged in viewpoint discrimination five times over.

***First***, the District disfavored religious views because of their religious perspective while leaving similar secular views unregulated. Religion is indisputably a viewpoint, as it provides "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Rosenberger*, 515 U.S. at 831. And bedrock First Amendment principles dictate government cannot "regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993).

The District's policy does precisely this, allowing secular moral codes while preventing religious ones. Longstanding secular clubs can exclude students from *any* role in the club if they are deemed not to have *secular* "good moral character" necessary for their secular mission, *supra* 15. But FCA cannot ask its *leaders* to exemplify the *religious* moral character required to express its religious message. It's been "quite clear" for decades that the First Amendment prohibits a public school from allowing secular groups to espouse values on "character" from a secular perspective while excluding religious groups from sharing their views from a religious perspective. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 109-12 (2001); *see also Lamb's Chapel*, 508 U.S. at 393 (school could not permit "views about family issues and child rearing [but exclude] those dealing with the subject matter from a religious standpoint").

**Second**, the District's actions against FCA are precisely because school officials "oppose the speaker's view.'" *Mansky*, 138 S.Ct. at 1885. The District asserts that it is merely applying its nondiscrimination policy evenhandedly. But even were this true (it is not), "a proffered justification [that] is facially reasonable … cannot save a regulation 'that is in fact based on the desire to suppress a particular point of view.'" *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 971 (9th Cir. 2002), *abrogated on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, (2008) (granting preliminary injunction); *see also BLinC v. Univ. of Iowa*, 991 F.3d 969, 985 (8th Cir. 2021) ("A nondiscrimination policy neutral on

its face violates a student group's rights to free speech and expressive association if not applied in a viewpoint-neutral manner."). Where "the government is plainly motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum, it is regulating a viewpoint rather than a subject matter." *Sammartano*, 303 F.3d at 971. That is precisely what occurred here: there is extensive evidence of religious targeting, but *no* evidence that *any* student's leadership application was ever denied due to FCA's religious leadership requirements, or even that FCA's "offensive" religious beliefs had ever been discussed on campus. *Contra Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 801 (9th Cir. 2011) (no evidence of intentional suppression).

***Third***, the District selectively enforces its nondiscrimination policies, making *ad hoc* exceptions for popular groups and activities, like sports and choir and the Senior Women club, to discriminate based on protected characteristics. But no exception is available for FCA. It is undisputed that this is because of FCA's religious views. *Supra* I.A; 7-ER-1267 *see also* 6-ER-919–20, 9-ER-1750. The District's discrimination toward FCA and its targeted rationales for continued selective enforcement prove that its refusal to grant ASB recognition to FCA in the coming school year is based in viewpoint discrimination. *See Reed*, 648 F.3d at 803 (policy may "be unconstitutional if not applied uniformly"); *BLinC*, 991 F.3d at 985 (8th Cir. 2021) (confirming "selective enforcement of a nondiscrimination policy violates [a] student group's free speech").

52

The myriad exceptions to the District's policy also set FCA's speech and association claims apart from those in *Martinez*. Despite its label, the District's "All Comers Policy" does not require "*all* student groups to accept *all* comers." *Martinez*, 561 U.S. at 694 (emphases in original). Broadly permitting District student groups to select members and leaders based on various criteria, but penalizing FCA for doing the same, "denie[s] benefits based on the organization's message." *Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2382 (2021) (citing *Healy v. James*, 408 U.S. 169 (1972)).

**Fourth**, the District's intentionally myopic reliance on complaint-driven enforcement empowers a "heckler's veto" to silence unpopular viewpoints. *Ctr. for Bio-Ethical Reform v. L.A. County*, 533 F.3d 780, 787-88 (9th Cir. 2008). This bedrock doctrine has, for decades, required that "the government … not give weight to the audience's negative reaction" when regulating speech. *Id.* at 789; *see also, e.g.*, *Cox v. Louisiana*, 379 U.S. 536, 551 (1965) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise."); *Bible Believers v. Wayne County*, 805 F.3d 228, 248, 250 (6th Cir. 2015) (en banc) ("The heckler's veto is … odious viewpoint discrimination" that violates speech and assembly rights).

District officials charged with regulating student clubs admitted that even where they knew that a student club was likely in violation of its all comers policy, they would not investigate or enforce the policy absent a

complaint. 5-ER-863–64; 7-ER-1165; 9-ER-1593–94. This willful-blind-ness enforcement scheme allows the District to ignore socially popular forms of "discrimination" (such as single-sex sports teams or the Senior Women), while excluding unpopular ones. *Compare* 5-ER-858 *with* 5-ER-863; *see also* 7-ER-1142–44, 7-ER-1217 (student group advertised "all fe-male" membership in school newspaper without controversy or investi-gation). The First Amendment does not tolerate such intentional distinc-tions.

