No. 22-15827

_____

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**
_____

FELLOWSHIP OF CHRISTIAN ATHLETES, AN OKLAHOMA CORPORATION, ET AL.,

Plaintiffs-Appellants,

v.

SAN JOSE UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.,

Defendants-Appellees,

_____

Appeal from the United States District Court
For the Northern District of California
Honorable Haywood S. Gilliam, Jr.
(4:20-cv-02798-HSG)

_____

**DEFENDANTS-APPELLEES' ANSWERING BRIEF**
_____

Stephen Berzon
sberzon@altber.com
Stacey M. Leyton
sleyton@altber.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151

Richard B. Katskee
katskee@au.org
Kenneth D. Upton, Jr.
upton@au.org
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-3234

Amy R. Levine
alevine@DWKesq.com
Dannis Woliver Kelley
200 California Street, Suite 400
San Francisco, CA 94111
Telephone: (415) 543-4111

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ..................................................3

STANDARD OF REVIEW ...............................................................3

STATEMENT OF THE ISSUES.......................................................4

STATEMENT OF THE CASE...........................................................5

    A.  FCA Clubs' Discriminatory Leadership Requirements and
        Resulting Derecognition............................................................6

    B.  Current District Policy ...........................................................13

    C.  Absence of FCA Club Applications or Students Interested in
        Applying...................................................................................16

    D.  Procedural History .................................................................17

SUMMARY OF ARGUMENT .......................................................18

ARGUMENT ..................................................................................20

    I.   There is no justiciable controversy regarding prospective relief ...........20

        A.  Plaintiffs submitted no evidence that students face imminent
            injury from the all-comers policy ...................................20

        B.  The futility doctrine does not apply.............................23

        C.  If Plaintiffs' standing were analyzed as mootness, their claim
            for prospective relief still would not be justiciable ......................26

    II.  Plaintiffs have not shown imminent irreparable injury...........................28

i

III. Plaintiffs failed to establish likelihood of success on the merits ............28

    A. Plaintiffs are not likely to prevail on their Equal Access
       Act claim ......................................................................................29

    B. Plaintiffs failed to establish a likely free speech violation ...........33

        1. The Districts's policy is reasonable....................................35

        2. The Districts's policy is viewpoint-neutral .......................42

    C. Plaintiffs failed to establish a likely free exercise violation.........47

        1. *Martinez* provides the proper free exercise framework .....47

        2. The District treats secular and religious conduct
           identically under its neutral application of the
           nondiscrimination policy....................................................42

        3. The District was not motivated by animus........................53

    D. The District did not impermissibly interfere with FCA's
       internal management decisions ....................................................54

IV. The equities do not support a preliminary injunction .............................56

V. The District Court Properly Denied Plaintiffs' Motions To
   Supplement the Record ........................................................................57

CONCLUSION.................................................................................................59

CERTIFICATE OF COMPLIANCE....................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Delta Chi-Delta Chapter v. Reed*,
    648 F.3d 790 (9th Cir. 2011) ..................................................................*passim*

*Altman v. Bedford Cent. Sch. Dist.*,
    245 F.3d 49 (2d Cir. 2001) ...............................................................27

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
    950 F.2d 1401 (9th Cir. 1991) ...........................................................20

*ATU Local 1015 v. Spokane Transit Authority*,
    929 F.3d 643 (9th Cir. 2019) .............................................................38

*Bates v. United Parcel Serv., Inc.*,
    511 F.3d 974 (9th Cir. 2007) ................................................20, 21, 23

*Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*,
    420 U.S. 128 (1975)...........................................................................27

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983)....................................................................42, 56

*Center for Bio-Ethical Reform, Inc. v. L.A. County Sheriff Dep't*,
    533 F.3d 780 (9th Cir. 2008) .............................................................46

*Christian Legal Society v. Martinez*,
    561 U.S. 661 (2010)..................................................................*passim*

*Christian Legal Society v. Walker*,
    453 F.3d 853 (7th Cir. 2006) .............................................................55

*Conlon v. InterVarsity Christian Fellowship*,
    777 F.3d 829 (6th Cir. 2015) .............................................................54

*Cotter v. Desert Palace, Inc.*,
    880 F.2d 1142 (9th Cir. 1989) .............................................................3

*Davis v. FEC*,
  554 U.S. 724 (2008)......................................................................................20

*Demery v. Arpaio*,
  378 F.3d 1020 (9th Cir. 2004) ...................................................................27

*Doe v. Madison Sch. Dist. No. 321*,
  177 F.3d 789 (9th Cir. 1999) .....................................................................26

*Employment Division v. Smith*,
  494 U.S. 872 (1990).........................................................................48, 49, 51

*Foster* v. *Carson*,
  347 F.3d 742 (9th Cir. 2003) .....................................................................26

*Fox v. Bd. of Trustees*,
  42 F.3d 135 (2d Cir. 1994) .........................................................................28

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
  528 U.S. 167 (2000)......................................................................................21

*Fulton v. City of Philadelphia*,
  141 S.Ct. 1868 (2021)........................................................................49, 51, 52

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ........................................................................4

*Gay-Straight Alliance Network v. Visalia Unified School District*,
  262 F.Supp.2d 1088 (E.D. Cal. 2001) ......................................................22

*Golden Gate Restaurant Ass'n v. City & County of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) ...................................................................56

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001).......................................................................................33

*Harris v. Itzhaki*,
  183 F.3d 1043 (9th Cir. 1999) ...................................................................53

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988)................................................................................35, 50

*Healy v. James*,
 408 U.S. 169 (1972)............................................................................47

*Herb Reed Enters., LLC v. Fla. Entert. Mgmt., Inc.*,
 736 F.3d 1239 (9th Cir. 2013) ..........................................................24

*Hopper v. City of Pasco*,
 241 F.3d 1067 (9th Cir. 2001) ..........................................................38

*Hsu v. Roslyn Union Free School District*,
 85 F.3d 839 (2nd Cir. 1996) ..............................................................32

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
 515 U.S. 557 (1995)............................................................................32

*International Brotherhood of Teamsters v. United States*,
 431 U.S. 324 (1977)......................................................................23, 24

*InterVarsity Christian Fellowship/USA v.*
 *Board of Governors of Wayne State University*,
 534 F.Supp.3d 785 (E.D. Mich. 2021) ........................................38, 55

*Intervarsity Christian Fellowship/USA v. University of Iowa*,
 5 F.4th 855 (8th Cir. 2021) ................................................................22

*LA Alliance for Human Rights v. County of Los Angeles*,
 14 F.4th 947 (9th Cir. 2021) ..............................................................20

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
 508 U.S. 384 (1993)............................................................................33

*Larez v. City of Los Angeles*,
 946 F.2d 630 (9th Cir. 1991) ..............................................................8

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
 138 S.Ct. 1719 (2018)...................................................................53, 54

*Namisnak v. Uber Techs., Inc.*,
 971 F.3d 1088 (9th Cir. 2020) .....................................................23, 24

*Nw. Env't Def. Ctr. v. Gordon*,
 849 F.2d 1241 (9th Cir. 1988) ..........................................................27

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ........................................................................21

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ........................................................................57

*Ocean Beauty Seafoods, LLC v.*
*Pacific Seafood Group Acquisition Co.*,
611 Fed.Appx. 385 (9th Cir. 2015) ..................................................58

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir 2021) ......................................................57, 58

*Our Lady of Guadalupe Sch. v. Morrisey-Berru*,
140 S.Ct. 2049 (2020) ....................................................................54

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*,
636 F.3d 1150 (9th Cir. 2011) ...........................................................4

*Puri v. Khalsa*,
844 F.3d 1152 (9th Cir. 2017) .........................................................54

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........................................................................43

*Reese v. County of Sacramento*,
888 F.3d 1030 (9th Cir. 2018) .........................................................58

*Resilient Floor Covering Pension Trust Fund Bd. of Trustees v.*
*Michael's Floor Covering, Inc.*,
801 F.3d 1079 (9th Cir. 2015) .......................................................3, 4

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ..................................................................32, 43

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976) ........................................................................54

*Spencer v. Kemna*,
523 U.S. 1 (1998) ......................................................................26, 27

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) ...........................................46, 47, 51

*Tandon v. Newsom*,
  141 S.Ct. 1294 (2021) ............................................................49, 50, 52

*Truth v. Kent Sch. Dist.*,
  542 F.3d 634 (9th Cir. 2008) ...................................................*passim*

*United States v. Hinkson*,
  585 F.3d 1247 (9th Cir. 2009) ...........................................................4

*United States v. Peninsula Commc'ns, Inc.*,
  287 F.3d 832 (9th Cir. 2002) ............................................................4

*Widmar v. Vincent*,
  454 U.S. 263 (1981)...........................................................................47

*Winter v. NRDC*,
  555 U.S. 7 (2008)........................................................................3, 28

*Yazzie v. Hobbs*,
  977 F.3d 964 (9th Cir. 2020) .............................................20, 22, 23

**Statutes**

20 U.S.C. §1400 ..............................................................................39, 50

20 U.S.C. §1681 ..............................................................................39, 50

20 U.S.C. §1703 .....................................................................................39

20 U.S.C. §4071 ..............................................................................29, 34

Cal. Educ. Code §218 .............................................................................57

Cal. Educ. Code §234 .............................................................................57

Cal. Educ. Code §35179 .........................................................................50

Cal. Stats. 1999, ch. 587 ........................................................................57

**Other Authorities**

5 C.C.R. §4910.......................................................................................39

34 C.F.R. §106.41 .............................................................................39, 50

**INTRODUCTION**

This is not the case Plaintiffs and their amici pretend it is. Desperate for a vehicle to cabin or reverse Circuit and U.S. Supreme Court precedent upholding the application of nondiscrimination policies to officially recognized student clubs, Plaintiffs mischaracterize the San José Unified School District's neutral application of a rule prohibiting discrimination by student clubs as an animus-driven campaign to harass and exclude Christian student groups.

Plaintiffs' problems start with standing. Groups like the Missouri-based Oklahoma corporation Fellowship of Christian Athletes ("FCA National") cannot challenge school policies simply because they find them objectionable. Rather, to obtain injunctive relief, Plaintiffs would need to establish at minimum that the policy is actually injuring them and that enjoining it is necessary to redress that injury. Plaintiffs cannot make this showing, because no student applied for recognition of an FCA club at any District high school this past school year, and there is no evidence that students intend to apply for recognition this fall or that any would apply but for the District's policy. Without any showing that students intend to apply for recognition, Plaintiffs face no imminent injury from the challenged policy and so lack standing to seek prospective relief. Because standing must be resolved before the merits, Plaintiffs' appeal must be dismissed on this ground alone.

Were the Court nonetheless to find the claims justiciable, the absence of evidence that current students intend to apply would preclude Plaintiffs from establishing likely imminent, irreparable harm. And the likelihood-of-success analysis would be dictated by binding precedent. The District's policy is modeled after, and resembles in all pertinent respects, the "all-comers" policy reviewed and upheld in *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010). This Court twice upheld similar policies prohibiting student groups from discriminating based on protected characteristics. *Truth v. Kent Sch. Dist.*, 542 F.3d 634 (9th Cir. 2008); *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011).