***Fifth***, the District has subjected FCA to "unique scrutiny" not imposed on any other club, which itself shows viewpoint discrimination. *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017). FCA is the *only* Pioneer club to ever have its ASB status revoked due to its leadership criteria, 7-ER-1242–43; the *only* Pioneer club to face severe public protests, 7-ER-1089; the *only* club District-wide to have had its ASB revocation approved by District superintendents, 9-ER-1564; and the *only* club whose leaders were required to meet with the principal as a condition of participating in Club Rush, 3-ER-421. This unique scrutiny of FCA is thus proof of viewpoint discrimination.

## IV. The District's Actions Fail Strict Scrutiny.

Because the District has burdened FCA's First Amendment rights, its actions must survive the "strictest scrutiny." *Trinity Lutheran*, 137 S.Ct. at 2019. This means they "must be narrowly tailored to serve a compel-ling state interest," *Calvary Chapel*, 982 F.3d at 1234 (cleaned up). The

District must provide *proof* to meet its heavy burden. Neither "speculation" and "conjecture" nor "broadly formulated interests" will suffice; it must show specific harms will result if it "grant[s] specific exemptions to particular religious claimants." *Fulton*, 141 S.Ct. at 1881; *Ramirez v. Collier*, 142 S.Ct. 1264, 1280 (2022).

But the District did not attempt to meet its burden below. Nor could it. The District's myriad "exceptions … undermines [its] contention that its non-discrimination policies can brook no departures." *Fulton*, 141 S.Ct. at 1882; *InterVarsity Christian Fellowship v. Univ. of Iowa*, 408 F.Supp.3d 960, 984 (S.D. Iowa 2019) (same). And its failure to "demonstrate[] that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice" dooms any attempt to show its ban on FCA is narrowly tailored. *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005); 4-ER-648 (other California FCA clubs remain recognized).

Because the District fails strict scrutiny, this Court should remand with instructions for the district court to enter an injunction.

## V. The District's Actions Violate the Religion Clauses.

By banning FCA from ensuring that its leaders sincerely embrace its religious beliefs, the District has also usurped the right of FCA and its clubs "to establish their own rules and regulations for internal … government" and "standard of morals." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724, 714 (1976).

An important "component of [religious] autonomy is the selection of the individuals who play certain key roles." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020). The First Amendment provides religious groups a "broad right to control the selection of … religious leaders," *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017), which means the government cannot contradict a religious organization's choice of "who its spiritual leaders w[ill] be." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835-36 (6th Cir. 2015). This ensures that governments don't become "entangled in essentially religious controversies," like disputes over "standards of morals" or decisions regarding who may properly lead religious worship or prayer. *Milivojevich*, 426 U.S. at 709, 713-14.

Completely denying FCA the ability to ask its leaders to sincerely believe in the existence of God is an obvious violation of the Religion Clauses' protection for important internal management decisions. *Wayne State*, 534 F.Supp.3d at 802 (recognizing student groups have "deeply ingrained right … to select their leaders"). Indeed, there "can be no clearer example of an intrusion into the internal structure or affairs" of a religious student group than forcing it to accept leaders who do not share its faith, since that "would cause the group as it currently identifies itself to cease to exist." *Walker*, 453 F.3d at 861, 863.

The district court's only basis for rejecting FCA's right to religious autonomy was that FCA was not a "religious institution" akin to the religious school in *Our Lady*. 1-ER-13. But an institution "need not be a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization" to qualify for religious leadership protection, so long as its mission is marked by clear or obvious religious characteristics." *Conlon*, 777 F.3d at 834 (holding that a Christian campus organization was a religious organization); *Wayne State*, 534 F.Supp.3d at 807-08 (applying *Conlon* to protect campus organization). Like the Christian campus group in *Conlon*, FCA has a religious name, mission, ministry, and teaching—"clear" and "obvious religious characteristics" that underscore FCA is a religious institution with a right to religious autonomy. *Cf.* ECF 137-4 at 194 ("FCA is a religious nonprofit corporation and is recognized as a church by the Internal Revenue Service.").

The District's ban on religious leadership intrudes on FCA's religious autonomy, requiring injunctive relief.

## VI. The Remaining Injunction Factors Favor Granting Relief.

In addition to likelihood of success or a serious question on the merits, the likelihood of irreparable harm absent relief, the balance of equities, and the public interest all favor FCA. *See Cottrell*, 632 F.3d at 1135. These factors are considered on a "sliding scale," on which "serious questions going to the merits and a balance of hardships that tips sharply

towards the plaintiff can support issuance of a preliminary injunction." *Id.* at 1134-35.