Nor can Plaintiffs prevail on the theory that the District's policy was selectively enforced based on religious animus. As the District Court correctly found, the District uniformly applied to all student clubs its policy prohibiting officially recognized clubs from discriminatorily excluding students from membership or leadership, and all clubs recognized in 2021-22 signed affirmations promising not to discriminate based on protected characteristics. As in *Martinez*, Plaintiffs "seek[] not parity with other organizations, but a preferential exemption from [the District's] policy." 561 U.S. at 669. To the extent that Plaintiffs premise their claims for prospective relief on alleged targeting, animus, harassment, or discrimination in spring 2019 (a year before Plaintiffs filed suit and two years before they moved for a preliminary injunction), their contentions rest on

2

egregious misrepresentations that are irreconcilable with the record and key District Court fact findings. They are also irrelevant, given that the issue presented is not whether the District acted appropriately in 2019, but whether implementation of the District's nondiscrimination policy in the *upcoming* school year is lawful.[1]

The appeal should be dismissed. Alternatively, the District Court's preliminary-injunction denial should be affirmed.

## JURISDICTIONAL STATEMENT

Defendants-Appellees agree with Plaintiffs' jurisdictional statement, except insofar as Plaintiffs lack standing to seek prospective relief, *see infra* at 20-28, and to the extent that Plaintiffs suggest that this Court has jurisdiction to review the District Court's January 2021 order dismissing a subset of their claims, 1-ER-23-53. Because "[t]he denial of preliminary relief is … not *inextricably* intertwined with an interlocutory ruling on the merits," the District Court's partial dismissal is not properly before the Court at this time. *Cotter v. Desert Palace, Inc.*, 880 F.2d 1142 (9th Cir. 1989).

## STANDARD OF REVIEW

Plaintiffs must show that irreparable injury is *likely* absent a preliminary injunction. *See Winter v. NRDC*, 555 U.S. 7, 22 (2008); *Resilient Floor Covering*

---

[1] Because the individual plaintiffs have damages claims premised on the original 2019 controversy, this Court will have an opportunity to consider those issues after final judgment.

*Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.,* 801 F.3d 1079, 1088 (9th Cir. 2015). Mandatory injunctions are "particularly disfavored," *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011), and require law and facts clearly favoring plaintiffs, *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).[2]

Denial of a preliminary injunction or motion to supplement is reviewed for abuse of discretion. *See United States v. Peninsula Commc'ns, Inc.*, 287 F.3d 832, 839 (9th Cir. 2002). A court abuses its discretion only if it misidentifies the legal standard or applies the correct standard in a way that is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1261-63 (9th Cir. 2009) (en banc). Factual findings are accepted unless clearly erroneous, meaning "illogical, implausible, or without support in … the record." *Id.* at 1262.

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs have standing to seek prospective injunctive relief without evidence that any District student applied for Associated Student Body

---

[2] Plaintiffs contend that they seek restoration of the status quo, AOB-23, but ASB recognition was withdrawn in spring 2019 and Plaintiffs did not file suit until April 2020 or seek a preliminary injunction until July 2021. AOB-10-11, 19; 11-ER-2125-34. As the District Court found (1-ER-7:22-8:4), an injunction would change the status quo.

4

("ASB") recognition of an FCA club last year or intends to apply this coming year, or evidence that students did not apply because of District policy.

2.      Whether, given the above, Plaintiffs established likely imminent, irreparable injury.

3.      Whether the District Court abused its discretion in holding that Plaintiffs failed to establish likely success on the merits given binding Supreme Court and Circuit precedent upholding policies like the District's.

4.      Whether the District Court abused its discretion in holding that equitable factors do not favor Plaintiffs' request for relief.

5.      Whether the District Court erred in denying, in part, Plaintiffs' request to supplement the record.

## STATEMENT OF THE CASE

The question here is whether the District Court abused its discretion in declining to preliminarily enjoin the District from ensuring that all students will have the opportunity to participate fully in ASB-recognized clubs this coming year. Yet Plaintiffs devote the bulk of their brief to complaining about events in April 2019 (a year before this lawsuit's filing) and recasting the District's policy of inclusiveness as religious animus. Egregious misrepresentations of the facts, out-of-context quotations, selective ellipses, and source misidentifications notwithstanding, the undisputed evidence shows that the District withdrew FCA clubs' recognition only

after confirming that leadership requirements mandated by FCA National conflicted with the District's long-standing nondiscrimination policy; the District continued to allow FCA clubs to meet, advertise, recruit, and hold large events at school; and the District is ready to recognize any FCA club that complies with its policy prohibiting discriminatory exclusion of students from club membership and leadership positions.

## A. FCA Clubs' Discriminatory Leadership Requirements and Resulting Derecognition

The District's ASB clubs program promotes students' sense of belonging and connectedness to school while developing their leadership and self-governance skills. 1-ER-10:2-10; 5-ER-779:19-780:18; 7-ER-1098:15-1099:14. ASB-recognized student clubs can have ASB accounts and bookkeeping services, are included in official school club lists, and are photographed for the yearbook. 1-ER-6:5-7; 5-ER-804:9-21; 2-SER-413. No clubs receive ASB funding. *Compare* 7-ER-1108:23-1109:9 *and* 5-ER-809:9-23 *with* AOB-6 (wrongly suggesting otherwise).[3]

Student clubs must apply for ASB recognition each fall. 2-SER-412-13. Before spring 2019, student FCA clubs, along with numerous other secular and religious student clubs, participated without controversy in the District's ASB clubs program. AOB-5. At that time, District and school officials were unaware of any

---

[3] Although athletic teams have ASB accounts, they are school-sponsored activities covered by different state and District rules, not part of the ASB-clubs program. 9-ER-1609:17-1611:13; 3-SER-706-08 ¶¶4, 7-8; 2-SER-418.

leadership eligibility restrictions for the FCA clubs at three District high schools. 6-ER-905:9-15, 921:1-9.

In April 2019, three Pioneer High School students complained to the principal about the requirement that students seeking FCA club leadership positions agree to abide by FCA National's Statement of Faith and Sexual Purity Statement. 6-ER-905:9-906:1; 4-ER-574:17-575:6; 3-SER-668. Those Statements require prospective student leaders to affirm and conform their conduct to the requirement that "The Bible is clear in teaching on sexual sin including sex outside of marriage and homosexual acts. Neither heterosexual sex outside of marriage nor any homosexual act constitute an alternative lifestyle acceptable to God." 3-SER-657-58; 3-SER-671-72; 3-SER-681-84. Because the District includes many non-heterosexual students and families, as well as students and families of faith who do not share FCA National's beliefs, this mandate excludes from club leadership not just LGBTQ+ students but anyone unwilling to sign a statement that "homosexual act[s]" including same-sex marriage are sinful.[4]

On April 25, 2019, FCA National's employee Rigo Lopez confirmed to Pioneer's principal Herb Espiritu that students wishing to hold leadership positions were required to agree to FCA National's "Sexual Purity Policy." 3-SER-657-58; *see*

---

[4] The Supreme Court has explained that requiring students to affirm opposition to homosexual conduct constitutes discrimination based on LGBTQ+ status. *Martinez*, 561 U.S. at 688-89, 700 n.1.

*also* 10-ER-2101.[5]  Espiritu sought guidance from District officials, 6-ER-912:12-913:4, who determined that FCA National's leadership requirements violated the District's nondiscrimination policy, making FCA clubs ineligible for ASB recognition.  3-SER-709 ¶¶11-12; 4-SER-803; 8-ER-1321:23-24:14; 8-ER-1325:11-46:21; 8-ER-1348:24-52:24; 8-ER-1390:20-91:8; 8-ER-1424:11-21.  On May 2, 2019, Espiritu informed Pioneer FCA's student leaders that FCA National's discriminatory requirements meant the club would lose official recognition but would continue to enjoy equal access to school facilities for club meetings and events.  8-ER-1510.[6]

The record shows that FCA clubs lost recognition solely because they violated District nondiscrimination policies, not because of official animus toward students' or FCA National's beliefs.  As Deputy Superintendent Stephen McMahon testified, "a recognized San Jose Unified [club] needs to be open to all students in a manner that doesn't violate the nondiscrimination policy."  8-ER-1401:8-11.  Requiring students

---

[5] It is thus untrue that the decision to derecognize FCA clubs "was made without consulting FCA or its student leaders."  AOB-10; *see also* 6-ER-917:18-24 (Espiritu spoke with FCA student leaders).

[6] "[F]inal say" over derecognition belonged to District leadership, 5-ER-751:13-52:17; 5-ER-828, not Pioneer's climate committee, 3-SER-709 ¶¶11-12.  In asserting otherwise, Plaintiffs cite only the student newspaper's account (not an "announce[ment]" by Espiritu).  AOB-10, 26; 6-ER-1008.  Even direct newspaper *quotes* are generally inadmissible as non-trustworthy sources lacking sufficient indicia of reliability.  *Larez v. City of Los Angeles*, 946 F.2d 630, 643-44 (9th Cir. 1991); *see* AOB-11-12 (citing student-newspaper quotes, 10-ER-1922).

to "disavow being homosexual" in order to be eligible to run for leadership positions violates that policy. 8-ER-1401:18-21.[7] Indeed, many student-initiated religious clubs are and have been ASB-recognized without incident (as were FCA clubs until District officials learned of the discriminatory leadership requirements). 2-ER-108; 5-SER-810 ¶2; 5-SER-833 ¶101; 5-SER-874-82; 2-SER-427-44; 1-SER-104-16.

Plaintiffs' contrary portrayal of FCA's derecognition as motivated by District officials' disapproval of certain religious beliefs is based on egregiously incomplete quotations, inaccurate parentheticals, and out-of-context statements. For example, Plaintiffs assert that "Espiritu said that FCA's *views* 'go against [Pioneer's] core values,'" "that the [climate] committee should 'take a united stance' against FCA," and that the committee agreed. AOB-10, 40 (citing 7-ER-1273). But the unaltered quote makes clear that the objection was not to FCA's "views" but to FCA National's

---

[7] *See also* 8-ER-1390:17-1391:8 ("the requirement that if you were engaged in a homosexual act, you could not be an officer, is prohibiting a group of students from leadership in this club," which violates District policy); 8-ER-1403:1-3 ("A student who engaged in homosexual activity shouldn't sign [the FCA Statement], and, therefore, could not be an officer."). As the District's PMK witness testified, asking leaders "to affirm that marriage is exclusively the union of one man and one woman … [is] discriminatory against homosexual students or those who [have] homosexual parents," and a "requirement[] that you affirm a belief in Christianity in order to run for [] leadership of the club" discriminates against students of other faiths. 9-ER-1749:19-24; 9-ER-1751:11-14; *see also* 9-ER-1778:12-24; 9-ER-1779:11-1780:3 (PMK deposition testimony that requirement that leaders affirm religious belief, not beliefs themselves, presented problem); 9-ER-1756:21-1758:11; 7-ER-1229:1-14 (activities director told by principal that FCA derecognition was because of pledge requirement); 3-SER-648-49.

mandate that club leaders abide by its exclusionary pledge. The notes of the climate committee meeting say that the administration had learned that "FCA club on campus has a signed *agreement/pledge that officers need to sign*. [Principal] feels pledge goes against core values of PHS." 7-ER-1273 (emphasis added).[8]

Plaintiffs also repeatedly mischaracterize statements (made long after the District's derecognition decision) by two or three *individual teachers* (out of over 1,500 District teachers) as those of "District officials."[9] But teachers played no role in setting District club recognition policy or deciding to derecognize FCA, and are not fairly characterized as "District officials" for those purposes.[10] Indeed, teachers have

---

[8] Principal Espiritu advocated for "a united stance" by the committee, *id.*, but nowhere suggested that this "united stance" ought to be "against FCA," AOB-10; *see also*, *e.g.*, AOB-10 (citing 6-ER-1008 as principal saying that FCA was derecognized because Pioneer "'disagree[d] with' FCA's beliefs and saw them as being 'of a discriminatory nature,'" when actual quote was that principal felt the "pledge"—not "FCA's beliefs"—was discriminatory); AOB-10 (quoting 6-ER-919) (asserting that principal said "'fact that [FCA's beliefs] existed'" was basis for derecognition, when context and omitted language show that derecognition was because student leaders were required to *agree to* and *abide by* discriminatory statements, *see* 5-ER-762:14-16; 6-ER-911:6-14; 6-ER-914:4-19; 6-ER-916:23-917:2; 6-ER-990:19-23.