**Irreparable Harm.** Irreparable harm is "relatively easy to establish" in the First Amendment context. *CTIA v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). Loss of First Amendment and EAA rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Diocese of Brooklyn*, 141 S.Ct. at 67; *Hsu*, 85 F.3d at 872; *accord Straights & Gays for Equal.*, 471 F.3d at 913 (recognizing "presumption of irreparable harm" for EAA claims because the EAA "protects free speech rights and expressive liberties"). Because FCA has demonstrated that its constitutional and civil rights are being violated, it has demonstrated irreparable harm.

FCA will additionally suffer irreparable injury in the coming school year because it will once again be barred from the benefits recognized student groups receive. *Supra* 17-18. Courts have repeatedly held that such derecognition is a significant and enduring harm to student groups. *See, e.g.*, *Bible Club*, 573 F.Supp.2d at 1300 (denial of a Christian club risked irreparable harm when it could affect recruitment efforts and delayed "preparations for club activities for the upcoming school year"); *Walker*, 453 F.3d at 867 (denial of recognition "constitute[d] irreparable injur[y]"); *Intervarsity Christian Fellowship v. Univ. of Iowa*, 5 F.4th 855, 862 (8th Cir. 2021) (deregistration caused student group to "struggle[]

with recruiting members, organizing activities" and caused the group to lose "a significant number of members").

Finally, stigmatizing FCA and its religious beliefs, sending a message to FCA members that they are not equal to their peers, is religious discrimination, which "is by itself an irreparable harm." *Singh v. Carter*, 168 F.Supp.3d 216, 233 (D.D.C. 2016).

**Balance of Equities and the Public Interest.** The balance of equities and the public interest "merge" because the District is a government entity. *Nken v. Holder*, 556 U.S. 418, 435 (2009). That FCA has "raised serious First Amendment questions" alone "compels a finding that the balance of hardships tips sharply in [FCA's] favor." *Am. Beverage Ass'n v. City & County of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019) (cleaned up). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* The same is true of FCA's EAA claims. *Straights & Gays for Equal.*, 471 F.3d at 913.

Without relief, Pioneer FCA may soon cease to exist, just like other derecognized FCA clubs in the District. Before this controversy, it had numerous leaders and members and held school-wide events that attracted crowds of students. 10-ER-2021. Now all that remains is a handful of students who, with good cause, fear more retaliation. 2-ER-71. Without relief, some of those students will graduate next year without having ever known a time when their high school wasn't discriminating against their club. *Colin*, 83 F.Supp.2d at 1149.

By contrast, the District will suffer, at best, minimal harm. No District high school student has *ever* complained that they were prevented from obtaining desired leadership positions within FCA by its religious leadership standards. Nor were there any complaints when the District re-recognized Pioneer FCA for the entire 2021-22 school year. In any event, "high school students are subjected to discrimination and selection all the time" within the District without incident—it's a fact of daily life. *Hsu*, 85 F.3d at 871 (citing "girls and boys [sports] teams," limiting honor roll membership, and the exclusion of "students who do not maintain a certain grade point average" from extracurriculars as examples of "discrimination" common "in a high school setting"). If dozens of sports teams and a "multitude" of District programs can exclude students based on criteria such as race, sex, or gender identity, there's no urgency to excluding FCA. To the contrary, the District's ongoing constitutional harm warrants immediate injunctive relief.

## VII. The District Court Improperly Rejected Plaintiffs' Supplemental Evidence.

During the depositions of three witnesses in June and July of 2021, Defendants' counsel instructed each witness not to answer questions about District investigations into Glasser's misconduct toward FCA. The magistrate judge rejected those instructions, allowing the depositions to be reopened since the testimony would likely be "highly relevant." ECF 97 at 4. The depositions revealed new evidence of systemic discrimination

against FCA viewpoint and the District's intent to continue excluding FCA. But the full transcripts of these depositions were not available until October 21, 2022, well after preliminary injunction briefing was complete. On October 22, FCA filed a timely motion to supplement the preliminary injunction record with the transcripts. ECF 125.

Similarly, on May 22, 2022, FCA timely filed a second motion to supplement the preliminary injunction record with one brief declaration and a single attachment, both of which provided new relevant information about the ongoing meetings held by Pioneer FCA during the 2021-2022 academic year and that did not exist when injunction briefing concluded. ECF 192, 192-2 (describing three meetings held by Pioneer FCA in the spring of 2022 and attaching a current Pioneer junior's FCA student leader application completed on May 2, 2022 to co-lead Pioneer FCA in the 2022-2023 academic year).