[9] *E.g.*, AOB-11 (asserting "District officials pressed for even more" but then citing statements by individual teachers); AOB-26 (stating that "District officials openly expressed their hostility to the content of FCA's religious beliefs" while quoting two teachers); AOB-40 (referring to teacher "and *other* District officials") (emphasis added); AOB-1 (asserting without citation that "District officials ... called for on-campus protests against FCA … and supported student protests that took place outside almost every FCA meeting").

[10] Plaintiffs also complain about fall 2019 student-organized protests. AOB-12.

a variety of views regarding the appropriate balance between nondiscrimination and the interests of religion-based student clubs, and many teachers and staff supported FCA and criticized the District's response. 10-ER-1888-90; 1-SER-228-37; 1-SER-376:4-17; 1-SER-366; 1-SER-338; 2-SER-307-11; *see also* 10-ER-1925 (students who raised objections to FCA's discriminatory pledge later said school counselor "shamed" them in meeting with Pioneer FCA leaders); D. Ct. Dkt. #115-3 at 193-94, 197.[11]

---

But even assuming that protests three years ago are relevant to whether prospective relief is now warranted, the District properly determined that it could not lawfully prohibit those protests, and Espiritu attempted to discourage the protests and prevent disruption of FCA meetings and events. 5-ER-837:8-38:9; 6-ER-965:19-66:1; 6-ER-966:4-14; 6-ER-973:2-75:18; 8-ER-1452:1-53:6; 8-ER-1455:23-58:10. Plaintiffs similarly reference past hostility by student journalists, AOB-12-13, but student conduct does not prove District animus. Indeed, after a momentary outburst by a journalism student at an FCA event, the District interceded, the student faced discipline within the confines of his disability-based IEP, and the newspaper's faculty advisor prohibited further coverage of the controversy. 8-ER-1464:4-66:12; 8-ER-1523; 9-ER-1586:9-87:8.

[11] Plaintiffs also misleadingly present statements by individual teachers. For example, Defendant Glasser's communications, viewed in context, expressed concern about LGBTQ+ students who might perceive that the District sanctioned a club that excluded them from leadership, and *questioned* whether a club that discriminates should be permitted to meet on campus. 10-ER-1926-27. *But see* AOB-9. Glasser clarified that he did not "want people to feel attacked for their views" and wondered whether attacking discriminatory views is necessary. 10-ER-1926-27 (selectively quoted at AOB-9). He did not accuse any individual FCA student of harassing anyone but asked whether exclusion of LGBTQ+ students from leadership could create a hostile environment in violation of the District's sexual-harassment policy. *See* AOB-11 (citing 4-ER-639-40). Finally, and most egregiously, Plaintiffs suggest that Glasser approvingly called FCA's student leaders "collateral damage," AOB-9, when the full quote shows his concern for

Plaintiffs correctly acknowledge that after FCA clubs' derecognition the District created a new category at Pioneer High School—student interest groups. AOB-11. Such groups remain able to advertise and meet at school, use the auditorium ("PAC") for events, fundraise, participate in school-wide activities like club rush, and receive faculty support. 2-SER-367 ¶¶4-6; 2-SER-410; 4-SER-803; 2-SER-367-68 ¶¶4-6; 5-ER-804:6-06:11; 5-ER-807:12-15; 5-ER-810:7-17; 5-ER-811:9-14; 5-ER-848:4-49:10; 7-ER-1108:1-10:10; 7-ER-1113:18-14:6. While Plaintiffs complain that FCA clubs were "'no longer allowed to have an ASB account or fundraise on campus,'" AOB-11 (quoting deposition question at 9-ER-1627), FCA clubs had never previously fundraised on campus or used ASB accounts or bookkeeping. 2-SER-390; 3-SER-452-458; 2-SER-383:16-21; 2-SER-390-19:22.[12]

While two FCA clubs folded by the end of the 2019-20 school year, Pioneer FCA continued to flourish in 2019-20 (while derecognized) and 2020-21 (while provisionally recognized during the COVID shutdown), with a solid leadership team and strong meeting/event turnout during those school years. 1-SER-103-227; 2-SER-

---

those students: "I am also cognizant that the FCA does great things on campus, and believe me, the idea that great students like [redacted] are what amounts to collateral damage in this situation has been agonizing for me." 10-ER-1926-27.

[12] FCA clubs could have fundraised on campus had they wanted to. *See* 5-ER-805; 5-ER-810; 5-ER-848-49; 7-ER-1109. Plaintiffs protest that FCA clubs "lost priority access to room usage," AOB-11, but there was no showing that this hypothetical priority, AOB-6 (citing 9-ER-1608-09), ever mattered.

384:15-86:3; 2-SER-387:13-89:21.

**B.    Current District Policy**

During the 2020-21 pandemic school year, all student clubs, including FCA Pioneer, were provisionally recognized.  7-ER-1239:7-41:23; 3-SER-702 ¶7; 2-SER-412-14 ¶¶4, 15.  In anticipation of the 2021-22 reopening, the District issued guidelines, trained its activities directors on ASB approval, revised the club-application process, and instituted standardized application forms and constitutions requiring that all ASB-recognized clubs agree to abide by the all-comers policy.  4-ER-694-715; 3-SER-702-03 ¶¶6-14; 2-SER-414 ¶¶12-13; 5-SER-1050-82.  As the District Court found, the District's requirement that "*all* ASB clubs … affirm their commitment to the District's non-discrimination policy" was a written formalization of pre-existing policies, not a change in policy.  1-ER-11 n.6, 1-ER-12 n.7; *see also* 9-ER-1702-03.

As Plaintiffs acknowledge, the District's policy requires "ASB clubs 'to permit any student to become a member or leader.'"  AOB-13.  "Any clubs seeking ASB recognition must sign an 'Affirmation statement' agreeing that 'any currently enrolled student at the school [may] participate in, become a member of, and seek or hold leadership positions in the organization.'"  *Id*. (alteration in original).  The policy is "'implemented and construed in accordance with the all comers policy' in *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010)."  *Id.* at 13-14.  The purpose is to

ensure that clubs are open to and welcome the participation of all students.  *Id.* at 14.

The District Court found, and Plaintiffs do not dispute, that *all* ASB-approved clubs in 2021-22 signed the affirmation agreeing to follow the all-comers policy and not discriminate, and all adopted constitutions prohibiting discrimination in club membership and leadership.  1-ER-5:2-6:4; 1-ER-18:20-19:8; *see also*, *e.g.*, 2-ER-75-76 (#22); 2-ER-113-14 (#3.1, 5.1-5.3); 2-ER-225-27; 5-SER-1050; 5-SER-1077-79.  Groups that applied, complied with ASB rules, and submitted appropriate forms were approved.  2-SER-412-14; 2-SER-420-28; 2-ER-104-09.[13]  The District has made clear that all clubs that sign the required affirmation—*including* any FCA clubs—will be approved in 2022-23.  3-SER-702-04 ¶¶10-13; 5-ER-830; *see also* 9th Cir. ECF #21-3 at 933-35 (June 24, 2022 memorandum from Deputy Superintendent reminding

---

[13] When students form clubs that may cause others to feel unsafe or targeted, the principal or other school staff may raise concerns, but (contrary to Plaintiffs' suggestion, AOB-7 (citing 5-ER-801-03, 5-ER-853)) have no authority to refuse to recognize "controversial" groups.  When students initiated a Satanic Temple Club, Principal Espiritu spoke with them about the club's purpose and encouraged them to choose another name, but ultimately approved it after finding no policy violation.  *See* 4-ER-626:9-17, 4-ER-628:1-7; 5-ER-802:11-20; 5-ER-844:14-20; 6-ER-1006; 7-ER-1169:20-1170:14; 10-ER-2002-03.  Similarly, Espiritu again considered school climate when he asked organizers of the Make America Great Again ("MAGA") Club to consider a different name, but would not and did not disallow any clubs on the ground that they were controversial.  In fact, the MAGA club was initially approved but dissolved after misbehavior at a campus event.  *See* 7-ER-1089:9-90:2; 7-ER-1091:15-92:8 (obscene chant at club rush violated school policy); 5-ER-802:1-02:9 ("as long as they're not discriminating [against] members and leaders or potential members or leaders … we really don't have any jurisdiction for us to derecognize them" based on possible controversy); 5-ER-803:6-04:1.

14

school officials that "any student club that applies for ASB recognition, and that complies with all requirements for doing so … should be approved," and that "includes clubs of a religious nature, including the Fellowship of Christian Athletes").

Plaintiffs' complaint that "the District has also long approved student group applications that exclude students based on criteria such as sex or ethnicity," AOB-15, is thus mistaken. The District Court correctly found that the District has *no* discretion to allow student clubs to discriminate based on criteria like race, religion, sex, or sexual orientation, and that "Plaintiffs fail to show that District officials have actually given any clubs permission to discriminate in violation of the Policy." 1-ER-9:7-9; 1-ER-16:19-20; *see also* 1-ER-17:6-18:19. Those factual findings are amply supported in the record. *See, e.g.*, 8-ER-1418:18-20:2.

The three student clubs that Plaintiffs discuss, AOB-15-16, are all addressed by specific District Court findings. The District Court found that Big Sisters/Little Sisters could not and did not exclude boys. 1-ER-18:12-14; *see also* 5-ER-852:4-13; 9-ER-1672:9-73:11; 2-SER-417 ¶30. It further found that Senior Women and South Asian Heritage Club both affirmed that *any* student is eligible for membership or leadership, and that there is no evidence that they actually discriminate in violation of the District's policy and the groups' written agreement not to do so. 1-ER-19:10-20; *see also* 2-ER-165 (#5.1-5.3); 2-ER-109. Finally, the permissible nondiscriminatory membership criteria that Plaintiffs decry as "broad exemptions" inconsistent with an

15

"'all-comers'" policy, AOB-14, are no different from the "neutral and generally applicable membership requirements unrelated to 'status or beliefs'" upheld in *Martinez*, 561 U.S. at 671 n.2. *See infra* at 44-45.

While Plaintiffs also complain that the District's policy "allows broad exemptions both expressly and in practice," AOB-14, what they point to are applications of entirely different policies that apply to the District's own programs, which are not subject to the policy challenged here. Moreover, the evidence Plaintiffs cite shows *no* District-approved exclusion of any students based on protected characteristics aside from single-sex athletic teams, which raise different concerns and are addressed *infra* at 50. *See also infra* at 40-41, 49-50 & nn.25-27 (addressing Plaintiffs' evidence regarding District programs).

## C. Absence of FCA Club Applications or Students Interested in Applying

Plaintiffs Klarke and Sinclair (not parties to this appeal) graduated in 2020. 1-ER-38:21-39:16. Two other students who led Pioneer FCA in 2020-21 graduated in 2021. 2-SER-415 ¶19. Despite FCA National employee Lopez's encouragement, 1-SER-71:11-79:11; 1-SER-93-102, and statements by the 2020-21 leaders that ASB status would be sought in 2021-22, no students submitted an ASB application for an FCA club at any District high school last year. 2-SER-367 ¶3; 5-SER 1087-88 ¶17; 5-SER-1091-92 ¶10. Although Pioneer FCA was invited to table at fall 2021 club rush, no one participated. 2-SER-367 ¶¶4, 6; 2-SER-363 ¶6; 5-SER-1087-88 ¶17.