The district court denied both motions without explanation. 1-ER-21-–22. At the same time, however, the district court granted a different motion by FCA to supplement the preliminary injunction record, on the grounds that it provided relevant and previously unavailable evidence. *See* ECF 177; 1-ER-18; 1-ER-21–22. But the evidence in both denied motions was likewise relevant and previously unavailable. Failing to provide any explanation for its denial and differential treatment among the motions was an abuse of discretion. *Ocean Beauty Seafoods v. Pac. Sea-*

*food Grp.*, 611 F. App'x 385, 387 (9th Cir. 2015) (denial of motion to supplement preliminary injunction record was abuse of discretion when evidence was "timely" and "highly relevant"); *Resilient Floor Covering v. Michael's Floor Covering*, 801 F.3d 1079, 1088 (9th Cir. 2015) ("illogical" application of "correct legal standard" abuses discretion).

## CONCLUSION

The Court should reverse the district court and remand the case with instructions to enter FCA's requested injunction.

Respectfully submitted,

*/s/ Daniel H. Blomberg*

KIMBERLEE WOOD COLBY
CENTER FOR LAW & RELIGIOUS
   FREEDOM
8001 Braddock Road, Suite 302
Springfield, VA 22151
(703) 642-1070
*kcolby@clsnet.org*

CHRISTOPHER J. SCHWEICKERT
SETO WOOD & SCHWEICKERT LLP
2300 Contra Costa Boulevard
   Suite 310
Pleasant Hill, CA 94523
(925) 938-6100
*cjs@wcjuris.com*

DANIEL H. BLOMBERG
  C*ounsel of Record*
ERIC S. BAXTER
NICHOLAS R. REAVES
ABIGAIL E. SMITH
JAMES J. KIM
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
   Suite 400
Washington, DC 20006
(202) 955-0095
*dblomberg@becketlaw.org*

June 27, 2022

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,987 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 27, 2022. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg

**ADDENDUM**

Pertinent Constitutional Provisions, Treaties, and Statutes

# Table of Contents

**Page**

First Amendment ...................................................................... 67

Equal Access Act (20 U.S.C. § 4071 *et seq.*) ........................................... 68

**First Amendment to the United States Constitution**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**Equal Access Act, 20 U.S.C. § 4071 *et seq.***

**(a)  Restriction of limited open forum on basis of religious, political, philosophical, or other speech content prohibited**

It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

**(b)  "Limited open forum" defined**

A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time.

**(c)  Fair opportunity criteria**

Schools shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum if such school uniformly provides that—

(1) the meeting is voluntary and student-initiated;

(2) there is no sponsorship of the meeting by the school, the government, or its agents or employees;

(3) employees or agents of the school or government are present at religious meetings only in a nonparticipatory capacity;

(4) the meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school; and

(5) nonschool persons may not direct, conduct, control, or regularly attend activities of student groups.

**(d)   Construction of subchapter with respect to certain rights**

Nothing in this subchapter shall be construed to authorize the United States or any State or political subdivision thereof—

(1) to influence the form or content of any prayer or other religious activity;

(2) to require any person to participate in prayer or other religious activity;

(3) to expend public funds beyond the incidental cost of providing the space for student-initiated meetings;

(4) to compel any school agent or employee to attend a school meeting if the content of the speech at the meeting is contrary to the beliefs of the agent or employee;

(5) to sanction meetings that are otherwise unlawful;

(6) to limit the rights of groups of students which are not of a specified numerical size; or

(7) to abridge the constitutional rights of any person.

**(e)   Federal financial assistance to schools unaffected**

Notwithstanding the availability of any other remedy under the Constitution or the laws of the United States, nothing in this subchapter shall be

69

construed to authorize the United States to deny or withhold Federal financial assistance to any school.

**(f) Authority of schools with respect to order, discipline, well-being, and attendance concerns**

Nothing in this subchapter shall be construed to limit the authority of the school, its agents or employees, to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary.

As used in this subchapter—

(1) The term "secondary school" means a public school which provides secondary education as determined by State law.

(2) The term "sponsorship" includes the act of promoting, leading, or participating in a meeting. The assignment of a teacher, administrator, or other school employee to a meeting for custodial purposes does not constitute sponsorship of the meeting.

(3) The term "meeting" includes those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum.

(4) The term "noninstructional time" means time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends.

If any provision of this subchapter or the application thereof to any person or circumstances is judicially determined to be invalid, the provisions

of the remainder of the subchapter and the application to other persons or circumstances shall not be affected thereby.