**D.     Procedural History**

Plaintiffs FCA National, Klarke, and Sinclair (at that time proceeding under pseudonyms) filed a complaint on April 22, 2020 and amended complaint one month later.  11-ER-2125-26.  On January 28, 2021, the District Court granted in part Defendants' motion to dismiss, dismissing Plaintiffs' claims for prospective relief on jurisdictional grounds because Klarke and Sinclair's claims for prospective relief were mooted by their graduation and FCA National failed to allege its own standing on organizational or associational grounds.  1-ER-38:15-41:13.  Klarke and Sinclair's damages claims remain pending below.  1-ER-25:1-28:27.

Klarke, Sinclair, and FCA National filed a second amended complaint on February 18, 2021, 11-ER-2130, and a third amended complaint adding Pioneer FCA on July 15, 2021, 11-ER-2133.  Defendants again moved to dismiss in part, arguing that FCA National and Pioneer FCA lack associational and organizational standing and that all Plaintiffs lack standing to seek injunctive relief.  11-ER-2137.  The fully briefed motion remains pending in the District Court.

Plaintiffs moved for a preliminary injunction on July 30, 2021, *see* 11-ER-2134—over two years after the District withdrew recognition from the local FCA clubs and 15 months after Plaintiffs sued.  The District Court denied that motion on June 1, 2022.  1-ER-21-22.

17

## SUMMARY OF ARGUMENT

Plaintiffs' appeal must be dismissed because their request for prospective relief is not justiciable. No District students sought recognition of an FCA club for the 2021-22 school year, and there is no evidence that any students will seek recognition in fall 2022. Nor is there evidence that any District students would seek recognition if the District's policy were enjoined. Plaintiffs have not shown that the District's policy is injuring them, or that enjoining it would redress their injuries. They therefore lack standing to pursue injunctive relief, and any injunctive claims by plaintiffs who originally had standing are moot. For the same reason, Plaintiffs cannot meet their burden to establish likely, imminent, irreparable injury.

While this Court need not reach the issue, the District Court did not abuse its discretion in concluding that Plaintiffs were unlikely to succeed on the merits. The District Court recognized that Plaintiffs' Equal Access Act ("EAA") claim fails under *Truth*, which held that a nondiscrimination policy indistinguishable from the District's was content-neutral and did not "implicate any rights that [religious student groups] might enjoy under the [EAA]." 542 F.3d at 647.

Plaintiffs' free speech claim likewise fails. The District's policy is functionally indistinguishable from those held constitutional in *Martinez* and *Alpha Delta*. Under those binding precedents, the District's nondiscrimination policy is reasonable and viewpoint-neutral. Plaintiffs' contention that the policy has been selectively enforced

18

to discriminate against their religious viewpoint is contrary to the District Court's factual findings and the record evidence, which shows that the District has applied and going forward will apply the ASB-clubs policy uniformly.

Plaintiffs' free exercise claim fails for the same reasons. The Free Exercise Clause does not require granting Plaintiffs a preferential exemption from nondiscrimination policies. The District's policy is a neutral, generally applicable rule subject to rational-basis review, as *Martinez* and *Alpha Delta* held, and easily satisfies that standard. As those decisions provide, religious organizations are not entitled to preferential treatment in a limited public forum. Because the District has no discretion to deviate from that policy and is not motivated by religious animus in enforcing it, none of the circumstances that might subject the District's conduct to heightened scrutiny are present.

Finally, the District's policy does not impermissibly interfere with the religious autonomy of local FCA clubs, which are associations of students, not religious ministries. The policy merely conditions the (quite limited) benefits of ASB recognition on clubs' agreement not to discriminate, and allows clubs to meet on campus using whatever leadership criteria they choose if they forgo recognition.

19

# ARGUMENT

## I.    There is no justiciable controversy regarding prospective relief.

### A.    Plaintiffs submitted no evidence that students face imminent injury from the all-comers policy.

Article III jurisdiction must be established "for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008).  Because this Court "must assure [itself] that the constitutional standing requirements are satisfied before proceeding to the merits," *Bates v. United Parcel Serv., Inc*., 511 F.3d 974, 985 (9th Cir. 2007) (en banc), standing "must be resolved before [this Court] may review the district court's denial of the motion for preliminary injunction," *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1405 (9th Cir. 1991); *see also LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021).  On a preliminary-injunction appeal, Plaintiffs "must make a clear showing of each element of standing." *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (per curiam) (quotations omitted); *see LA Alliance*, 14 F.4th at 956 (same).

Because the individual plaintiffs' injunctive-relief claims were dismissed on jurisdictional grounds, *see supra* at 17, only FCA National and Pioneer FCA are

parties to the preliminary-injunction motion and appeal.[14]  Both lack standing to

pursue prospective relief, which requires a plaintiff to demonstrate not just past

injury but "a sufficient likelihood that he will again be wronged in a similar way."

*Bates*, 511 F.3d at 985 (citations omitted).  Plaintiffs must show a "real and

immediate threat of repeated injury," *O'Shea v. Littleton*, 414 U.S. 488, 496

(1974), that "is certainly impending."  *Friends of the Earth, Inc. v. Laidlaw Envtl.*

*Servs.*, 528 U.S. 167, 170 (2000).

In light of the fact that no students applied for recognition of an FCA club in

2021-22, and there is no evidence that any students intend to seek ASB recognition

in fall 2022, Plaintiffs cannot establish a "real and immediate threat of repeated

injury."  Despite having been put on notice of Defendants' standing challenge, 9th

Cir. ECF #21-1 at 9-12, Plaintiffs offered *no* evidence that students will apply for

ASB recognition and do not even attempt to explain how they face imminent harm

from the District's policy.  Their sole "evidence" that anyone wants an FCA club to be

ASB-recognized consists of hearsay and speculation in multiple declarations by a

single FCA National employee, not evidence from actual students, who are the only

ones who may apply for ASB recognition.  And even the FCA National employee's

proffered declarations do not say that any students will apply for ASB recognition in

---

[14] By the time Pioneer FCA joined this case as a plaintiff in the third
amended complaint, both the individual plaintiffs and the "Student
Representatives" FCA National claimed to represent had graduated.

fall 2022.  *See* 2-ER-56 ¶¶7, 12 (stating only that two or three students who attended Pioneer FCA meetings in spring 2022 intend to meet on campus during 2022-23, which student interest clubs may do without ASB recognition).  Without a "clear showing" (or any showing) that any students will seek ASB recognition, the all-comers policy cannot be inflicting a real and immediate impending injury on *anyone*.[15]

Plaintiffs' failure to demonstrate that any students intend to apply for ASB recognition places this case on all fours with *Yazzie*, which dismissed a preliminary-injunction appeal involving a vote-by-mail deadline because the plaintiffs did not show they intended to vote by mail in the upcoming election.  977 F.3d at 967.  Such a showing—the "bare minimum" for asserting a concrete and particularized injury—is also missing here.  *Id.*[16]

---

[15] Plaintiffs previously asserted that "national organizations have standing to challenge policies forbidding the formation of student clubs on public school campuses."  9th Cir. ECF #40-1 at 9.  But Article III does not confer blanket standing on any national organization that wants to sponsor a student club, and none of Plaintiffs' cases so hold.  In *Gay-Straight Alliance Network v. Visalia Unified School District*, 262 F.Supp.2d 1088, 1103 (E.D. Cal. 2001), "the GSA Network allege[d] its members wish[ed] to form a GSA club" but suffered an "immediate threat of harm to all students who would join and participate in such a club" based on specific allegations of ongoing "discrimination and harassment."  *Intervarsity Christian Fellowship/USA v. University of Iowa*, 5 F.4th 855, 862 (8th Cir. 2021), which involved an action for damages and injunctive relief, did not address standing at all.

[16] Plaintiffs previously argued that under *Truth* a written ASB-recognition policy renders future harm sufficiently likely to establish standing to seek

22

That same failure prevents Plaintiffs from showing that their injury is "likely to be redressed by the prospective injunctive relief." *Bates*, 511 F.3d at 985-86. Plaintiffs' desired preliminary injunction would require the District to cease applying its policy to FCA and "restore ASB approval to any previously derecognized student chapters affiliated with FCA." 4-SER-804-05. But Plaintiffs admit there are no longer any FCA-involved students at two schools at issue, AOB-17, and there is no evidence that any students at the third will seek recognition this fall. Requiring the District to recognize nonexistent clubs with no identified student members could not possibly constitute appropriate relief. *See Yazzie*, 977 F.3d at 967-68 ("infeasibility" of requested relief shows lack of redressability requiring dismissal of preliminary-injunction appeal).

## B. The futility doctrine does not apply.

Plaintiffs previously argued that failure to prove that students have applied or will apply for ASB recognition did not matter because students are not required to take "futile gesture[s]." 9th Cir. ECF #40-1 at 18. Their authority explains that this "futility" rule was established by *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) ("*Teamsters*"). *See Namisnak v. Uber Techs.,*

---

injunctive relief. 9th Cir. ECF #40-1, at 9. But in *Truth*, the dispute was not whether students would again seek recognition but whether their applications would continue to be denied. 542 F.3d at 641. The deficiency in Plaintiffs' standing derives from their failure to establish that students will even apply.

*Inc.*, 971 F.3d 1088, 1092 (9th Cir. 2020) (citing *Teamsters*, 431 U.S. at 365-66). In holding a plaintiff was not required to submit a futile employment application, *Teamsters* explained that "[t]o conclude that a person's failure to submit an application … does not inevitably and forever foreclose his entitlement to [] relief … is a far cry … from holding that nonapplicants are always entitled to such relief." 431 U.S. at 367. Rather, "[b]ecause [a nonapplicant] is necessarily claiming that he was deterred from applying … by the [] discriminatory practices, his is the not always easy burden of proving that he would have applied … had it not been for those practices." *Id.* at 367-68.

If Plaintiffs had demonstrated that students would have sought ASB recognition in fall 2021 (or will in fall 2022) but for the District's policy, futility might apply. But Plaintiffs presented no evidence from any student to that effect. Instead, Plaintiffs again offer only hearsay and speculation in multiple declarations by a single FCA National employee who opines about which students want to lead Pioneer FCA, why they haven't applied for recognition, and whether unspecified students will apply if the policy is enjoined. While "the rules of evidence do not apply strictly to preliminary injunction proceedings," that is "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development." *Herb Reed Enters., LLC v. Fla. Entert. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). But this case has been pending for over two years.

24

Discovery has closed. The parties submitted supplemental evidence up until the preliminary-injunction hearing. Plaintiffs had every opportunity to submit relevant, admissible evidence but failed to do so.

The unreliability of the declarations further precludes reliance on their speculation regarding students' intent (and underscores why the evidence is not admissible). The predictions in *seven* previous declarations as to which students would be members or leaders of Pioneer FCA varied each time, and not a single one resulted in an application. *Compare*, *e.g.*, 4-ER-648-49 ¶¶14, 18; 2-SER-359-61 ¶¶7, 14, 16; 2-ER-71 ¶3; 2-ER-55 ¶¶2-3.[17] Even the most recently proffered declaration asserts only that students intend to meet on campus—not that they would apply for ASB recognition but for the all-comers policy. *Supra* at 21-22.

Finally, Plaintiffs suggest that the stigma of derecognition or alleged hostility from three years ago is discouraging students' applications. AOB-17; *see also* 9th Cir. ECF #40-1 at 12. But again, Plaintiffs submitted *no students' testimony* that stigma or hostility is why they did not apply or participate in Pioneer FCA (as opposed to, for example, because the club's leaders graduated without recruiting replacements, students did not care about ASB recognition enough to do

---

[17] Though Lopez attributed M.H.'s failure to complete the 2021-22 ASB application to her discomfort with the District's all-comers policy, 4-ER-648-49 ¶¶14-16, his deposition testimony revealed that the only objection raised was by Lopez himself, 1-SER-77:16-79:11.

the paperwork, or students are reluctant to join a discriminatory group).  While Plaintiffs contend that the only logical explanation for FCA clubs' decline is the District's actions, *id.*, the record shows that Pioneer FCA continued to flourish in 2019-20 and 2020-21, and that Pioneers for Christ (which was also led by Klarke and Sinclair) never lost ASB recognition but *also* no longer exists following Klarke and Sinclair's graduation.  2-ER-96-109; 2-SER-396:11-400:5; 2-SER-409:1-17; 2-SER-415 ¶22; 2-SER-455-59; 5-SER-1071-72.

Plaintiffs' ideological interest in obtaining a merits decision from which they might seek emergency Supreme Court relief, 9th Cir. ECF #40-1 at 2, does not entitle them to manufacture standing based on rank speculation by a single FCA National employee.

### C.  If Plaintiffs' standing were analyzed as mootness, their claim for prospective relief still would not be justiciable.

Whether analyzed as mootness or standing, the case-or-controversy requirement of Article III continues through all stages of litigation.  *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  "If an action or a claim loses its character as a live controversy, then the action or claim becomes 'moot' ...."  *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 797-98 (9th Cir. 1999) (en banc).  "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  *Foster* v. *Carson,* 347 F.3d 742, 745 (9th Cir. 2003) (quotation omitted).

Even assuming that Plaintiffs had standing when each joined the case (which they did not), their claims for injunctive relief would be moot because the individual plaintiffs and other students identified in the complaint as intending to seek ASB recognition have graduated and can no longer benefit from prospective relief. *See Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam) ("[Once] all of the named plaintiffs in the action had graduated ... a case or controversy no longer exists."). The lack of effective injunctive relief that could be ordered without students who plan to meet, *see supra* at 23, further underscores the mootness of Plaintiffs' injunctive-relief claims. *See Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) ("The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted."). The burden is therefore on Plaintiffs to show that some exception to mootness doctrine applies and establishes jurisdiction here.[18]

---

[18] One mootness exception, the capable-of-repetition-yet-evading-review doctrine, "applies only in exceptional situations." *Spencer*, 523 U.S. at 17. Courts do not consider the time for litigating student challenges to be too short for full litigation. *Doe*, 177 F.3d at 798 (graduation prayer); *see also Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71 (2d Cir. 2001) (this "exception is not available when the issue is students' rights and the complaining students have graduated from the defendant institution"). Further, "[t]o satisfy the second prong, the plaintiffs must show either a demonstrated probability or a reasonable expectation" that they will be subject to the same conduct. *Demery v. Arpaio*, 378 F.3d 1020, 1027 (9th Cir. 2004). Plaintiffs have not met their burden to show that any student will apply for ASB recognition in the future.

A "bare statement of intention is insufficient to escape mootness," particularly when that expressed intention "is not solely within Plaintiffs' power to accomplish." *Fox v. Bd. of Trustees*, 42 F.3d 135, 143-44 (2d Cir. 1994) (challenge to college's policy moot when plaintiffs graduated or left school during litigation, despite intention to reapply). Lopez's bare assertion that "[i]f the Court grants an injunction … Pioneer FCA's leadership will apply for ASB recognition," 4-ER-648-49, is insufficient to avoid mootness. The only students who sought recognition have graduated, and Lopez himself cannot apply.

## II. Plaintiffs have not shown imminent irreparable injury.

Even if Plaintiffs could establish Article III standing, *Winter* dooms their appeal for failure to demonstrate *likely*, *imminent* irreparable injury. 555 U.S. at 22. Plaintiffs generically assert that "[i]rreparable harm is relatively easy to establish" here. AOB-58 (quotations omitted). But showing that a policy *could* cause injury falls far short of demonstrating likely imminent injury to *Plaintiffs*. For the same reasons that Plaintiffs lack standing, they have not shown that anyone—let alone Plaintiffs themselves—faces likely imminent injury from the all-comers policy.

**III.    Plaintiffs failed to establish likelihood of success on the merits.**

    **A.    Plaintiffs are not likely to prevail on their Equal Access Act claim.**

The parties agree that the District's ASB student-clubs program constitutes a "limited open forum" available to student clubs under the EAA.  20 U.S.C. §4071(a).  Accordingly, the only question is whether the District's requirement that any clubs seeking ASB recognition agree to comply with its nondiscrimination policy denies "equal access" to the EAA forum or discriminates "on the basis of the religious, political, philosophical, or other content of [] speech."  20 U.S.C. §4071(a).  As the District Court recognized, those questions are settled in this Circuit.  1-ER-14:10-23.

In *Truth*, this Court squarely rejected the contention that requiring compliance with nondiscrimination policies as a condition of ASB recognition "restricts ASB status on the basis of religion or the religious content of speech." 542 F.3d at 648.  *Truth* considered the EAA's text, purpose, and legislative history, and held that the content neutrality (or lack thereof) of a district's policy is the determinative issue under the EAA.  *Id.* at 646-47.  *Truth* explained, "Congress could have written the [EAA] to protect religious clubs against a burden on their speech or activities, but did not."  *Id.* at 646; *cf. id.* (contrasting different law, which "limited governments' abilities to impose even neutral, nondiscriminatory policies against" religious groups).

29

*Truth* held that nondiscrimination policies do not run afoul of the EAA. *Id.* at 647. "On their face, [schools'] non-discrimination policies do not preclude or discriminate against religious speech" and are not "justifie[d] … with reference to the content of a message [a group's] discriminatory conduct may attempt to convey." *Id.* Rather, they "are content-neutral" and "to the extent they proscribe … [discrimination], the policies do not implicate any rights that [religious student groups] might enjoy under the [EAA]." *Id. Truth*'s conclusive holding suffices to show that Plaintiffs are unlikely to prevail under the EAA.

Plaintiffs' remaining attacks on the District Court's decision fare no better. First, Plaintiffs contend that the District discriminated against local FCA clubs by "target[ing] FCA's religious message for harassment and exclusion, denigrating FCA's religious speech and creating bespoke rules in response to FCA's attempt to obtain equal treatment in the District." AOB-25. Those arguments are not only based on egregious misrepresentations of the record but are also entirely irrelevant to the question presented by this appeal.

The record demonstrates that FCA clubs lost recognition solely because of their noncompliance with the District's nondiscrimination policy, not because of animus toward FCA's or any students' beliefs. *See supra* at 8-10. As explained *supra* at 9, many student-initiated religious clubs (including Pioneers for Christ, also led by the individual plaintiffs) have been ASB-recognized without incident—

30

as FCA clubs were until District officials learned of FCA's discriminatory leadership requirement. *See supra* at 6-7. The facts here are therefore nothing like those presented in Plaintiffs' pre-*Truth* cases, AOB-25-26, where the schools explicitly excluded religious speech.

In any event, the question is not whether the District complied with the EAA in spring 2019—over two years before Plaintiffs sought preliminary injunctive relief. That question will be considered in connection with the individual plaintiffs' still-pending damages claims. 1-ER-52:24-25. Instead, the question is whether the District's policies governing ASB recognition for *future* school years comply with the EAA. The record is clear that the sole reason school FCA clubs might not receive official recognition in the 2022-23 year (should any student apply) would be if they are unwilling to comply with the District's neutral policy. Should the clubs affirm compliance, they will be recognized.

Second, Plaintiffs attempt to distinguish *Truth* as being about membership restrictions, not leadership requirements. AOB-27-30. But the policy in *Truth* applied to *both*. 542 F.3d at 644. This Court's conclusion that the policy was content-neutral necessarily applied to both categories.

*Martinez* and *Alpha Delta* likewise upheld policies that required "open eligibility for membership *and leadership*." 561 U.S. at 668, 671 (emphasis added); 648 F.3d at 795-96. Because "[c]ontent neutrality for purposes of the

31

[EAA] is identical to content neutrality for First Amendment claims," *Alpha Delta*, 648 F.3d at 802 n.5; *see also Truth*, 542 F.3d at 645 (in interpreting EAA, courts rely on "cases deciding analogous issues under the First Amendment"), those decisions foreclose Plaintiffs' attempt to distinguish *Truth*.

As for the Second Circuit's pre-*Martinez* decision in *Hsu v. Roslyn Union Free School District*, 85 F.3d 839 (2nd Cir. 1996), that decision concluded that a club's requirement that certain leadership positions be held by Christians constituted "speech" "to the extent that it [was] reasonably designed to assure that a certain type of religious speech will take place at the [club's] meetings." *Id.* at 856. Far from endorsing the Second Circuit's reasoning, *Truth* merely disclaimed a direct conflict and explained that *Hsu* focused "on the term 'speech' in the Act rather than the content-neutrality (or lack thereof) of school policies." 542 F.3d at 647. *Hsu*'s distinction between nondiscrimination requirements for membership and those for certain leadership positions, 85 F.3d at 858 & n.17, does not survive *Martinez*, which confirmed the validity of content-neutral nondiscrimination rules for both membership and leadership. 561 U.S. at 671.[19]

―――――――――――――

[19] *Martinez* made clear that the Supreme Court decisions on which *Hsu* relied apply only to government "*comp[ulsion]* … to include unwanted members, with no choice to opt out," and are irrelevant when the issue is a benefit like ASB recognition in a limited public forum. *Martinez*, 561 U.S. at 681-83 & n.14 (distinguishing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995), and *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)); *but see Hsu*, 85 F.3d at 858-59 (relying upon *Roberts* and *Hurley*).

Under the District's policy, students remain free to express controversial ideas and opinions, including through ASB-recognized student clubs. They must simply refrain from adopting discriminatory membership and leadership criteria if they want to take advantage of the limited benefits ASB recognition confers. Plaintiffs are not entitled to a privileged exemption from the District's uniform, content-neutral policies. *See Martinez*, 561 U.S. at 687 n.17.

### B. Plaintiffs failed to establish a likely free speech violation.

Plaintiffs' free speech and association claims are also foreclosed by Supreme Court and Ninth Circuit precedent.

As Plaintiffs acknowledge, AOB-47, their speech and association challenge is "properly analyzed under the limited-public-forum doctrine." *Alpha Delta*, 648 F.3d at 797 (citing *Martinez*, 561 U.S. at 679-83). The District has made that forum available *only* to student clubs; it is not open to outside groups like FCA National, and it does not encompass the District's own programs. FCA National does, of course, have free-speech and free-exercise rights to use school facilities after hours on the same terms as nonreligious outside groups; "exclusion" of a group from public facilities "based on [the group's] religious nature" would be impermissible. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001); *accord Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392-93 (1993). But as an outside organization, FCA National has no constitutional

33

right to demand access to the District's limited public forum for student clubs or the benefits of ASB recognition that go with it.[20]  As a result, it has no right to the injunctive relief demanded here—ASB recognition, which only District students may seek or obtain.

Even ignoring this problem, Plaintiffs' speech and association claims fail. "In a limited public forum, the government may impose restrictions that are 'reasonable in light of the purpose served by the forum,' so long as the government 'does not discriminate against speech on the basis of its viewpoint.'" *Alpha Delta*, 648 F.3d at 797 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  As the District Court held, 1-ER-9:13-11:24, and as binding Supreme Court and Ninth Circuit precedent establishes, the District's policy is both reasonable and viewpoint-neutral.

### 1. The District's policy is reasonable.

The Supreme Court and this Court have expressly recognized that it is "reasonable" for educational institutions to require, as a condition of official recognition, that student clubs accept all students or refrain from discriminating on the basis of protected characteristics like race, sex, religion, and sexual orientation. *Martinez*, for example, held that by "bring[ing] together individuals with diverse

---

[20] Nor do outside organizations have a statutory right to access such access or benefits, see 20 U.S.C. §4071(a)), or to "direct, conduct, control, or regularly attend activities of student groups" within that forum, id. §4071(c)(5).

backgrounds and beliefs," UC Hastings's all-comers policy reasonably "encourage[d] tolerance, cooperation, and learning among students," while also ensuring that "the leadership, educational, and social opportunities afforded by [officially recognized groups] are available to all students." 561 U.S. at 688-89. In *Truth*, this Court likewise recognized that conditioning ASB recognition on compliance with nondiscrimination policies was reasonable given the "school's mission … to instill in students the 'shared value of a civilized social order,' which includes instilling the value of non-discrimination." 542 F.3d at 649 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988)). *Alpha Delta* similarly held that such requirements are reasonable means "to promote diversity and nondiscrimination." 648 F.3d at 799.

The ASB program is no different. Among other purposes, the District's student-initiated clubs promote students' connectedness to school, feeling of belonging, and experience with self-governance. 1-ER-10:2-10 (District Court finding); 5-ER-779:19-780:18; 7-ER-1098:15-1099:14.[21] Extending due respect to educational policy determinations, *Martinez*, 561 U.S. at 687, the District Court recognized that "[t]he District could reasonably determine that students cannot

---

[21] Plaintiffs contend that the District Court found the policy reasonable because "students might find FCA's criteria offensive." AOB-49. But the District Court focused not on students' feelings about FCA's "criteria," but on the effects of discrimination on students' school engagement. 1-ER-10:8-10.

engage in the school community if they are prohibited from joining clubs or holding leadership positions because of their race, gender, religion, national origin, or other protected characteristic."  1-ER-10:7-10:10.

Ignoring these binding precedents and factual findings, Plaintiffs argue that the District's policy is unreasonable simply because one of the ASB program's many purposes is to promote the expression of ideas and opinions.  AOB-48. *Martinez* and *Alpha Delta* rejected that very argument.  648 F.3d at 799 n.3 (citing *Martinez*, 130 S.Ct. at 2992).  Both recognized that educational institutions may reasonably impose restrictions on a limited public forum that serve some but not all of the forum's purposes, and that educational institutions need not privilege a forum's speech-promoting purposes above all others.

Moreover, the District Court found that even without ASB recognition, FCA clubs retain significant means to advertise, communicate with students, and meet on campus.  1-ER-10 n.5; *see supra* at 12.  As in *Alpha Delta*, 648 F.3d at 799, and *Martinez*, 561 U.S. at 691, this further demonstrates the policy's reasonableness.

Plaintiffs are also simply wrong to contend that the policy undermines the speech-promoting purposes of the ASB program.  Debate and intellectual development are fostered when students with diverse backgrounds and viewpoints work together instead of walling each other off.  *Cf. Martinez*, 561 U.S. at 689 (noting that Hastings "reasonably adheres to the view that an all-comers policy, to

36

the extent it brings together individuals with diverse backgrounds and beliefs, encourages tolerance, cooperation, and learning among students") (quotations omitted). And as Plaintiffs admit, the District has policies to promote the expression of controversial or unpopular opinions and ideas and protects students from discipline based on their speech. AOB-48. Those protections apply in full to students who wish to express religious beliefs or associate in support of those beliefs, and the District has long granted ASB recognition to groups organized around such beliefs. *See, e.g.*, 2-ER-104; *supra* at 9. Further, the student members of any ASB-recognized club—whether organized around religion, politics, or ultimate frisbee—are entitled to vote for leaders who share their beliefs, ideas, and opinions. *See, e.g.*, 8-ER-1412:17-21 (Deputy Superintendent confirmed that "student member voters may consider whether the prospective candidate agrees with their religious beliefs" and this would be "the proper ASB process" "[w]hen electing their president"); 5-ER-878:8-79:9. The District's policy requires only that clubs seeking ASB recognition not declare certain students categorically ineligible for membership or leadership based on protected characteristics. Plaintiffs are no more burdened by this than any other club. *Martinez*, 561 U.S. at 669, 684 n.15, 697 n.27.

Finally, Plaintiffs contend that the policy allows a "hodgepodge of inscrutable exceptions and … leaves officials with standardless discretion to find

groups in violation." AOB-50. The District Court found the opposite: District officials have *no* discretion to permit *any* ASB-recognized student club to discriminate on a prohibited basis like race, sex, religion, or sexual orientation. 1-ER-16:17-18. The District's straightforward requirement that clubs seeking recognition not exclude students using discriminatory criteria is nothing like the amorphous standards in *ATU Local 1015 v. Spokane Transit Authority*, 929 F.3d 643, 648 (9th Cir. 2019) (policy prohibited "public issue" advertising "expressing or advocating an opinion, position, or viewpoint on matters of public debate about economic, political, religious or social issues"), or *Hopper v. City of Pasco*, 241 F.3d 1067, 1079 (9th Cir. 2001) (policy gave administrators "unbounded discretion" to determine whether artwork was "controversial").

Unlike the college policy in *InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State University*, which was applied in an "inconsistent and arbitrary" manner "riddled with exceptions," 534 F.Supp.3d 785, 821 (E.D. Mich. 2021), the District Court found that the policy here applies in full to all student clubs, without exception. 1-ER-16:21-20:5; *see supra* at 14-16.[22] Plaintiffs' other

---

[22] *Cf. Wayne State*, 534 F.Supp.3d at 798-99 (identifying other religious groups university had allowed to "limit[] leadership to those who shared the groups' religious principles," including by requiring that "leaders be 'faithful,' "engage in prayerful Discernment," not "violat[e] an Islamic principle," "agree" with group's "denominational faith statements," "profess a personal relationship with Jesus Christ," "be Coptic Orthodox Christian," and "really love God").

examples of supposed "exceptions" or "selective enforcement" involve District-sponsored programs or activities that are not even subject to the District's all-comers policy for ASB-recognized clubs.  Unlike student clubs, District-run athletics and other programs are *not* forums for student speech under the EAA or First Amendment.[23]  And as the District Court found, Plaintiffs' evidence did not support their contentions that the District had approved discriminatory clubs.  1-ER-18:12-14, 1-ER-19:10-20, 1-ER-19:24-20:3; *see also supra* at 14-16.[24]  The District Court further found "no indication in the record that any club other than Pioneer FCA has refused to sign the ASB Affirmation Form"; rather, the District will treat any FCA club that may seek ASB recognition this coming year in precisely the same way that it treats every other club seeking recognition.  1-ER-20:1-5; 1-ER-16:3-6; 1-

---

[23]  The limited public forum created by the ASB program is limited to these student clubs.  District-run programs and activities do not involve any such forum, and may instead direct resources to ensure educational equity or meet particular students' needs.  *See, e.g.*, 20 U.S.C. §1681, 34 C.F.R. §106.41 (Title IX); 20 U.S.C. §§1400 *et seq*. (Individuals with Disabilities Education Act); 20 U.S.C §1703(f) (Equal Educational Opportunities Act of 1974).  State law and District policies treat student clubs distinctly from both District-run curricular programs and curricular and extracurricular activities like athletics, cheerleading, or choir.  *See, e.g.*, 5 C.C.R. §4910(d), (j) (distinguishing student-initiated "'Club'" from school-sponsored "'Extracurricular activity'"); *id.* §4921 ("Separate Teams"); 10-ER-1859-62 ("Extracurricular and Cocurricular Activities" are District-supervised/financed and participating students represent District); 7-ER-1287-88 (athletics); 3-SER-706-09; 4-SER-711-805.

[24] The South Asian Heritage Club may "prioritize" *recruitment* of South Asian members but expressly affirms that non-South Asians may join and that there is "[n]o cap on members."  1-SER-114.

ER-19:24-20:1 ("[A]cross the board, the District requires all ASB clubs to confirm their commitment to the non-discrimination policy."); 9th Cir. ECF #21-3 at 933-35.

Even if the District *had* inadvertently recognized some noncomplying clubs, moreover, *Alpha Delta* recognized that such instances of "administrative oversight" would not establish the underlying policy's invalidity. 648 F.3d at 804.

Plaintiffs also wrongly contend that Defendants concede that "the District exercises discretion to *permit discrimination*" when it sees fit. AOB-7 (similarly asserting that Defendants admit that "[t]he District reserves substantial discretion about *whether* … to apply its nondiscrimination policies to its own programs and activities") (emphases added). The District has a variety of nondiscrimination policies that apply to its own District- or school-led academic and extracurricular programs. While its general policy prohibits discrimination in all programs and activities and precludes exclusion of students based on race, gender, and other protected characteristics, under other policies the District does provide specific support services for students who need them (for example, school-based counseling for certain groups, and accommodations for pregnant and parenting students), is authorized by state and federal laws to segregate students for athletic teams and sex education, and tracks student discipline and achievement of different groups in order to comply with federal regulations and ensure that all students' educational needs are addressed. Plaintiffs

40

complain about the District's equity policy, AOB-8, but efforts to monitor whether

particular student cohorts are academically behind and to orient programs to redress

disparities are the opposite of a policy to discriminate. Plaintiffs' argument confuses

discrimination with attempts to address different students' specific needs. *See* 3-SER-

703-04 ¶15.[25] Nor did Plaintiffs show that other programs exclude any students on

the basis of status or belief. AOB-8.[26] In any event, the District's all-comers policy

for student clubs does not apply to those programs, so Plaintiffs' unfounded claims

---

[25] Non-club District programs that Plaintiffs decry as discriminatory include the District's provision of lactation accommodations and other support services for pregnant and parenting students. *See* AOB-8 (citing 10-ER-1850-54; 10-ER-1855-57; 9-ER-1728). They contend that District *outreach* efforts, 9-ER-1632, and "[p]romoting the employment and retention of a diverse staff," 10-ER-1849, constitute "discrimina[tion] based on race …." AOB-8 (citing those ER pages); *see also id.* (citing 10-ER-1858, which requires verification of legal immigration status and prohibits discrimination based on refugee or asylee status as examples of District's discrimination). Even more strangely, Plaintiffs suggest that allowing different restrooms, locker rooms, and accommodations on overnight field trips, or separating groups of students by gender for sex education, is somehow comparable to excluding students based on protected characteristics. AOB-16 (citing 6-ER-998-1002; 9-ER-1736).

[26] Plaintiffs again rely on inadmissible student newspaper articles, 6-ER-1008; 9-ER-1816; 10-ER-1941, and even flyers and Instagram posts, 10-ER-1966-70. AOB-8, 16; *but see supra* at 8 n.6 (such evidence is neither admissible nor reliable). But none of these involve student clubs, and no admissible or reliable evidence shows that Girls' Circle (a counseling program), Latino Male Mentor Group, or campus events like "Mr. Mustang" did exclude or continue to exclude students based on status or belief. 9-ER-1643:15-44:13. Plaintiffs also reference the "Male Summit," but there is no evidence this was a District event rather than an outside organization's. *See also infra* at 50 (addressing athletic teams).

41

about those programs do not undermine the legality of the only policy at issue here.[27]

### 2. The District's policy is viewpoint-neutral.

The District Court also correctly concluded that the District's policy is viewpoint-neutral.

In a limited public forum, "a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Martinez*, 561 U.S. at 695. As the District Court recognized, both the Supreme Court and this Court have held that nondiscrimination policies like the District's are viewpoint-neutral because their purpose is unrelated to suppressing speech.

In *Martinez*, the Supreme Court held that Hastings's policy was "textbook viewpoint neutral" because it was both neutral on its face and justified without reference to the content of regulated speech. *Id.* at 695-96. Similarly, in *Alpha Delta*, this Court held that nondiscrimination policies are neutral because they do

---

[27] If Plaintiffs and their amici, *see* 9th Cir. ECF #38 at 8, were correct that District-run programs must be lumped together with student clubs and the nondiscrimination policy applied in exactly the same way to them all, a school with even one girls' sports team, as required for interscholastic sports, or one special-education class for students with disabilities, as required by federal and state law, would have no choice but to allow all religious student clubs to exclude students on the basis of any protected characteristic, be it race, gender, sexual orientation, religion, or disability. That pernicious result is not what the Constitution requires. *Cf.*, *e.g.*, *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983).

not "target speech or discriminate on the basis of its content, but instead serve[] to remove access barriers imposed against groups that have historically been excluded." 648 F.3d at 801; *see also id.* (noting that this Court "reached a similar conclusion in *Truth*").[28] Likewise, in *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984), the Supreme Court held that even a state law *prohibiting* discrimination by private groups (instead of merely conditioning receipt of a government benefit on nondiscrimination) was neutral because the state's purpose was to "eliminat[e] discrimination and assur[e] its citizens equal access to publicly available goods and services." As in *Martinez*, the policy here is both viewpoint- and content-neutral. Indeed, it does not suppress speech at all. Rather, it aims to eliminate discrimination, remove barriers, and ensure that all District students have equal access to ASB-recognized student clubs.

Plaintiffs *nowhere* contend that the purpose of the District's nondiscrimination policy is to suppress or discriminate against particular viewpoints or content. *See* AOB-50-54.[29] Indeed, as the District Court noted, the policy predates the 2019 controversy regarding FCA clubs. 1-ER-11:9-11 & n.6.

---

[28] Plaintiffs' amici argue that *Alpha Delta* is no longer good law because in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Supreme Court held that a local government's purpose was not relevant when the restrictions at issue were facially content-based. *See, e.g.*, 9th Cir. ECF #46 at 6-8. But in *Alpha Delta*, as here, the school's policy was "neutral as written." 648 F.3d at 803.

[29] Plaintiffs' selective-enforcement theory is addressed *infra* at 44-46.

43

This is dispositive with respect to the only issue currently before this Court: whether the District may apply its nondiscrimination policy when reviewing ASB applications, including from any FCA-affiliated club, for the upcoming 2022-23 school year.

Plaintiffs' arguments about the policy's supposed non-neutrality are meritless.

Plaintiffs first suggest that the policy is viewpoint-discriminatory because other student clubs are allowed to "deviate" from it by applying *non*discriminatory membership and leadership criteria, while FCA clubs cannot apply religious criteria to exclude students. AOB-51. But their examples are no different from the policy in *Martinez*, which allowed "neutral and generally applicable membership requirements unrelated to status or beliefs." *Martinez*, 561 U.S. at 671 n.2. Criteria like grade-point average and artistic or athletic ability, derided by Plaintiffs as "so-called 'non-discriminatory criteria,'" AOB-14, are "skill measurements" that are fully consistent with providing "all students … the *opportunity* to participate on equal terms," *Martinez*, 561 U.S. at 671 n.2. So is a requirement that students have "good moral character." AOB-14-15; *see Martinez*, 561 U.S. at 671 n.2 ("conduct requirements" are "boilerplate good-behavior standards" consistent with all-comers policy); *see also id.* (expressly approving of dues and attendance requirements). The Supreme Court had no trouble concluding that Hastings's policy, which allowed

44

such criteria, was "textbook viewpoint neutral."  *Id.* at 695; *see also id.* at 694.

While the District may not provide a comprehensive list of every possible

nondiscriminatory criterion, the policy's examples and the guiding principle that

ASB-recognized clubs must allow all students to participate "regardless of their

individual characteristics" provide sufficient guidance to school officials.  9-ER-1739-

41.

Even if they did not, that would simply render the District's policy a

nondiscrimination policy (prohibiting discrimination on certain enumerated grounds)

rather than an all-comers policy (requiring that all students have the opportunity to

participate), either of which is constitutionally acceptable.  Plaintiffs' argument

repeats the *Martinez* plaintiffs' mistake, conflating the policy's "differential *impact*

on groups wishing to enforce exclusionary membership policies" with the policy's

*purpose*.  561 U.S. at 696.  Policies are neutral if they "'serve[] purposes unrelated

to the content of expression,'" regardless of whether they have "'an incidental

effect on some speakers or messages but not others.'"  *Id.* at 695 (quoting *Ward v.

Rock Against Racism*, 491 U.S. 781, 791 (1989)) (emphasis added).  As in

*Martinez*, Plaintiffs are "simply confusing [their] *own* viewpoint-based objections

to nondiscrimination laws … (which [they] are entitled to have and [to] voice) with

viewpoint *discrimination*." *Id*. at 696.

Plaintiffs next complain that FCA clubs have been subjected to "religious

targeting," selective enforcement, and unique scrutiny.  AOB-50-54.  But those allegations are premised on misrepresentations that are contrary to the record evidence and the District Court's factual findings.  *See supra* at 8-11, 14-16 (describing Plaintiffs' misrepresentations regarding basis for FCA clubs' derecognition and treatment of other clubs' requirements).[30]

Finally, that the District previously investigated groups primarily in response to student complaints does not render this a "heckler's veto" case.  AOB-53-54. The policy prohibits discriminatory conduct, not speech, and its enforcement depends solely on whether a club's conduct violates the policy, not on whether its "messages … cause[d] discomfort, fear, or even anger" in others.  *Center for Bio-Ethical Reform, Inc. v. L.A. County Sheriff Dep't*, 533 F.3d 780, 788 (9th Cir. 2008).  This is apparent from the fact that FCA existed on District campuses for years without incident, until the District discovered that their conduct violated District policy.  And even though complaint-driven processes are *not* inherently discriminatory, *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1083-84 (9th Cir. 2015), the District has now implemented additional affirmative procedures to ensure that every ASB-recognized student club complies with the

---

[30] Plaintiffs complain that FCA clubs had not denied any students' leadership applications based on FCA National's leadership requirements, AOB-54, but do not dispute that these requirements conflict with the nondiscrimination policy.

nondiscrimination policy. 1-ER-18:20-20:2. Enforcement of the policy is therefore not dependent on students' complaints.

### C. Plaintiffs failed to establish a likely free exercise violation.

*Martinez* and *Alpha Delta* also rejected free exercise challenges to the club recognition policies in those cases, which resemble the District's policy in all relevant respects. *Martinez*, 561 U.S. at 697 n.27; *Alpha Delta*, 648 F.3d at 804. In those cases, as here, the policies were generally applicable and imposed at most only incidental burdens on religious conduct. *Id.* Plaintiffs' attempts to avoid these precedents lack merit, and their free exercise claim is unlikely to succeed.

### 1. *Martinez* provides the proper free exercise framework.

Because the "mission [of a school district] is education," it retains the "authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities," including for limited public forums that the school district opens for student speech. *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981); *see Healy v. James*, 408 U.S. 169, 189 (1972).

As previously explained, the Supreme Court held in *Martinez* that nondiscrimination requirements for official recognition "fit[] comfortably within the limited-public-forum category, for [a religious club], in seeking what is effectively a state subsidy, faces only indirect pressure to modify its membership policies" and "may exclude any person for any reason if it forgoes the benefits of

47

official recognition." 561 U.S. at 682. That conclusion was the basis for the Court's rejection of not only CLS's free-speech and expressive-association claims, *id.* at 680-81, but also its free-exercise claim, *id.* at 697 n.27. For under *Employment Division v. Smith*, 494 U.S. 872, 878-882 (1990), the Free Exercise Clause does not confer the right to an exemption from "otherwise valid regulations of general application that incidentally burden religious conduct." *Martinez*, 561 U.S. at 697 n.27; *see also Alpha Delta*, 648 F.3d at 804 (under *Smith*, "nondiscrimination policy" is "rule of general application" that does not violate Free Exercise Clause). The access requirements for a correctly designed limited public forum for student clubs must be religiously neutral and generally applicable. Hence, "[i]n seeking an exemption from [an] across-the-board all-comers policy, [a religious student group] … seeks preferential, not equal, treatment; [so] it … cannot moor its request for accommodation to the Free Exercise Clause." *Id.* at 697 n.27.

Here, too, the District has imposed religiously neutral nondiscrimination requirements on "all ASB student clubs," 1-ER-12:10, but Plaintiffs demand an exemption under the Free Exercise Clause that would afford them "preferential, not equal, treatment." *Martinez*, 561 U.S. at 697 n.27. Under *Martinez*, *Alpha Delta*, and *Smith*, that claim fails as a matter of law.

48

    **2.**       **The District treats secular and religious conduct identically under the nondiscrimination policy.**

Seeking to evade *Martinez* and *Alpha Delta*, Plaintiffs argue the District's policy is subject to strict scrutiny under *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), and *Tandon v. Newsom*, 141 S.Ct. 1294 (2021). AOB-33-39. That is incorrect.

Both *Fulton* and *Tandon* detail how deviations from otherwise neutral rules to disfavor religious groups trigger strict scrutiny. In *Fulton*, the Supreme Court held that a "formal system of entirely discretionary exceptions" to a nondiscrimination policy for secular groups, paired with a categorical ban on religious exemptions from the same policy, undermines the policy's general applicability and triggers strict scrutiny. 141 S.Ct. at 1877-79. And in *Tandon*, the Court concluded that when "comparable secular activity" is treated "more favorably than religious exercise," a policy is no longer neutral under *Smith* and is instead subject to strict scrutiny. 141 S.Ct. at 1296.

Neither case applies here. As explained, the record evidence overwhelmingly supports the District Court's factual finding that District officials lack *any* discretion to exempt ASB-recognized clubs from the nondiscrimination policy. *See supra* at 13-16.

Whether the District applies different rules to its *own* programs, *see* AOB-34, is irrelevant. A public school district may design its own programs to serve

governmental interests such as curricular or educational goals, which may be different from those served by creating a limited public forum for student speech in student clubs. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267-71 (1988). Because the District has different interests in its own programs than in the ASB-club forum, they simply are not "comparable." *Tandon*, 141 S.Ct. at 1296. That the District has created women's sports teams to ensure equitable access to athletic opportunities regardless of sex or gender, as required by Title IX, *see* 20 U.S.C. §1681; 34 C.F.R. §106.41, or created special programs to assist students with learning disabilities, as required by the Individuals with Disabilities Education Act, 20 U.S.C. §§1400 *et seq.*, in no way undermines the District's interest in applying its nondiscrimination policy to the distinct ASB-clubs program.

That conclusion undergirds the District's right to tell the interscholastic Pioneer Varsity Lacrosse Team, a District-run program, what to wear and whom to play, even though it does not and likely cannot do the same for students' ultimate frisbee clubs. *See* Cal. Educ. Code §35179. And it supports the District's academic policies, making special instruction available to students who are not native English speakers while applying its all-comers nondiscrimination policy to ASB-recognized student clubs. Treating those clubs differently from the District's own programs is no "religious gerrymander[]." AOB-44 (quoting *Carson v. Makin*, 142 S.Ct. 1987, 2000 (2022)). Rather, it is a function and natural

50

consequence of the programs' distinct contexts and the entirely different legal rules and policies that apply to them.

As explained *supra* at 13-16, Plaintiffs are wrong that "the District has applied its policy strictly to [Pioneer] FCA" while making "exceptions" for nonreligious clubs. AOB-34. The District *applies* the policy to all clubs; it has not *enforced* the policy against other clubs because, to the District's knowledge, none violate and demand to keep violating it. *See* 1-ER-17:6-18:19; *supra* at 14-15. A rule does not cease to be neutral and generally applicable by being enforced only against those who violate it. *See, e.g.*, *Stormans*, 794 F.3d at 1084. And the District did not withdraw ASB recognition from Pioneers for Christ, which held beliefs similar to FCA's and was headed by the same two students but did not apply FCA National's discriminatory requirement categorically excluding certain students from leadership. *See supra* at 26.

Plaintiffs also fault the District's approval process for clubs as too discretionary. AOB-35. Again, Plaintiffs' factual contentions are simply false. *See supra* at 15. There is neither evidence that the District has exercised discretion to favor secular groups over religious ones, nor a *Fulton*-style viewpoint-discriminatory "formal system of entirely discretionary exceptions" for favored secular groups. 141 S.Ct. at 1877-78 (citing *Smith*, 494 U.S. at 884).

51

Allowing clubs to define membership based on nondiscriminatory criteria does not constitute improper discretion under *Fulton*. Unlike Philadelphia's "formal system of" unfettered discretion, the District here has *no* discretion to waive the nondiscrimination requirements for ASB-recognized clubs, and Plaintiffs have not shown that it has done so. Nondiscriminatory requirements such as premising "'eligibility for membership and leadership on attendance, the payment of dues, or other neutral requirements,'" 1-ER-12:22-13:1 (quoting *Martinez*, 561 U.S. at 693), raise no constitutional concerns, and were expressly approved in *Martinez*. 561 U.S. at 671 n.2, 693. They do not undermine the District's "asserted government interest," *Tandon*, 141 S.Ct. at 1296, in preventing invidious discrimination to *any* extent, let alone to the same extent as FCA National's exclusionary leadership requirements.

Finally, as for supposed restrictions by other ASB-approved clubs based on protected characteristics, the District Court determined after exhaustive facutal analysis that there was no evidence that "the District has, in the past, knowingly allowed ASB clubs to violate the [nondiscrimination] Policy." 1-ER-18:18-19. Only Pioneer FCA seeks to evade the District's policy. In other words, even before its recent measures to clarify the nondiscrimination requirements, the District consistently and fairly enforced its policy. *See* 1-ER-18:20-19:8. *Fulton* and *Tandon* thus offer no support for Plaintiffs' free exercise claims.

### 3.    The District was not motivated by animus.

Nor is there any whiff of antireligious animus in the District's requirement that FCA clubs, like all other clubs, abide by neutral nondiscrimination requirements. After learning of Pioneer FCA's requirements for club leaders, Principal Espiritu was advised by the Deputy Superintendent that the requirement violated the policy. 8-ER-1321-26. The evidence confirms that the decision was based solely on the club's violation of the policy, not on any statements by or views of teachers, students, or anyone else. *See supra* at 8-10.

Far from supporting Plaintiffs' position, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S.Ct. 1719 (2018), underscores that the District's actions do not trigger strict scrutiny. *Masterpiece* concluded that the Colorado Civil Rights Commission violated a baker's free-exercise rights not by enforcing state nondiscrimination requirements against him, but by conducting a biased adjudicatory proceeding in which commissioners' "hostility toward [the plaintiff's] sincere religious beliefs" "surfaced at the Commission's formal, public hearings." 138 S.Ct. at 1729-30. The Court carefully distinguished statements made by decision-makers *during that adjudication* from other statements in other contexts, which do not present the same constitutional problem. *Id.*; *see also Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir. 1999). Here, Plaintiffs point only to statements by individuals with no decision-making authority respecting FCA

53

clubs' status.  *See* AOB-39-42.  Plaintiffs have no evidence that those statements in any way informed, let alone dictated, the District's decisions concerning the clubs. *See supra* at 9-11.  On these facts, *Masterpiece* has no bearing.

Because the District's nondiscrimination policy is neutral and generally applicable, the District Court properly recognized that Plaintiffs are unlikely to succeed in establishing a Free Exercise Clause violation.

### D.   The District did not impermissibly interfere with FCA's internal management decisions.

Plaintiffs also contend the District's requirement that FCA clubs comply with the all-comers policy as a condition of ASB approval constitutes unconstitutional interference with FCA's "religious autonomy."  AOB-57.  But the cases Plaintiffs cite all involve direct government interference with religious institutions' autonomous decision-making, not student clubs in public schools.[31] The District's right to impose reasonable rules on students, including in a limited public forum, is well-established, as is the understanding that students' First Amendment rights must be considered in the unique context of the public schools. No case has held that high school students have a right to autonomous religious decision-making in any context, let alone at school.

---

[31] *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708 (1976); *Our Lady of Guadalupe Sch. v. Morrisey-Berru*, 140 S.Ct. 2049, 2055 (2020); *Puri v. Khalsa*, 844 F.3d 1152, 1159-62 (9th Cir. 2017); *see also Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 831 (6th Cir. 2015).

Regardless, FCA and its local student groups remain entirely free to apply whatever leadership requirements they want: The District's policy merely specifies whether clubs with discriminatory requirements are entitled to the benefits of ASB recognition. As *Martinez* held, the legal test when government is "dangling the carrot of subsidy, not wielding the stick of prohibition," is entirely different from church-autonomy cases, in which government dictates and controls the internal affairs of a religious organization. 561 U.S. at 683. And while Plaintiffs cite two out-of-circuit decisions that elided the distinction between benefits and prohibitions and found that university policies governing official student group recognition impermissibly interfered with religious groups' religious autonomy or expressive association, AOB-59, *Martinez* specifically *rejected* the approach taken in *Christian Legal Society v. Walker*, 453 F.3d 853, 866-67 (7th Cir. 2006), concluding that group recognition policies like those here are properly analyzed under limited-public-forum doctrine rather than as standalone infringements of First Amendment freedoms, *Martinez*, 561 U.S. at 678-83.

*InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State University*, 534 F.Supp.3d 785, 823 (E.D. Mich. 2021), also does not help Plaintiffs, as it was premised on the district court's finding that denying official recognition effectively prevented the student group there from "meeting … on campus" and exposed members to discipline, including expulsion. 534 F.Supp.3d

at 812-13.  FCA clubs here face no such situation; instead, just like in *Martinez*, they retain "substantial alternative channels" to communicate with fellow students and advertise events and have "access to school facilities to conduct meetings." *Martinez*, 561 U.S. at 690-91 (citation omitted).

## IV.  The equities do not support a preliminary injunction.

Plaintiffs were also not entitled to a preliminary injunction because the balance-of-hardships and public-interest factors weighed against an injunction.  As the District Court explained, "[i]n adopting its non-discrimination policy, the District had to weigh the interests of students who seek to exclude, the interests of students who face exclusion in the absence of a non-discrimination policy, and the educational costs and benefits of striking a particular balance between them."  1-ER-21:17-21.  The District's objective to spare its students the harms of discrimination and exclusion is weighty and deserving of deference.  *See Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1126-27 (9th Cir. 2008) ("consideration of the public interest is constrained" when "responsible public officials … have already considered that interest").  Indeed, enforcement of nondiscrimination protections is a public policy of the highest order.  *See Bob Jones Univ.*, 461 U.S. at 593-96.

The District's "creditworthy" policy still allows FCA clubs to meet at school and enjoy "substantial alternative [communication] channels."  *Martinez*, 451 U.S.

at 690 (quotations omitted). An injunction would, by contrast, force the District to allow (and place its imprimatur on) students' exclusion from ASB-recognized clubs based on personal characteristics like sexual orientation, race, or religion. Such discrimination "impose[s] stigma and injury of the kind prohibited by our basic charter." *Obergefell v. Hodges*, 576 U.S. 644, 671 (2015). That stigma is particularly harmful to LGBTQ+ students, as California has recognized. *See*, *e.g.*, 1999 Cal. A.B. 537, Cal. Stats. 1999, ch. 587 §§2-3; Cal. Educ. Code §§218, 234. The injunction Plaintiffs seek would leave many students subject to invidious discrimination, injuring them, their families, and the community as a whole.

## V.   The District Court Properly Denied Plaintiffs' Motions To Supplement the Record.

Finally, the District Court did not abuse its discretion in denying, in part, two of Plaintiffs' three motions to supplement the record. Plaintiffs assert that their supplemental evidence was "relevant" and "previously unavailable," AOB-61, but fail to identify any error or prejudice and neglect to mention that Defendants' motions to supplement were similarly denied. 1-ER-21:27-22:1; D. Ct. Dkt. #119, 180. Because Plaintiffs bear the burden to show that an incorrect ruling was prejudicial, *see Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20

57

F.4th 466, 476 (9th Cir 2021); *Reese v. County of Sacramento,* 888 F.3d 1030,

1047 (9th Cir. 2018), their failure to do so requires affirmance.[32]

Plaintiffs' first motion, D. Ct. Dkt. #125, sought to introduce evidence

relating to the District's investigation of Glasser's posting of FCA's "purity

pledge" on his whiteboard in April 2019. Plaintiffs argued to the District Court

that the documents demonstrated that the District did not admonish Glasser or

conduct a required investigation, *id.* at 2:26-3:19; 4:8-24, and now say the

documents show "systemic discrimination against FCA viewpoint and the

District's intent to continue excluding FCA," AOB-60-61. But the record evidence

shows only that the Glasser investigation fell through the cracks in April 2020 as

COVID overwhelmed District operations. *See*, *e.g.*, 3-ER-249:21-50:21; 3-ER-

256:9-20; 3-ER-270:13-72:5; 3-ER-276:14-78:5. That administrative glitch has no

bearing on Plaintiffs' entitlement to a preliminary injunction more than two years

later. Glasser did not and does not review club applications or determine ASB

recognition, and he had no role in the revocation decision. *See supra* at 8 & n.6.

---

[32] Plaintiffs contend that *Ocean Beauty Seafoods, LLC v. Pacific Seafood Group Acquisition Co.*, 611 Fed.Appx. 385 (9th Cir. 2015), holds that "[f]ailing to provide any explanation for its denial and differential treatment among the motions was an abuse of discretion." AOB-61-62. But there, the court denied a motion to supplement on the ground that it did not need additional evidence, while simultaneously denying a preliminary injunction for lack of evidence. This "incongruity... [was] compounded by the fact that some of the excluded documents ... were highly relevant to the issues the district court weighed in denying the preliminary injunction." 611 Fed.Appx. at 387.

Plaintiffs' second motion, D. Ct. Dkt. #192, which sought to admit an eighth Lopez declaration concerning Pioneer FCA activity in spring 2022, was also properly denied. The motion was untimely, as it describes events occurring *before* the May 12, 2022 preliminary injunction hearing but was filed *after* that hearing. *See* 1-SER-2 ¶¶2-12. In any event, the District Court acknowledged that FCA students had met at Pioneer this past spring, 1-ER-6:19-21, and accepted counsel's representation of that fact at the hearing, 1-SER-62:22-63:5. Plaintiffs have thus failed to show prejudice.

## CONCLUSION

This appeal should be dismissed for lack of standing. Should the Court conclude that it is justiciable, the District Court's decision should be affirmed.

Dated: July 18, 2022

Respectfully submitted,

*/s/Stacey M. Leyton*
Stacey M. Leyton
Stephen Berzon
Altshuler Berzon LLP

Amy R. Levine
Dannis Woliver Kelley

Richard B. Katskee
Kenneth D. Upton, Jr.
Americans United for Separation of Church and State

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

I, Stacey M. Leyton, hereby certify that this brief contains 13,708 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32-1(c). The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6). I certify that this motion complies with the word limits of Federal Rule of Appellate Procedure 32(a)(7) as modified by Circuit Rule 32-1(a).

Dated: July 18, 2022                    By: /s/ *Stacey M. Leyton*
                                             Stacey M. Leyton