**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FELLOWSHIP OF CHRISTIAN ATHLETES, an Oklahoma corporation; FELLOWSHIP OF CHRISTIAN ATHLETES OF PIONEER HIGH SCHOOL, an unincorporated association; CHARLOTTE KLARKE; ELIZABETH SINCLAIR, | No. 22-15827<br><br>D.C. No. 4:20-cv-02798-HSG |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| SAN JOSE UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION; NANCY ALBARRAN, in her official and personal capacity; HERB ESPIRITU, in his official and personal capacity; PETER GLASSER, in his official and personal capacity; STEPHEN MCMAHON, in his official and personal capacity, | |
| *Defendants-Appellees*. | |

2      FELLOWSHIP OF CHRISTIAN ATHLETES V. SAN JOSE USD

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted En Banc March 23, 2023
Pasadena, California

Filed September 13, 2023

Before:  Mary H. Murguia, Chief Judge, and Consuelo M.
Callahan, Milan D. Smith, Jr., Sandra S. Ikuta, Mark J.
Bennett, Eric D. Miller, Bridget S. Bade, Daniel A. Bress,
Danielle J. Forrest, Patrick J. Bumatay and Jennifer Sung,
Circuit Judges.

Opinion by Judge Callahan;
Concurrence by Judge Forrest;
Partial Concurrence and Partial Dissent by Judge M. Smith;
Partial Concurrence and Partial Dissent by Judge Sung;
Dissent by Chief Judge Murguia

# SUMMARY[*]

### First Amendment/Free Exercise Clause

The en banc court reversed the district court's denial of a motion for a preliminary injunction in an action brought by the Fellowship of Christian Athletes (FCA) and others against the San Jose Unified School District (the District) for violation of FCA's First Amendment rights to free exercise of religion and free speech, and directed the district court to enter an order reinstating FCA's recognition as an official Associated Student Body (ASB) approved student club.

FCA requires its student leaders to affirm a Statement of Faith, which includes the belief that sexual relations should be within the confines of a marriage between a man and a woman. The San Jose Unified School District revoked FCA's status as an official student club for violation of the District's non-discrimination policies.

The en banc court held that the District's Pioneer High School FCA had representational organizational standing and its claims for prospective injunctive relief were not moot, given that at least one student intended to apply for ASB recognition in the coming school year but had been discouraged by the District's policies. FCA National had organizational standing and its claims were not moot because the District's actions frustrated FCA National's mission and required it to divert organizational resources,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

which it would continue to do in order to challenge the District's policies.

The en banc court next held that the district court erred in applying a heightened standard applicable to mandatory injunctions. Because FCA's motion for a preliminary injunction sought to maintain the status quo under which it had been granted ASB recognition for nearly 20 years, the relief sought was properly characterized as a prohibitory injunction.

Addressing the merits of FCA's First Amendment's Free Exercise Clause claim, the en banc court stated that to avoid strict scrutiny, laws that burden religious exercise must be both neutral and generally applicable. A purportedly neutral "generally applicable" policy (1) may not have a mechanism for individualized exemptions; (2) may not treat comparable secular activity more favorably than religious exercise; and (3) must not be hostile to religious beliefs.

The en banc court held that the District's nondiscrimination policies, including its more recently enacted "All Comers Policy," which prohibits all ASB clubs from enacting discriminatory membership and leadership criteria, were not generally applicable, and therefore subject to strict scrutiny. The District (1) retained discretion to grant individualized exemptions and did so in a viewpoint-discriminatory manner, (2) treated comparable secular activity more favorably than religious exercise, and (3) penalized FCA based on its religious beliefs.

To pass strict scrutiny, the District's policies must be narrowly tailored to advance a compelling government interest. Because the District failed to offer any showing that it considered less restrictive measures, it fails the tailoring prong of the strict scrutiny test. Accordingly, the en banc

court held that FCA and the other plaintiffs demonstrated a likelihood of success on the merits of their Free Exercise claims. The remaining preliminary injunction factors also supported granting the requested injunctive relief.

Concurring, Judge Forrest agreed that FCA was entitled to a preliminary injunction but wrote separately because she viewed this case as raising more of a free speech rather than a religious-freedom issue and therefore would resolve the case under the Equal Access Act and the Free Speech Clause of the First Amendment. Judge Forrest would not address direct organizational standing because FCA's chapter at Pioneer High School had standing to represent its members in this action.

Concurring in part and dissenting in part, Judge M. Smith, with whom Chief Judge Murguia and Jung Sung join with respect to Part II, agreed that the plaintiffs were entitled to a preliminary injunction because the District treated religious activities differently than secular ones, but wrote separately because the majority opinion swept well beyond what was needed to resolve this case. Judge M. Smith dissented as to the majority's holding in a footnote that plaintiffs would be likely to succeed on a facial challenge to the District's All-Comers Policy under the Free Speech Clause.

Concurring in part and dissenting in part, Judge Sung agreed with the majority that Pioneer FCA has representational standing but stated that FCA National did not have direct organizational standing to pursue prospective injunctive relief for the reasons stated by Chief Judge Murguia in her dissent. On the merits, Judge Sung concluded that the district court did not abuse its discretion in refusing to enjoin the District from uniformly applying its

nondiscrimination policy to student groups in the then-upcoming school year, for the reasons stated by Chief Judge Murguia in her dissent.

Dissenting, Chief Judge Murguia with whom Judge Sung joined with respect to Parts I, II.B, II.C.2, III.A, III.B, and IV (except for the last sentence), would dismiss this appeal because plaintiffs failed to make the necessary "clear showing" of Article III standing for prospective injunctive relief. Plaintiffs failed to establish that any District student sought ASB recognition for an FCA club for the 2021-22 school year or intended to apply for ASB recognition during the then-upcoming 2022–23 school year or would do so if the District's non-discrimination policies were enjoined. Briefly addressing the merits, Chief Judge Murguia stated that (1) the District's All-Comers Policy did not formally provide the District with discretion to grant exceptions; (2) the record did not support a finding that the District selectively enforced its Policy only against FCA; and (3) the majority made both legal and factual errors in finding that the Policy was not neutral.

## COUNSEL

Daniel H. Blomberg (argued), Eric S. Baxter, Nicholas R. Reaves, Abigail E. Smith, James J. Kim, Becket Fund for Religious Liberty, Washington, D.C.; Kimberlee W. Colby, Christian Legal Society, Center for Law & Religious Freedom, Fairfax, Virginia; Christopher J. Schweickert, Seto Wood & Schweickert LLP, Pleasant Hill, California; for Plaintiffs-Appellants.

Stacey M. Leyton (argued) and Stephen Berzon, Altshuler Berzon LLP, San Francisco, California; Richard B. Katskee and Kenneth D. Upton Jr., Americans United for Separation of Church and State, Washington, D.C.; Amy R. Levine and William Tunick, Dannis Woliver Kelley, San Francisco, California; Andrea A. Brott, Law Offices of Andrea A. Brott, Berkeley, California; for Defendants-Appellees.

Christopher E. Mills, Spero Law LLC, Mount Pleasant, South Carolina, for Amici Curiae Campus Crusade for Christ Inc., InterVarsity Christian Fellowship/USA, Young Life, Ratio Christi, and The Navigators.

Bradley J. Lingo, J. Alex Touchet, Robertson Center for Constitutional Law, Regent University School of Law, Virginia Beach, Virginia; Michael G. Schietzelt Jr., Wake Forest, North Carolina; for Amicus Curiae Robertson Center for Constitutional Law.

Peter M. Torstensen Jr., Assistant Solicitor General; David M.S. DeWhirst and Christian B. Corrigan, Solicitors General; Austin Knudsen, Attorney General of Montana; Montana Department of Justice, Helena, Montana; Kathleen L. Smithgall, Associate Solicitor, Consovoy McCarthy PLLC, Arlington, Virginia; for Amicus Curiae State of Montana and 22 Other States.

Eduardo E. Santacana, Willkie Farr & Gallagher LLP, San Francisco, California; Kathryn Joseph, Director of Policy & Advocacy, Interfaith Alliance Foundation, Washington, D.C.; for Amicus Curiae Interfaith Alliance Foundation.

Cynthia F. Crawford and Casey Mattox, Americans for Prosperity Foundation, Arlington, Virginia, for Amicus Curiae Americans for Prosperity Foundation and Professor Luke C. Sheahan.

Howard Slugh, Jewish Coalition for Religious Liberty, Washington, D.C., for Amicus Curiae Jewish Coalition for Religious Liberty.

Kelly J. Shackleford, Jeffrey C. Mateer, David J. Hacker, Jeremiah G. Dys, Ryan N. Gardner, and Keisha T. Russell, First Liberty Institute, Plano, Texas; Kayla A. Toney, First Liberty Institute, Washington, D.C.; for Amici Curiae D.B., Hannah Thompson, and Jacob Estell.

Anthony J. Dick, Harry S. Graver, and Ryan M. Proctor, Jones Day, Washington, D.C., for Amicus Curiae Professor Michael W. McConnell.

Ronald G. London, Foundation for Individual Rights and Expression, Washington, D.C.; Abigail E. Smith, Foundation for Individual Rights and Expression, Philadelphia, Pennsylvania; for Amicus Curiae Foundation for Individual Rights and Expression.

Joseph R. Rose, Gibson Dunn & Crutcher LLP, San Francisco, California; Jun Nam, Gibson Dunn & Crutcher LLP, Palo Alto, California; Blaine H. Evanson, Gibson Dunn & Crutcher LLP, Irvine, California; for Amici Curiae Cardinal Newman Society and Christian Medical & Dental Associations.

Emily Martin, Sunu Chandy, Phoebe Wolfe, Auden Perino, and Hunter Iannucci, National Women's Law Center, Washington, D.C.; Courtney M. Dankworth, Harold W. Williford, Joshua N. Cohen, and Isabelle M. Canaan, Debevoise & Plimpton LLP, New York, New York; for Amici Curiae National Women's Law Center and Twenty-One Additional Organizations.

Mark Bresee, Alyssa Ruiz de Esparza, Juliana Duran, Atkinson Andelson Loya Ruud & Romo, La Jolla,

California; Keith Bray, Kristin Lindgren, and Dana Scott, California School Boards Association, West Sacramento, California; for Amicus Curiae California School Boards Association and its Education Legal Alliance.

John J. Bursch and J. Caleb Dalton, Alliance Defending Freedom, Washington, D.C.; David A. Cortman, Alliance Defending Freedom, Lawrenceville, Georgia; Tyson C. Langhofer, Alliance Defending Freedom, Lansdowne, Virginia; for Amici Curiae Ratio Christi and Chi Alpha.

## OPINION

CALLAHAN, Circuit Judge:

Anti-discrimination laws undeniably serve valuable interests rooted in equality, justice, and fairness. And in a pluralistic society, these laws foster worthy goals such as inclusion and belonging. The Constitution also protects the right for minorities and majorities alike to hold certain views and to associate with people who share their same values. Often, anti-discrimination laws and the protections of the Constitution work in tandem to protect minority views in the face of dominant public opinions. However, this appeal presents a situation in which the two regrettably clash.

The Fellowship of Christian Athletes (FCA or FCA National), as its name suggests, is a ministry group formed for student athletes to engage in various activities through their shared Christian faith. FCA holds certain core religious beliefs, including a belief that sexual intimacy is designed only to be expressed within the confines of a marriage between one man and one woman. In order for FCA to

express these beliefs, it requires students serving in a leadership capacity to affirm a Statement of Faith and to abide by a sexual purity policy. Because of these religious beliefs, however, the San Jose Unified School District (District) revoked FCA's status as an official student club on multiple campuses for violation of the District's non-discrimination policies.

While it cannot be overstated that anti-discrimination policies certainly serve worthy causes—particularly within the context of a school setting where students are often finding themselves—those policies may not themselves be utilized in a manner that transgresses or supersedes the government's constitutional commitment to be steadfastly neutral to religion. Under the First Amendment's protection of free exercise of religion and free speech, the government may not "single out" religious groups "for special disfavor" compared to similar secular groups. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2416 (2022).

The District, rather than treating FCA like comparable secular student groups whose membership was limited based on criteria including sex, race, ethnicity, and gender identity, penalized it based on its religious beliefs. Because the Constitution prohibits such a double standard—even in the absence of any motive to do so—we reverse the district court's denial of FCA's motion for a preliminary injunction.

**I.**

Founded in 1954, FCA is an international Christian religious ministry organization with more than 7,000 student chapters (also known as "huddles") in middle schools, high schools, and colleges across the United States. FCA seeks to equip "student athletes from all backgrounds for fellowship, spiritual growth, and service on their campuses."

FCA's "vision [is] 'to see the world transformed by Jesus Christ through the influence of coaches and athletes,' and its mission [is] 'to lead every coach and athlete into a growing relationship with Jesus Christ and His church.'" To further these goals, FCA clubs regularly meet to host religious discussions, service projects, prayer times, worship, and Bible studies.

FCA "welcome[s] all students to participate in the[se] events." FCA "also welcome[s] all students to join [its ranks] as members." However, FCA requires its student leaders to affirm certain core religious beliefs identified in FCA's Statement of Faith. Included in these core tenets of FCA's Statement of Faith is the belief in the authority of the Bible, the virgin birth, the death and resurrection of Jesus, the ministry of the Holy Spirit, and God's design for marriage. In particular, one portion of the Statement of Faith calls upon student leaders to affirm a belief that sexual intimacy may only be enjoyed within the context of marriage, and more specifically, between one man and one woman:

> We believe God's design for sexual intimacy is to be expressed only within the context of marriage, that God created man and woman to complement and complete each other. God instituted marriage between one man and one woman as the foundation of the family and the basic structure of human society. For this reason, we believe that marriage is exclusively the union of one man and one woman.

As part of FCA's Christian Character and Mission, student leaders must also conform to FCA's Sexual Purity Statement.  The Sexual Purity Statement reads:

> God desires His children to lead pure lives of holiness.  The Bible teaches that the appropriate place for sexual expression is in the context of a marriage relationship. The biblical description of marriage is one man and one woman in a lifelong commitment.
> While upholding God's standard of holiness, FCA strongly affirms God's love and redemptive power in the individual who chooses to follow Him.  FCA's desire is to encourage individuals to trust in Jesus and turn away from any impure lifestyle.

FCA asks its student leaders to embrace and affirm these beliefs because it "helps [FCA] keep Jesus Christ the center of [its] ministry with a clear understanding of what [FCA] believe[s]."  According to FCA, student leaders' adherence to this "higher standard of biblical lifestyle and conduct" is "vitally important to the credibility and effectiveness of each FCA chapter's ministry."  FCA contends that if its student leaders acted contrary to these beliefs, it "would compromise the integrity of the group and the leaders, undercut the group's mission and message, and harm [FCA's] ability to express [its] Christian beliefs."

FCA leadership positions are open to all students as long as the student "sincerely affirm[s] FCA's Statement of Faith and its standards of conduct."

**A.**

In the District, student-run organizations can apply for recognition as part of the District's Associated Student Body (ASB) program. The purpose of the ASB "program is to give students practice in self-governance, [to] provide social and recreational activities, to honor outstanding student achievement, [and] to enhance school spirit and student sense of belonging." The District also views the ASB program as "an appropriate venue for students to learn how to be leaders; how to engage with some of the democratic principles that align with their own personal interests; how to be members of a community; [and] how to be welcoming and inclusive." The District recognizes ASB clubs founded on a wide variety of common viewpoints. Some examples of the many ASB-recognized clubs in the District include: Bachelor Nation, Chess Club, Communism Club, Girls Who Code, Harry Potter Club, K-Pop Club, Mock Trial, and Ping Pong Club.

Each year, student organizations must submit applications for ASB approval, which the District and school officials ultimately grant or deny. Student organizations seek ASB recognition for the many benefits that it confers upon the club. For instance, ASB-recognized clubs enjoy important recruiting tools such as inclusion in the official club list and the student yearbook, access to ASB financial accounts and ASB-sanctioned fundraisers, an official campus faculty advisor, and priority access to meeting spaces on campus.

Since the early 2000s, FCA chapters enjoyed ASB recognition in three District high schools, including Pioneer High School (Pioneer). From that time until the events giving rise to this lawsuit in 2019, no student ever

complained to the District that he or she wanted to hold a leadership position in an FCA chapter but was ineligible because of FCA's religious requirements. And until the controversy arose in 2019, there is no evidence any student in the District ever complained that he or she felt excluded by FCA's religious beliefs. In sum, FCA chapters enjoyed controversy-free ASB recognition in the District for nearly two decades.

**B.**

In April 2019, a teacher at Pioneer, Peter Glasser, obtained copies of FCA's Statement of Faith and Sexual Purity Statement from students in the school. Glasser viewed these statements to contain "objectionable" "moral stances" on marriage and sexuality. Glasser felt he "had to react right away" to these viewpoints "because any delay in [his] response could have been interpreted as agreement, or even worse, apathy." So, before his first period class, Glasser posted the FCA statements on his whiteboard with a note: "I am deeply saddened that a club on Pioneer's campus asks its members to affirm these statements. How do you feel?"

According to Glasser, he did not realize that two FCA officers were present in his first period class. Those students felt "insulted" and deeply hurt that Glasser did not speak with them privately before broadcasting his message on the board to the class. During a break between classes, an FCA officer approached Glasser to inform him that his note was incorrect, and that only officers—not members—were required to "sign that pledge." And the next day, another FCA officer told him that the statement was inaccurate and did not reflect the version used by the local FCA chapter. Based at least in part on these interactions, FCA officers

asked for Glasser to include their faculty advisor in future conversation with him.

In addition to his whiteboard note, Glasser sent an email––attaching FCA's Statement of Faith and Sexual Purity Statement—to Pioneer Principal Herb Espiritu and two other faculty members.  Glasser asked if they "were aware of the pledge that . . . [FCA] requires of its members" and noted one of his students was "very upset about the anti-gay prerequisites for membership/officership."     Principal Espiritu responded that he was "not aware of this pledge" and that he would "discuss this with the admin team and follow up with the club leadership as necessary."

A week after he sent his initial email, Glasser sent a follow up email to Principal Espiritu on April 29, 2019.  By this point, the controversy surrounding FCA had grown, and as Glasser put it in his email:  "we move right to the question of whether [FCA's] views need to be barred from a public high school campus."   While he initially stated he was "ambivalent" on that question, Glasser concluded that based on the need to express support "for all LGBTQ+ kids and their friends and allies" on campus, it was necessary to discuss the issue "head on."   Below are some of Glasser's thoughts on FCA's views:

> We've discussed before how I believe that our campus needs to grow dramatically in our treatment of gender identity, and for me, this FCA issue is the straw (lead pipe, really) that broke the camel's back. In so many ways, I feel that there's only one thing to say that will protect our students who are so victimized by religious views that discriminate against them: I am an adult on your campus, and

> these views are bullshit to me. They have no
> validity. It's not a choice, and it's not a sin.
> I'm not willing to be the enabler for this kind
> of "religious freedom" anymore. LGBTQ+
> kids, you deserve to have your dignity
> defended by the adults around you.

While Glasser did express some concern that "great
students" in FCA could be "collateral damage," and he did
not "want people to feel attacked for their views," he
explained that "part of me thinks that attacking these views
is the only way to make a better campus."

The following day, April 30, 2019, the Pioneer "Climate
Committee," a school leadership committee composed of
several school department chairs (including Glasser) and
administrators, convened to discuss the controversy
surrounding FCA. As the meeting minutes reflect, Principal
Espiritu and the Climate Committee agreed that FCA's
"pledge" clashed with the "core values of [Pioneer High
School] [such as] inclusive[ness] [and] open-mindedness."
Principal Espiritu also noted the "need to take a united stance
as [a] committee." After the meeting, Principal Espiritu
brought the Climate Committee's concerns about FCA to the
District administrators' attention.

Two days after the Climate Committee meeting, on May
2, 2019, Principal Espiritu informed the student leaders of
Pioneer FCA that the District had decided to strip the club of
its ASB approval. In a comment for a column posted in
Pioneer's school newspaper, The Pony Express, Principal
Espiritu was quoted as stating: "The pledge is of a
discriminatory nature. We decided that we are no longer
going to be affiliated with them." Principal Espiritu later
testified that he did not speak with any FCA representatives

to verify or confirm the specific prerequisites for FCA
leadership before stripping the club of recognition. Rather,
Principal Espiritu testified that it was "sufficient to deny
ASB approval" "simply because the sexual purity statement
existed" and that "FCA holds" those beliefs.

In essence, based on the documents provided to Glasser
and the discussion of the Climate Committee, the District
concluded that because "a student could not be an officer of
[FCA], if they were homosexual," FCA had violated the
District's "Non-Discrimination Policy."[1]

FCA's derecognition marked the first time any club at
Pioneer had gained and then lost ASB approval without the
club itself choosing to revoke its application before
completion of the application process.    According to
Pioneer's ASB Activities Director, Michelle Mayhew, the
school administrators granted approval to all clubs that
applied. Once a student club gained ASB approval, it would
only undergo additional scrutiny if any issues were brought
to the attention of the administration.    After FCA's
derecognition, the District allowed Pioneer FCA to remain
on campus as an unaffiliated "student interest group" that did
not enjoy many of the benefits of the ASB program. FCA
was the only student group at Pioneer that fell into this

---

[1] The Nondiscrimination In District Programs and Activities policy,
(Board Policy 0410) provides in relevant part:

> District programs, . . . activities, and practices shall be
> free from discrimination based on gender, gender
> identity and expression, race, color, religion, ancestry,
> national origin, immigration status, ethnic group,
> pregnancy, marital or parental status, physical or
> mental disability, sexual orientation or the perception
> of one or more such characteristics.

18    FELLOWSHIP OF CHRISTIAN ATHLETES V. SAN JOSE USD

category.  Principal Espiritu testified that he allowed FCA to meet on campus because of his obligations under the Equal Access Act (EAA),[2] and that based on those obligations, he would have done the same "[i]f they wanted to have a KKK meeting."

## C.

Although FCA was no longer an ASB-recognized group, some teachers expressed concern that FCA was still able to remain on campus as a student interest group.  For example, in an email to two other teachers, Jason Goldman-Hall, the faculty advisor for The Pony Express, referred to a student reporter who "fe[lt] bad for FCA" as an "idiot" who was "dragging her feet" for not immediately interviewing other teachers involved with the Gender and Sexuality Alliance (GSA)[3] student club.  Danni McConnell, a history teacher and faculty advisor for the GSA student club, stated in a Pony Express article that "[i]t's unfortunate that there is an organization on campus that subscribes to a national organization that has these beliefs."  McConnell called it "a hurtful message and problem" and urged students to "rally[] against the issue."

---

[2] The EAA prohibits public secondary schools that receive federal funds and create a limited open public forum (which occurs when the school grants official recognition to student-organized clubs) from denying any student club equal access to that forum "on the basis of the religious, political, philosophical, or other content of the speech at [a club's] meetings."  20 U.S.C. § 4071(a)–(b); *see also Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 235, 247 (1990).

[3] According to the record, when Glasser helped found this club on Pioneer's campus in 2002, it was referred to as the Gay-Straight Alliance.

In July 2019, Glasser sent Principal Espiritu an email questioning whether they could "ban FCA completely from campus," and asking if the school could find that "FCA violates [the District's] sexual harassment policy" such that it would not be shielded by any equal access laws.  Before the start of the new school year, Glasser sent Principal Espiritu a follow up email noting he was "eager to get a status update" on FCA and for the Climate Committee "to talk about next steps" to "determine if [the District's] sexual harassment policy could be used."

**D.**

For the 2019–2020 school year, FCA applied for but was denied ASB recognition.  However, another club—the Satanic Temple Club—was formed and was granted ASB approval.  The Satanic Temple Club's leadership (including one student who initially brought FCA's Statement of Faith to Glasser's attention) asked Glasser to serve as the club's faculty advisor.  Glasser declined, noting he viewed it as intending to "mock" FCA, and that he wanted to avoid "compromis[ing] [his] credibility" surrounding FCA. However, another faculty member and member of the Climate Committee, Michelle Bowman, agreed to serve as its faculty advisor.  Bowman, when later emailed by one of her former students about the Satanic Temple Club and its role in the controversy surrounding FCA, encouraged the former student to speak and responded:

> Out of context, your club sounds fierce, but we know it's not.  [FCA] still exists on campus.  It has not been denied recruitment. It's published on the Pioneer website.  The lawsuit comes from their national organization.  We live in polarized times.

> Even with the Biden win, millions of people
> voted for the real devil.  And, evangelicals,
> like FCA are charlatans and not in the least
> bit Christian based or they "conveniently"
> forget what tolerance means.   Talk about
> twisting the truth . . . and the sad thing is that
> they probably believe they are victims.

Bowman concluded her response by saying:  "Get your voice
out there.  Slander is unacceptable.  They choose darkness
over knowledge and they perpetuate ignorance."

In September 2019, some Pioneer students expressed an
interest in protesting FCA in an organized fashion and
distributed flyers[4] announcing the protest. After a few weeks
of some discussion of mediation, attempts to find
alternatives, and efforts by school officials to discourage the
protestors, the students ultimately came to the conclusion
that the protest was necessary to "express [their]
dissatisfaction"   with   the   "discriminatory   message
indoctrinated in an educational environment that's supposed

---

[4] The flyers stated:

**Did you Know?**
Every leader of the Fellowship of Christian Athletes
has to agree that same-sex marriage and homosexual
sex are morally wrong.
**Disagree with this?**
Join the protest!
Wednesdays at lunch outside room 360
Signs will be provided. The aim of this protest is not
to alienate any member of the FCA or create hostility
but rather to educate the school about the regional
organization's polices.

to be a safe space for everyone." On October 23, 2019, students gathered outside an FCA meeting in protest, holding signs with slogans such as "HATRED ISN'T A RELIGIOUS BELIEF." These protests were reported in The Pony Express and photos of the protestors were posted on the newspaper's Instagram account.

At an FCA meeting in November 2019, two student reporters from The Pony Express attended to take photos. According to one teacher who observed, the photographers took "well over 300 photos," often within five feet of the person's face they were photographing. And each time a new student at the meeting spoke, the photographers would go over and take 25 photos in close proximity. In an email from a teacher alerting Principal Espiritu to this activity, the teacher characterized it as "intimidating," "flat out bullying," and stated that "[i]t did not feel like a safe environment." The teacher noted that he had "never seen a club, sports team, or class so targeted."

At an FCA meeting in December 2019, a group of 15 to 25 students participated in a protest organized by the GSA club. Due to the potential for unrest, there was at least one security officer present, and some protestors were apparently barred entry to the auditorium. According to one teacher who attended, Channel Sulc, it was not true that students were barred for being hostile; however, students held signs for the duration of the meeting. In her comments to The Pony Express, Sulc stated that, according to the protestors, there was a greater need to "create a safer and more accepting community for all," which required that "FCA not hold events on campus" or that FCA "reassess" its core beliefs.

At an FCA event in February 2020, one protestor associated with the "student newspaper, entered and was disruptive." According to the paper's faculty advisor, Goldman-Hall, the student reporter was caught on video "verbally abusing" FCA members. In his email to Principal Espiritu, Goldman-Hall noted that the newspaper had "irreparably compromised" its objectivity on FCA and would no longer cover FCA as a result.

According to one FCA officer, there were protests at every "regular" FCA meeting and at "any [FCA] club activity or event" during the 2019–2020 school year.

**E.**

In spring 2020, the COVID-19 pandemic halted all student club activity on campus, and club activity did not reconvene in person until April 2021. For the 2020–2021 school year, Pioneer granted all clubs, including FCA, provisional ASB approval.

In April 2020, two FCA student leaders at Pioneer, Charlotte Klarke and Elizabeth Sinclair[5] and FCA National filed suit against the District and several school officials including Principal Espiritu and Glasser. After motion practice, Klarke, Sinclair, FCA National, and the local chapter at Pioneer (Pioneer FCA) (collectively, Plaintiffs) filed their operative third amended complaint in July 2021. Plaintiffs brought claims for relief for: (1) equal access to extracurricular school clubs under the Equal Access Act (EAA), 20 U.S.C. §§ 4071–4074; (2) Free Speech,

---

[5] Klarke and Sinclair had first sued under their initials to avoid harassment, but the district court ordered their names to be disclosed at the District's request, ruling that "harassment at their high school . . . ended when [they] graduated in June 2020."

Expressive Association, and Free Exercise of Religion under the First Amendment; and (3) Equal Protection under the Fourteenth Amendment. On July 30, 2021, Plaintiffs filed a motion "for a preliminary injunction requiring Defendants to restore recognition to student chapters affiliated" with National FCA, including Pioneer FCA, "as official [ASB] approved student clubs." Defendants moved to dismiss in part, arguing that all plaintiffs lack standing to pursue injunctive relief. This motion to dismiss remains pending before the district court.

**F.**

In response to the ongoing litigation, the District adopted a new version of its non-discrimination policy for the 2021–2022 school year emphasizing the need for more training on student club membership and leadership requirements. The new non-discrimination requirements in the "All-Comers Policy" were applicable to "all individuals in the District programs and activities," including "[a]ll ASB recognized student groups," and the ASB program, and the District. The central feature of the new All-Comers Policy "require[d] ASB recognized student groups to permit any student to become a member or leader, if they meet non-discriminatory criteria." In order to gain or retain ASB approval, the student club officers had to sign a statement affirming the club would: "allow any currently enrolled student at the school to participate in, become a member of, and seek or hold leadership positions in the organization, regardless of his or her status or beliefs." According to the Student Organization Guidelines (the guidelines), the new All-Comers Policy was to "be implemented and construed in accordance with the all comers policy considered by the Supreme Court" in *Christian Legal Society Chapter of the University of*

*California, Hastings College of Law v. Martinez* [*(Martinez)*], 561 U.S. 661 (2010).

While the All-Comers Policy prevented ASB clubs from enacting discriminatory membership and leadership criteria, the guidelines carved out several exceptions. According to the guidelines, ASB clubs could "adopt non-discriminatory criteria" for membership and leadership, "such as regular attendance at group meetings, participation in group events, participation in the group for a minimum period of time, or participation in orientation or training activities." Apart from these examples, the guidelines do not define what constitutes "non-discriminatory criteria." Instead, school officials rely on "common sense" and enforce the requirements on a case-by-case basis.

Despite the All-Comers Policy, schools in the District were allowed to maintain—or even themselves sponsor— clubs with facially discriminatory membership requirements. For example, the Senior Women club retained approval even though it was open only to "seniors who identify as female." Likewise, the South Asian Heritage club could "prioritize" acceptance of south Asian students. Indeed, Michelle Mayhew, Pioneer's Activities Director, acknowledged that other groups could limit their membership. For example, she agreed that "the Interact club could continue to require that its members or its leaders demonstrate good moral character or show leadership ability." She also suggested that the Republican student club [could] become ASB approved even if it required "club leaders . . . [to] support the Republican platform." Similarly, Mayhew also agreed the Girls' Circle could "still limit their membership to students who are female identifying."

After implementation of the All-Comers Policy, no FCA club applied for ASB recognition in the District for the 2021–2022 school year.  According to FCA's regional director in the Bay Area, Rigoberto Lopez, student leaders at Pioneer would have applied for ASB recognition but did not because the All-Comers Policy would have in effect prohibited FCA from "select[ing] leaders based on their agreement with the club's faith."

The students were correct.  In the District's view, FCA's Statement of Faith violates the All-Comers Policy on two grounds.  First, the requirement that leaders "affirm a belief in Christianity" improperly excluded students of other faiths or non-religious students.  Second, the requirement that leaders "affirm that marriage is exclusively the union of one man and one woman" improperly excluded "homosexual students or those who affiliate with homosexual parents." Principal Espiritu testified that Pioneer FCA could not gain ASB approval under the All-Comers Policy with its existing leadership requirements.

**II.**

In June 2022, the district court denied the Plaintiffs' motion for a preliminary injunction. The district court found that Plaintiffs were requesting a "mandatory preliminary injunction" and therefore applied a "heightened standard" required for issuance.  Applying that standard, the district court concluded that Plaintiffs failed to show the "facts and law clearly favor" their likelihood of success on the merits.

First, the district court held that the All-Comers Policy, as written, was unlikely to violate Plaintiffs' rights. Applying a limited public forum analysis as set forth in *Martinez*, the district court concluded that Plaintiffs were unlikely to prevail on their free speech and expressive

association claims because the All-Comers Policy was content- and viewpoint-neutral under existing Ninth Circuit law. The district court similarly found that Plaintiffs were unlikely to prevail on their Free Exercise claims because the All-Comers Policy was generally applicable and only incidentally burdened religion. In addition to Plaintiffs' constitutional claims, the district court likewise found Plaintiffs were unlikely to prevail on their EAA claim because the All-Comers Policy was "content-neutral because it does not preclude religious speech but rather prohibits acts of discrimination."

Second, the district court held that Plaintiffs were unlikely to show the All-Comers Policy, as applied, violated their rights. Specifically, the district court rejected Plaintiffs' argument that the All-Comers Policy contained a formal mechanism to grant discretionary exceptions that ran afoul of *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). Lastly, the district court found that Plaintiffs failed to show clear selective enforcement of any of the non-discrimination policies.

Plaintiffs timely appealed the district court's denial of the motion for a preliminary injunction. A divided three-judge panel reversed, directing the district court to enter a preliminary injunction against the District ordering it to recognize student groups affiliated with FCA. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F.4th 1075, 1099 (9th Cir. 2022). Judge Lee, who authored the majority opinion, also wrote separately "to highlight the depth" of the District's animus towards the students' religious beliefs. *Id.* at 1099–1100 (Lee, J., concurring). Judge Christen, dissenting, wrote that the majority impermissibly reached the merits of the case because Plaintiffs could not establish Article III standing and

the case should be dismissed for lack of jurisdiction. *Id.* at 1103 (Christen, J., dissenting).

After the District petitioned for rehearing en banc, a majority of active judges voted to rehear the case. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 59 F.4th 997, 998 (9th Cir. 2023). The en banc court heard argument on March 23, 2023. On April 3, 2023, a majority of the en banc court issued an injunction pending resolution of the appeal, ordering Defendants-Appellees in the interim to recognize student chapters associated with FCA as officially ASB-approved. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 64 F.4th 1024, 1025 (9th Cir. 2023).

We review the district court's denial of a preliminary injunction for an abuse of discretion. *Olson v. California*, 62 F.4th 1206, 1218 (9th Cir. 2023). A district court abuses its discretion when it utilizes "an erroneous legal standard or clearly erroneous finding of fact." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc)). A factual finding is clearly erroneous if it is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)). Applying these standards, we reverse.

## III.

Although Defendants' motion to dismiss in part for lack of standing remains pending before the district court, we have an independent obligation to consider standing at all

stages because it is an Article III jurisdictional requirement.**[6]**
*See United States v. Viltrakis*, 108 F.3d 1159, 1160 (9th Cir.
1997); *see also Hernandez v. Campbell*, 204 F.3d 861, 865
(9th Cir. 2000) (per curiam) ("Federal courts are always
under an independent obligation to examine their own
jurisdiction." (cleaned up)). "[T]he standing inquiry . . . [is]
focused on whether the party invoking jurisdiction had the
requisite stake in the outcome when the suit was filed."
*Davis v. FEC*, 554 U.S. 724, 734 (2008); *see also Morongo
Band of Mission Indians v. Cal. State Bd. of Equalization*,
858 F.2d 1376, 1380 (9th Cir. 1988).

Since the filing of this action, the two individual
plaintiffs in this action, Charlotte Klarke and Elizabeth
Sinclair, have graduated from Pioneer High School.
Accordingly, their claims for prospective injunctive relief
were previously dismissed as moot.    Thus, we must
determine whether either Pioneer FCA or FCA National had
standing as of April 22, 2020, when the complaint was filed.
*See Nat'l Ass'n of Optometrists & Opticians LensCrafters,
Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("[I]n an
injunctive case this court need not address standing of each
plaintiff if it concludes that one plaintiff has standing.").

"[T]he irreducible constitutional minimum of standing"
consists of three elements:  (1) "plaintiff must have suffered
an injury in fact," i.e., one that "is (a) concrete and
particularized and (b) actual or imminent, not conjectural or
hypothetical," (2) the injury must "be fairly traceable to the

---

[6] While we respect the views of our colleagues who have elected to write
separately, we do not feel the need to offer any specific responses to
those writings.  The majority opinion faithfully applies precedent, and
while the separate writings may have differing views on that precedent,
those writings have no binding effect on this court.

challenged action of the defendant," and (3) it must be "likely" that the injury is redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

To bring a claim for prospective injunctive relief, "[t]he plaintiff must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (citations and quotation marks omitted). "[P]laintiffs 'may demonstrate that an injury is likely to recur by showing that the defendant had . . . a written policy, and that the injury 'stems from' that policy. Where the harm alleged is directly traceable to a written policy[,] there is an implicit likelihood of its repetition in the immediate future.'" *Truth v. Kent Sch. Dist.*, 542 F.3d 634, 642 (9th Cir. 2008) (quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004)), *overruled on other grounds by Los Angeles County v. Humphries*, 562 U.S. 29 (2010).

## A.

An organization has standing to bring suit on behalf of its members if "(1) at least one of its members would have standing to sue in his own right, (2) the interests the suit seeks to vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006). Only the first prong is in dispute here.

Plaintiffs contend that Pioneer FCA's student leaders had standing to sue in their own right because, under the

current All-Comers Policy, any application for ASB recognition would have been denied. Indeed, the District admits that any such application would have been futile. But "[w]e have consistently held that standing does not require exercises in futility." *Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002); *see also Truth*, 542 F.3d at 642.

In response, Defendants argue that Plaintiffs lack standing and that their claims seeking prospective injunctive relief become moot during the course of the litigation because they cannot establish (1) a "real and immediate threat of repeated injury" because "no students applied for recognition of an FCA club" during the 2021–22 school year, and (2) "any student's intent to apply for ASB recognition for the 2022–23 school year but for the non-discrimination policy."

Article III also requires that "an actual controversy be extant at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016), *as revised* (Feb. 9, 2016) (cleaned up). Thus, where "an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Id.* at 160–61 (cleaned up). Due to the nature of the mootness inquiry, unlike standing, we must consider factual developments that occurred after the suit was filed. *See Meland v. Weber*, 2 F.4th 838, 849 (9th Cir. 2021).

The declarations submitted by Rigoberto Lopez, FCA National's student advisor in the Bay Area, show that at least one student at Pioneer intended to apply for ASB recognition but was discouraged by the District's policies. In a September 2021 declaration, Lopez identified four Pioneer

students, including N.M., a then-junior, who expressed her desire to "either lead or continue [her] membership in Pioneer FCA in the coming year" and that if the court were to grant an injunction allowing Pioneer FCA to retain its leadership requirements, that "Pioneer FCA's leadership will apply for ASB recognition." In an October 2021 declaration, Lopez again identified N.M. as one of the students who attended the school's "Club Rush" recruiting event. In a May 2022 declaration, Lopez discussed FCA's "plans to grow the group during the 2022–23 school year." As part of these plans, Lopez attended multiple meetings, including a meeting in which the club confirmed N.M. and B.C (who had just submitted an FCA Student Leader Application) "as Pioneer FCA's leadership for the 2022–23 school year." Based on these declarations it is apparent that at least one Pioneer FCA student leader would apply for ASB recognition, meaning that the claims for prospective relief are not moot.

Contrary to Defendants' characterizations, this evidence is not speculative. The record shows that after the decision of the three-judge panel in this case, N.M. and B.C. promptly applied for ASB recognition on behalf of Pioneer FCA and submitted a signed application on September 1, 2022. Indeed, the District indicated that the timely application would "be approved in accordance with the Ninth Circuit's August 29, 2022 decision."

Defendants seek to dismiss the Lopez declarations as "hearsay and speculation," and criticize Plaintiffs for not providing "evidence from actual students, who are the only ones who may apply for ASB recognition." But these arguments are legally and factually flawed. Legally, that the declarations are hearsay is irrelevant because a court may exercise its discretion to accept hearsay and make inferences

in ruling on a preliminary injunction. *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc).

Moreover, the record is now clear that Lopez's assertions concerning N.M. and B.C. are true. Factually, Defendants' arguments about the declarations from Lopez—rather than the students directly—ignore the record in this case. In making this argument, Defendants entirely ignore the stipulation they entered into stating that the District would not depose any non-party student in exchange for Plaintiffs' agreement not to introduce testimony from them. Indeed, the parties entered into this stipulation only after N.M. and other FCA student leaders felt intimidated after receiving deposition notices from the District's counsel, despite not being parties to the litigation. The District cannot simultaneously enjoy the benefits of the stipulation by excluding testimony from these students while criticizing them for not submitting direct declarations they were not required to submit.[7]

Accordingly, we find that Pioneer FCA has representational organizational standing to sue on behalf of its members.

**B.**

"[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its

---

[7] Because this testimony raises a mootness issue, it is appropriate to consider the Lopez declarations here. *See Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003) (stating that a court may allow the parties to supplement the record where supplementary material would "render a controversy moot and thus divest us of jurisdiction"). We therefore **GRANT** Plaintiffs' motion to supplement the record on standing, Dkt. No. 98. All other pending motions are **DENIED as moot.**

mission and caused it to divert resources in response to that frustration of purpose." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879 (9th Cir. 2022) (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021)). While an organization may not "manufacture" an injury by "choosing to spend money fixing a problem that otherwise would not affect the organization at all," it "can establish standing by showing that [it] would have suffered some other injury had [it] not diverted resources to counteracting the problem." *Id.*

According to its Huddle Playbook, FCA's mission is "[t]o lead every coach and athlete into a growing relationship with Jesus Christ and His church." FCA's mission is highly dependent upon its structure. Indeed, FCA's entire ministry starts at the local level on school campuses across the country. As FCA states, "[t]he campus gives FCA the platform" necessary to engage in its mission, and the "campus is strategic" in furthering its goal of engaging students in Christianity. On campuses in the District, only ASB clubs enjoy the myriad benefits of membership such as inclusion in the yearbook, the ability to fundraise, access to an ASB account, and priority access to meeting spaces in campus facilities. Given the vital importance of the campus huddles to FCA's mission, the District's denial of those benefits has undoubtedly hampered FCA National's ability to engage in its core objective. We thus conclude that the District's denial of ASB recognition has and continues to frustrate FCA National's mission.

In addition, FCA National has also had to "divert[] resources" in "counteracting the problem" posed by the derecognition both at the time the complaint was filed and since then. *See Sabra*, 44 F.4th at 879 (citation omitted). According to Lopez, FCA National has diverted "a huge

amount of staff time, energy, effort, and prayer that would normally have been devoted to preparing for school or ministry" in "[w]orking to support the FCA student leaders" after the derecognition.  In addition to working directly to support the Pioneer FCA student leaders, FCA National has also diverted extensive time "from working on ministry-advancing activities to instead address" the impact of the derecognition on the students.

Lost money and "staff time spent responding" to a challenged government action are directly redressable and, under our precedent, vest direct organizational standing. *Walker v. City of Lakewood*, 272 F.3d 1114, 1124–25 (9th Cir. 2001); *see also, e.g.*, *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1166 (9th Cir. 2013) ("Diverted staff time is a compensable injury" when it is "caused by the [challenged government action]"); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (organizational plaintiff demonstrated standing by "show[ing] a drain on its resources" caused by combating housing violations).

The District does not ultimately dispute FCA National's distinct organizational standing theory.  Rather, it only disputes the factual basis for the theory: that FCA National has not adequately demonstrated that District students intend to apply for ASB recognition for FCA.  As discussed above, however, this argument pertains to mootness (not standing), and two Pioneer students applied for FCA recognition in fall 2022.  Because Pioneer students, such as N.M., remain committed to forming an FCA chapter on campus, despite the District's derecognition, FCA National will continue to devote significant time and resources to assist its student members in complying with—and, if necessary, challenging—the District's policies.  We therefore hold that

FCA National has organizational standing, and its claims are not moot.

## IV.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). We evaluate "these factors on a sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.'" *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (quoting *All. for the Wild Rockies*, 632 F.3d at 1131). When the balance of equities "tips sharply in the plaintiff's favor," the plaintiff must raise only "serious questions" on the merits—a lesser showing than likelihood of success. *All. for the Wild Rockies*, 632 F.3d at 1131–32, 1134–35 (citation omitted); *see also Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

The district court erred in characterizing the requested relief as a mandatory injunction rather than a prohibitory injunction. The distinction between the two types of injunctions can fairly be categorized as one of action versus inaction. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) ("A mandatory injunction orders a responsible party to take action, while [a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." (cleaned up)). The difference is legally significant because mandatory injunctions are "particularly

36    FELLOWSHIP OF CHRISTIAN ATHLETES V. SAN JOSE USD

disfavored," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (simplified), and place a higher burden on the plaintiff to show "the facts and law *clearly* favor the moving party." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (emphasis added) (cleaned up).

The inquiry is whether the party seeking the injunction seeks to alter or maintain the status quo. *See Ariz. Dream Act Coal.*, 757 F.3d at 1060–61. The district court found that the controversy here arose when the Plaintiffs filed the lawsuit in April 2020, and at that time, "no FCA groups had ASB club status at any District school." Accordingly, the district court concluded that "the status quo is that the District has no ASB-recognized FCA clubs" and thus Plaintiffs were "asking to change this current state" by seeking recognition. The district court concluded Plaintiffs were seeking a mandatory injunction subject to the heightened standard required for issuance.

Plaintiffs contend the controversy arose not at the time of the lawsuit, but rather when the District first derecognized FCA clubs in May 2019. Plaintiffs assert that they are not seeking to alter the status quo, but simply restore it because before the District's actions in 2019, FCA clubs enjoyed ASB recognition on District campuses for nearly 20 years.

In applying the heightened standard applicable to mandatory injunctions, the district court abused its discretion by determining that the status quo was one in which FCA clubs were unrecognized in District schools. *See Saucillo v. Peck*, 25 F.4th 1118, 1133 (9th Cir. 2022) ("[A] district court abuse[s] its discretion by employing an erroneous legal standard."). While there is no bright line rule for when a controversy arises, the district court's reasoning

that the controversy arose at the time of the lawsuit is contrary to our caselaw. We held in *Arizona Dream* that the status quo is "the legally relevant relationship between the parties before the controversy arose." 757 F.3d at 1061 (emphasis omitted). The facts of *Arizona Dream* inform our analysis.

There, Deferred Action for Childhood Arrivals (DACA) recipients sought a preliminary injunction against Arizona officials from enforcing a policy that prevented them from obtaining driver's licenses. *Id.* at 1057–58. We held that the "district court erred in defining the status quo" as one in which the new policy gave rise to the plaintiffs' claims. *Id.* at 1061. Rather, before the new law went into effect, plaintiffs were eligible to receive driver's licenses and "[b]y revising their policy," the defendants, not the plaintiffs, "affirmatively changed [the] status quo." *Id.*

Here, the District's new policy of enforcing its non-discrimination rules likewise alters the status quo of providing FCA clubs ASB recognition—a benefit that FCA enjoyed without issue for nearly 20 years. Based on that longstanding relationship between the parties, we hold that the status quo was one in which FCA enjoyed recognition. Because it was the District's action that "affirmatively changed" that status quo and Plaintiffs' motion for a preliminary injunction seeks to restore that status quo, the relief sought is properly viewed as a prohibitory injunction. The district court thus erred in applying a heightened standard applicable to mandatory injunctions.

## V.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend. I. To

avoid strict scrutiny, laws that burden religious exercise must be both neutral and generally applicable. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Nor may the government "act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018). Under the strict scrutiny standard, the government must demonstrate that "a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546 (cleaned up). The District argues that this standard does not apply. The District is mistaken.

The District contends that we must analyze the Free Exercise claim under *Martinez*, 561 U.S. at 661, and this Court's decision in *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011). Both cases involved Free Exercise claims, but neither governs our case. To start, *Martinez* says little about the Free Exercise Clause analysis at all. Rather, the majority opinion's analysis is confined to a footnote in which it simply repeats the holding from *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878–82 (1990), that "the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct." *Martinez*, 561 U.S. at 697 n.27 (citations omitted). Quoting *Martinez*, the District contends that we need only conduct a limited public forum analysis to conclude that FCA "seeks preferential, not equal, treatment."

But this argument runs headlong into more recent Supreme Court authority refining what it means to be "generally applicable" under *Smith*. First, while the *Fulton*

majority declined to overrule *Smith*, the majority opinion clarified *Smith*'s scope, holding that the mere existence of government discretion is enough to render a policy not generally applicable. *See Fulton*, 141 S. Ct. at 1879 ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given. . . ."). Second, and as discussed later, the stipulated facts in *Martinez* providing for an *exceptionless* policy are critically distinct from the discretion the District retains when applying the non-discrimination policies in this case. *See* 561 U.S. at 675–76.

In relying on *Alpha Delta*, the District argues that Plaintiffs' Free Exercise claims fail because they do not "contend that the purpose of the District's nondiscrimination policy is to suppress or discriminate against particular viewpoints or content." But on this point *Alpha Delta* is not controlling because it is out of step with the Supreme Court's post-*Smith* Free Exercise jurisprudence. In *Alpha Delta*, we found no Free Exercise violation because the policy incidentally burdening religion did "not target religious belief or conduct." 648 F.3d at 804. Since *Alpha Delta* was decided, the Supreme Court has clearly rejected such a "targeting" requirement for demonstrating a Free Exercise violation. This is most evident in *Tandon v. Newsom*, in which the Court held that "treat[ing] *any* comparable secular activity more favorably than religious exercise" prevented a law from being considered "neutral and generally applicable." 141 S. Ct. 1294, 1296 (2021) (per curiam). Thus, *Fulton* and *Tandon* clarify that targeting is not required for a government policy to violate the Free Exercise Clause. Instead, favoring comparable secular activity is sufficient. To the extent that *Alpha Delta* stands for the proposition that a Free Exercise violation requires a showing

of more, we overrule it as "clearly irreconcilable" with intervening Supreme Court authority. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).**[8]**

Distilled, Supreme Court authority sets forth three bedrock requirements of the Free Exercise Clause that the government may not transgress, absent a showing that satisfies strict scrutiny. First, a purportedly neutral "generally applicable" policy may not have "a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). Second, the government may not "treat . . . comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. Third, the government may not act in a manner "hostile to . . . religious beliefs" or inconsistent with the Free Exercise Clause's bar on even "subtle departures from neutrality." *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (citation omitted); *Lukumi*, 508 U.S. at 534. The failure to meet any one of these requirements subjects a governmental

---

[8] *Alpha Delta*'s analysis pertaining to the Free Speech Clause has similarly been abrogated by more recent Supreme Court authority. In *Alpha Delta*, our court found that the nondiscrimination policy was not subject to strict scrutiny because it was not implemented "for the *purpose* of suppressing [p]laintiffs' viewpoint." 648 F.3d at 801. But that standard requiring a purpose or intent to suppress a viewpoint is incompatible with *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). In reversing our court, *Reed* held that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). Thus, even if the District were correct that there was no intent to suppress FCA's religious viewpoint—a contention that is dubious based on these facts—the District's intent is irrelevant in the Free Speech analysis. Because *Alpha Delta* is no longer good law, Plaintiffs are likely to prevail on their Free Speech claim as well.

regulation to review under strict scrutiny. On the record before us, the District's implementation of its non-discrimination policies fails all three.

## A.

The Supreme Court's recent decision in *Fulton* demonstrates the faults in the District's view of general applicability. In *Fulton*, a foster care agency, Catholic Social Services (CSS) had a contract with the City of Philadelphia (City) in which the City's Department of Human Services would ultimately place children in foster homes associated with CSS. 141 S. Ct. at 1874–75. CSS, like FCA, held religious beliefs about marriage that informed its work within the foster care system. *Id.* at 1875. "CSS believe[d] that marriage is a sacred bond between a man and a woman," and as such, it would not certify unmarried or same-sex couples to participate in its program. *Id.*[9] In 2018, the City investigated CSS after the City Council stated that there were "laws in place to protect . . . people from discrimination that occurs under the guise of religious freedom." *Id.* The City ultimately decided that it would not fully renew its contract with CSS unless the agency agreed to certify participation by same-sex couples. *Id.* at 1875–76. CSS and three of its affiliated foster parents sued, bringing Free Exercise challenges. After the Third Circuit affirmed the district court's denial of preliminary relief, *id.* at 1876, the Supreme Court reversed, *id.* at 1882.

In doing so, the Supreme Court provided a framework for determining whether a government policy burdening

---

[9] "CSS [did] not object to certifying gay or lesbian individuals as single foster parents or to placing gay and lesbian children." *Fulton*, 141 S. Ct. at 1875.

religious exercise is "generally applicable" and thus not
subject to strict scrutiny. *Id.* at 1877. Under this framework,
"[a] law is not generally applicable if it invites the
government to consider the particular reasons for a person's
conduct by providing a mechanism for individualized
exemptions." *Id.* (cleaned up). In our case, the District's
policies are not generally applicable because the District
retains discretion to grant individualized exemptions for its
own programs and student programs alike.

The District has "broad" and "comprehensive" policies
forbidding discrimination on the basis of race, sex, sexual
orientation, religion, and other criteria. These policies apply
district-wide not only for ASB student groups, but also for
all District programs and activities. But rather than apply its
non-discrimination policies *without exception*, the District
admits that it retains (and exercises) significant discretion in
applying exceptions to its own programs, as well as to
student programs. Indeed, the District claims to justify this
exercise of discretion using its separate "Board-adopted
equity policy," which represents the District's "commitment
to ensuring that . . . students get what they need" and to
"support high-quality outcomes for students."    While
inclusiveness is a worthy pursuit, it does not justify uncertain
exemptions or exceptions from the broad non-discrimination
policies, which undermine their neutrality and general
applicability and burden Free Exercise.  For example, the
District's mechanism allows it to evaluate which "groups of
students" qualify for the equity policy's objectives based on
"race, ethnicity, gender, sexual orientation, language,
disability, and socioeconomic status."  This authority "to
decide which reasons for not complying with the policy are
worthy of solicitude" on an ad hoc basis renders the policy

not "generally applicable" and requires the application of strict scrutiny. *Fulton*, 141 S. Ct. at 1879 (cleaned up).

The District's assertion that *Fulton* was only concerned with "unfettered" discretion, is overly narrow. Properly interpreted, *Fulton* counsels that the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise. *See id.* at 1879. And this case steps beyond the mere existence of a mechanism. Although the District avers that it has not yet exercised its discretion to grant exemptions, the record is replete with instances in which the District has actually done so, and done so in a viewpoint-discriminatory manner. Most notably, the District exercises its discretion to allow student groups to discriminate based on sex or ethnic identity. For example, the District recognizes the Senior Women Club and the South Asian Heritage Club, which facially discriminate on the basis of sex and ethnicity. Even if the District seeks to justify these discriminatory practices by asserting that they benefit "individuals who need specific support from the school system" and align with the District's "equity policy," this would not change matters. As discussed more below, the District's alleged good intentions do not change the fact that it is treating comparable secular activity more favorably than religious exercise.

The District also retains discretion to allow student groups to discriminate based on other "non-discriminatory" criteria. The District does not maintain any written list of such approved criteria; rather, these exemptions are sanctioned based on the District officials' use of "common sense" on a case-by-case basis. For example, the District allows its clubs and programs to restrict membership based on attributes such as good character. While screening for

such qualities may further important interests for particular clubs, the very fact that they require a case-by-case analysis is antithetical to a generally applicable policy.

The non-discrimination policies at issue may serve many admirable goals articulated by the District. Of course, it is desirable to help "students get what they need" and to "support high-quality outcomes for students." But in allowing exceptions to its generally applicable policies, the District necessarily is forced to delve into the specific facts and circumstances or to "consider the particular reasons" for such "individualized exemptions." *Fulton*, 141 S. Ct. at 1877. Thus, while the exercise of "common sense often makes good law," *Peak v. United States*, 353 U.S. 43, 46 (1957), it means that the law is not generally applicable. The District's broad discretion to grant exemptions on less than clear considerations removes its non-discrimination policies from the realm of general applicability and thus subjects the policy to strict scrutiny.

## B.

In *Fulton*, the Supreme Court determined that it was "more straightforward to resolve [the] case under the rubric of general applicability" rather than to address the claims the government had also "transgressed [the] neutrality standard" required by the Free Exercise Clause. *Fulton*, 141 S. Ct. at 1877. But under the facts of our case, it is evident that in addition to a lack of general applicability, there are significant concerns with the District's lack of neutrality.

As the Court held in *Tandon*, "regulations are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise." 141 S. Ct. at 1296 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67–68 (2020) (per

curiam)). In *Tandon*, the Court explained that California could not impose COVID-related gathering restrictions on at-home religious exercise while providing more favorable treatment to comparable secular activities by exempting gatherings at places such as hair salons, retail stores, movie theaters, and indoor restaurants. *Id.* at 1297. Similarly in *Lukumi*, the City of Hialeah could not ban animal sacrifice in a manner that precluded the religious practices of Santeria while exempting other forms of animal killing for food, including hunting. 508 U.S. 524–28, 537–39. At bottom— and regardless of design or intent—the government may not create "religious gerrymanders." *Walz v. Tax Comm'n of N.Y.C.*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring).

Under *Tandon*, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." 141 S. Ct. at 1296 (citing *Roman Cath. Diocese*, 141 S. Ct. at 67). And in making these comparisons, the Court "is concerned with the risks various activities pose." *Id.* While the District attempts to draw a distinction between school-operated and student-operated programs, we are only concerned with the risk involved and "not the reasons why people gather." *Id.* The District's asserted interest here is in ensuring equal access for all students to all programs and in prohibiting discrimination on protected enumerated bases, including sex, race, and ethnicity.

However, in practice, this results in a pattern of selective enforcement favoring comparable secular activities. For example, the District allowed the Girls' Circle to admit only female-identifying students, and the Big Sister/Little Sister club to similarly exclude members of the opposite gender. The District also permitted groups to select their members

based on "good moral character."  However, this selective enforcement is seen most obviously in the case of the Senior Women Club, which was ASB approved despite the group stating on its ASB application form that "[a] student shall no longer be considered a member if the student . . . does not identify as female."  The District Court clearly erred in finding that despite this express membership requirement, because the club's application also contained pre-written template non-discrimination language, it was "not clear proof that the District allows the club to violate" the non-discrimination policy.  In sum, each of these clubs were allowed to discriminate expressly—even on otherwise protected grounds.  That the District allows such discrimination for secular groups significantly undercuts its goal of ensuring that all students "ha[ve] equal access . . . to all of [the District's] programs."  Indeed, to the contrary, the District actually "identif[ies] systemic issues" on the basis of characteristics such as race and gender, and in response creates these programs and activities designed to fulfill the needs of those secular groups.

Individual preferences based on certain characteristics and criteria serve important purposes for these groups.  It is hardly a leap of logic to say that the Senior Women club benefits from having all female members to help their members feel more comfortable.  And it is understandable that other clubs require "good moral character."  But at the same time, it makes equal sense that a religious group be allowed to require that its leaders agree with the group's most fundamental beliefs.  Simply put, there is no meaningful constitutionally acceptable distinction between the types of exclusions at play here.  Whether they are based on gender, race, or faith, each group's exclusionary membership requirements pose an identical risk to the

District's stated interest in ensuring equal access for all
student to all programs.     Under *Tandon*, the District's
acceptance of comparable selective secular organizations
renders its decision to revoke and refuse recognition to FCA
subject to strict scrutiny.

## C.

"A law burdening religious practice that is not neutral or
not of general application must undergo the most rigorous of
scrutiny." *Lukumi*, 508 U.S. at 546.     Indeed, the Free
Exercise Clause "forbids subtle departures from neutrality,"
and "covert suppression of particular religious beliefs." *Id.*
(first quoting *Gillette v. United States*, 401 U.S. 437, 452
(1971) then quoting *Bowen v. Roy*, 476 U.S. 693, 703
(1986)). As part of evaluating the neutrality of government
actions, we must therefore examine "the historical
background of the decision under challenge, the specific
series of events leading to the enactment or official policy in
question, and the legislative or administrative history,
including contemporaneous statements made by members of
the decisionmaking body." *Masterpiece Cakeshop*, 138 S.
Ct. at 1731 (quoting *id.* at 540).     We especially note that
government actions coupled with "official expressions of
hostility to religion . . . [are] inconsistent with what the Free
Exercise Clause requires . . . [and] must be set aside." *Id.* at
1732. Although the district court made no findings in this
regard, the District's hostility toward FCA was neither subtle
nor covert and its decision to revoke FCA's ASB recognition
is therefore subject to strict scrutiny.

The Supreme Court's recent decision in *Masterpiece
Cakeshop* is illustrative.     There, state officials in the
Colorado Civil Rights Commission (Commission) opened
an investigation into a baker and cake-shop owner after he

declined to create custom wedding cakes for same-sex couples because he claimed his religious beliefs prohibited him from doing so. *Masterpiece Cakeshop*, 138 S. Ct. at 1724–26. After referring the matter to an administrative law judge, the Commission affirmed the decision, ordered various remedial measures, and commanded the baker to cease and desist from refusing same-sex couples the same wedding-related services provided to heterosexual couples. *Id.* at 1726. The Colorado Court of Appeals affirmed the Commission. *Id.* at 1726–27.

The Supreme Court reversed, finding that the Commission demonstrated "elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated his objection." *Id.* at 1729. The Court specifically highlighted several instances of hostility demonstrated by members of the Commission, including comments that the baker's beliefs had no legitimate currency in the public sphere and that he could believe "what he wants to believe" but had to compromise if he wanted to "do business in the state." *Id.* While the Court found those comments demonstrated some level of hostility, any doubt of the disparaging nature of those comments was lifted when one of the commissioners at another public meeting opined that religion was a common means "to justify all kinds of discrimination throughout history," including slavery and the Holocaust. *Id*. That same commissioner also stated that "[religion] is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others." *Id.* The Court found that these disparaging comments—to which no other member of the Commission objected— inescapably "cast doubt on the fairness and impartiality of the Commission's adjudication of [the] case." *Id.* at 1730.

The Court also found evidence of hostility based on the difference in treatment between this particular baker and the cases of at least three "other bakers who objected to a requested cake on the basis of conscience and prevailed before the Commission." *Id.* at 1730. In those instances, bakers refused to create cakes with messages and religious text conveying disapproval of same-sex marriage, and the Commission found objections that such messages were "derogatory," "hateful," and "discriminatory" sufficient. *Id.* The Court rejected any distinction, holding that any disparate treatment "cannot be based on the government's own assessment of offensiveness." *Id.* at 1731. In sum, the Supreme Court found that the Commission's actions violated its "duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Id.*

The Court further noted the somewhat unique circumstances of that case in that the hostile comments showing animus were made by members of an adjudicatory body that was tasked with neutrally applying the law while it was deciding the case. *Id*. In our case, the District contends that there is "no evidence" that the statements made by Glasser, Bowman, and Principal Espiritu and others "informed, let alone dictated the District's decision[]" to derecognize FCA. We disagree.

While not directly equivalent to the Commission, the Climate Committee and its role in the derecognition of FCA fall well within the ambit of the legal principles articulated in *Masterpiece Cakeshop*. The Climate Committee was not simply made up of random individuals in the District, but rather individuals with positions of importance within the schools including department chairs, administrators such as the principal and vice principal, and the director of activities.

Moreover, the stated purpose of this group was to "to discuss anything . . . negatively impacting [the] climate or . . . culture on campus." Without Glasser's and the Climate Committee's actions, there is no indication that any other group or administrative body within the District would have called for an investigation of FCA's membership and leadership policies and ultimately called for its derecognition on campus.

Like the Commission in *Masterpiece Cakeshop*, the Climate Committee made a recommendation that was ratified by the District. While there is some confusion as to whether the District or Principal Espiritu had the final say on derecognition, there is no dispute that the decision closely followed the Climate Committee's determination that FCA violated certain "core values" such as "inclusiveness [and] open-mindedness." There is no indication that any member of the Climate Committee or District official thought otherwise; to the contrary, the Climate Committee concluded it had "to take a united stance as [a] committee." After Principal Espiritu forwarded the Climate Committee's concerns to District officials, there is also no indication in the record that District officials pushed back on these views in any way. Rather, the District allowed Principal Espiritu and the Climate Committee to strip FCA of ASB status. Any doubt regarding the power wielded by the Climate Committee and Principal Espiritu is belied by the speed in which FCA was derecognized.[10]    Before the Climate

---

[10] At oral argument, counsel for the District stated that "the record is clear that the Climate Committee did not make [the decision to derecognize FCA]" and that "Ms. Bowman and Mr. Glasser, who were the teachers, were not involved in the decision." These assertions—that Bowman and Glasser were simply teachers with no influence and that

Committee's investigation, FCA had functioned on campus without issue for nearly 20 years. But in a span of less than two weeks after the initial complaint by Glasser, FCA was derecognized without any ability to defend itself—a penalty never before imposed on any ASB-recognized student group at Pioneer.

The District argues that there is not even "any whiff of antireligious animus" present in this case. This argument "does not pass the straight-face test." *Hughes v. Kisela*, 862 F.3d 775, 797 (9th Cir. 2016) (Ikuta, J., dissenting from denial of rehearing en banc); *see also Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003) ("Although rare, on occasion, we see arguments that simply fail the straight-face test."). Assessed in their totality, the facts of this case arguably demonstrate animus by government decision-makers exceeding that present in *Masterpiece Cakeshop* or *Lukumi*. This holds particularly true when bearing in mind the hostility here is directed not at adult professionals, but at teenage students.[11]   Students were told—in front of their peers—that the views embodied in their Statement of Faith were objectionable and hurtful and had no rightful place on campus.

While there is strong evidence of animus toward FCA in the District, for purposes of the *Masterpiece Cakeshop*

_____

the Climate Committee had no role in the decision-making process—are unsupported by the totality of the record in this case.

[11] While teachers certainly retain their own Free Speech rights, the power dynamic of the student-teacher relationship is not lost upon us. In a vacuum, the disparaging comments made by some of the members of the Climate Committee are harmful, but when made to and in reference to students that they are responsible for counseling, such statements bolster a finding of animus in this case.

analysis, we focus on the animus exhibited by the members of the Climate Committee. One teacher and Climate Committee member disparaged FCA's beliefs by calling them "bullshit" and deeming them without "validity." Another teacher and Climate Committee member accused FCA of "choos[ing] darkness" and "perpetuat[ing] ignorance," calling them "charlatans," who "'conveniently' forget what tolerance means," and "twisting the truth." And perhaps most tellingly, the school's principal stated to the entire school in a newspaper article that FCA's views were "of a discriminatory nature." These comments echo the comments condemned by the Court in *Lukumi* and *Masterpiece Cakeshop*. *See Lukumi*, 508 U.S. at 541–42 (noting comments by city officials describing Santeria as "foolishness," "an abomination," and "abhorrent"); *Masterpiece Cakeshop*, 138 S. Ct. at 1729 (noting comments by Commission members describing the baker's religious beliefs as "despicable" and comparing them to "defenses of slavery and the Holocaust").

Even after FCA was derecognized on campus, students and teachers alike continued their campaign to "ban FCA completely from campus." And Glasser, for instance, over a summer vacation, went so far as to hypothesize a scenario in which "FCA violates [the District's] sexual harassment policy." In other words, he suggested that teenage students who met in private to hold prayer groups and discuss the Bible were creating a hostile work environment for the adult teachers on campus. Indeed, Glasser's follow up email expressing his eagerness to "talk about next steps" to "use[]" government policy to exclude FCA is the exact type of comment found to "evidence significant hostility" by the Supreme Court. *Lukumi*, 508 U.S. at 541 (holding that

statements by city council, including asking: "[w]hat can we do to prevent the Church from opening?" to show animus).

The objections to FCA's presence were not merely passive, either. Students formed the Satanic Temple Club, which Glasser viewed as created for the sole purpose of mocking FCA, and whose faculty advisor was another Climate Committee member. And while unlike *Masterpiece Cakeshop*, none of these statements were made during an actual adjudication, particularly when considered at the preliminary injunction stage these actions sufficiently show that the District's decisions were motivated by "animosity to religion or distrust of its practices." *See Lukumi*, 508 U.S. at 547. Accordingly, the District's policies are subject to strict scrutiny.

## VI.

In response to the ongoing litigation, the District adopted its own version of the All-Comers policy modeled after the version upheld by the Supreme Court in *Martinez*. Based on the adoption of this new policy, the District contends that the past actions under its non-discrimination policy do not give rise to any forward-looking relief because FCA is the only club that maintains discriminatory criteria. We are not persuaded.

Though new in name, the record evidence shows that the All-Comers Policy is little more than a rebranded version of the District's previous non-discrimination policies. Indeed, the language of the two policies and the types of discrimination they seek to prohibit is functionally identical. They are nearly indistinguishable on paper and there is no daylight between them for purposes of enforcement. Even after the implementation of the All-Comers Policy, the District still approved clubs with facially discriminatory

membership criteria such as the Senior Women Club. Pioneer's Activities Director, Michelle Mayhew, acknowledged that other groups could continue to limit their membership based on criteria such as good moral character. While the District attributes issues in the process for approving these clubs to a simple mistake or inadvertence instead of to selective enforcement of its anti-discrimination policies, its argument is undercut by Mayhew's admission that under the All-Comers Policy, she would approve an ASB application for the Girls Who Code club even if it expressly limited its membership to students identifying as female. Based on the record before us, the only reasonable inference that can be drawn here is that the "in name only" All-Comers Policy was adopted in response to the litigation in this case. But the adoption of that policy cannot undo the past animosity toward FCA based on its beliefs. In sum, the All-Comers Policy appears to be the type of post hoc justification that is incompatible with the protections of the First Amendment. *See Kennedy*, 142 S. Ct. at 2432 n.8 ("Government 'justifications[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" (alteration in original) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996))).

While each of these groups may have valid reasons for its membership prerequisites or preferences, the All-Comers Policy does not provide exceptions for "benign" discriminatory membership rules. Indeed, even if it did, the Constitution does not allow for "benign" classification based on race, ethnicity, or sex. *See Adarand Constrs., Inc. v. Pena*, 515 U.S. 200, 226–27 (1995) (applying strict scrutiny to "benign" racial classifications). While each of these clubs might be able to maintain discriminatory membership

policies, the District may not selectively enforce the All-Comers Policy against FCA because of its religious beliefs.[12] In sum, the All-Comers Policy is neither neutral nor generally applicable under *Fulton* or *Tandon*.

In its briefing, the District relies heavily on *Martinez* in an attempt to justify its position. But *Martinez* does not stand for the broad proposition that an all-comers policy immunizes an institution from scrutiny of whether a law or policy is neutral and generally applicable. Rather, *Martinez* simply held that a truly categorical all-comers policy—one which required student groups to accept all members without exception—may comply with the First Amendment as a neutral law of general applicability. *See* 561 U.S. at 674–76 (discussing parties' stipulation). *Martinez* is also distinguishable on its facts. The narrowness of the Court's holding is evident by its repeated emphasis that the policy was applicable "across-the-board" on the basis of a stipulated record. *See id.* at 668, 675–78; *see also id.* at 698 (Stevens, J., concurring) (observing the "narrow issue presented by the record"). By contrast, the record here demonstrates the District's All-Comers Policy is replete with exemptions that treat comparable secular groups more favorably by allowing them to limit membership based on a

---

[12] As previously noted, *see supra* at 18 n.2, the EAA prohibits the District from denying any student club equal access to ASB recognition based on the "religious, political, philosophical, or other content" of the club's speech. Even if a law is facially "content-neutral," the government still impermissibly regulates based on content if it selectively enforces its laws. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1146–47 (9th Cir. 2005). In examining content-neutrality under the EAA, we borrow the First Amendment analysis. *See Truth*, 542 F.3d at 645–46. Because Plaintiffs are also likely to succeed on the merits of their Free Exercise claim, in part due to the selective enforcement and discrimination based on religious viewpoint, they are also likely to prevail on their EAA claim.

variety of discriminatory secular criteria.    Fairly read, *Martinez* affirms that the District's All-Comer's Policy as applied is neither neutral nor generally applicable, and thus is subject to strict scrutiny.

\* \* \*

Under each of the three criteria set forth by the Supreme Court, the District's non-discrimination policies are subject to strict scrutiny.    The District essentially concedes that it cannot meet this standard as it has offered no arguments to the contrary.    To pass strict scrutiny, the District's policies must be "narrowly tailored" to advance "a compelling governmental interest."    *Lukumi*, 508 U.S. at 531–32. Because the District has failed to offer any showing that it has even considered less restrictive measures than those implemented here, it fails at least the tailoring prong of the strict scrutiny test.    *See Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981).    Accordingly, Plaintiffs have shown a likelihood of success on the merits of their Free Exercise claims to support the issuance of a preliminary injunction.

## VII.

The remaining factors in the preliminary injunction test also favor an injunction.    It is axiomatic that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."    *Roman Cath. Diocese*, 141 S. Ct. at 67 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).    And we have observed, "[i]rreparable harm is relatively easy to establish in a First Amendment case" because the party seeking the injunction "need only demonstrate the existence of a colorable First Amendment claim."    *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482

(9th Cir. 2022), *cert. denied*, No. 22-699, 2023 WL 2959385
(U.S. Apr. 17, 2023) (cleaned up).  For all the reasons
discussed above, Plaintiffs have demonstrated a colorable
claim that the District's application of its non-discrimination
policies to FCA violated their Free Exercise rights, and will
continue to violate those rights absent an injunction.  In
particular, the deprivation of ASB recognition has and will
continue to hamper FCA's ability to recruit students,
constituting an enduring harm that will irreparably risk the
club's continued existence on campus.  *See Christian Legal
Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006)
(explaining the "flaw[]" in the district court's holding of no
irreparable harm based on derecognition).  The irreparable
harm factor thus weighs in favor of injunctive relief.

Where, as here, the party opposing injunctive relief is a
government entity, the third and fourth factors—the balance
of equities and the public interest—"merge."  *Nken v.
Holder*, 556 U.S. 418, 435 (2009).  Because FCA has (at a
minimum) "raised serious First Amendment questions," that
alone "compels a finding that the balance of hardships tips
sharply in [its] favor."  *Am. Bev. Ass'n v. City & County of
San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc)
(cleaned up).  Furthermore, "it is always in the public interest
to prevent the violation of a party's constitutional rights."  *Id.*
(quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.
2012)).

Finally, without injunctive relief, FCA's ability to recruit
new students to bolster its dwindling membership will
continue to be harmed, to the degree that the club may cease
to exist District-wide.  While the District's asserted interest
in inclusiveness may be important, the Constitution prohibits
the District from furthering that interest by discriminating
against religious views.  Indeed, the record suggests that the

harm to the District by the grant of injunctive relief is
minimal as prior to the events giving rise to this action, FCA
existed as a recognized club for nearly two decades without
any objection.   In sum, the remaining injunction factors
favor the grant of preliminary relief.

### VIII.

Anti-discrimination laws and policies serve undeniably
admirable goals, but when those goals collide with the
protections of the Constitution, they must yield—no matter
how well-intentioned. *303 Creative LLC v. Elenis*, 143 S.
Ct. 2298, 2315 (2023) ("When a state public
accommodations law and the Constitution collide, there can
be no question which must prevail." (citing U.S. CONST.,
Art. VI, cl. 2)).   Even if the views held by FCA may be
considered to be out-of-date by many, the First Amendment
"counsel[s] mutual respect and tolerance . . . for religious
and non-religious views alike." *Kennedy*, 142 S. Ct. at 2416.
We do not in any way minimize the ostracism that LGBTQ+
students may face because of certain religious views, but the
First Amendment's Free Exercise Clause guarantees
protection of those religious viewpoints even if they may not
be found by many to "be acceptable, logical, consistent, or
comprehensible." *Fulton*, 141 S. Ct. at 1876 (quoting
*Thomas*, 450 U.S. at 714).

Plaintiffs are likely to succeed on their Free Exercise
claims because the District's policies are not neutral and
generally applicable and religious animus infects the
District's decision making.[13]   The remaining factors also
support granting Plaintiffs' requested injunctive relief.

---

[13] As noted, *supra* at 40 n.8, 55 n.12, Plaintiffs are also likely to succeed
on their Free Speech and EAA claims.

Therefore, we **REVERSE** the district court's denial of FCA's motion for a preliminary injunction and direct the district court to enter an order reinstating FCA's ASB recognition.**[14]**

---

FORREST, J., concurring:

The San Jose Unified School District's (District) treatment of students participating in the Fellowship of Christian Athletes' (FCA) student club is shocking and fundamentally at odds with bedrock principles that have guided our Republic since the beginning. I strongly agree with the court that FCA is entitled to a preliminary injunction. I write separately only because, after further consideration, I see this as a free-speech case more than a religious-freedom case, and I would resolve it under the Equal Access Act (EAA) and the Free Speech Clause of the First Amendment. I also would not address direct organizational standing because FCA's chapter at Pioneer High School (Pioneer) has standing to represent its members in this action.

---

[14] Plaintiffs also appeal the district court's denial of their two motions to supplement the preliminary injunction record. Because the district court failed to provide any explanation for denying the motions and because the evidence—namely, Lopez's third declaration—is highly relevant for determining mootness, we reverse the district court's denial of Plaintiffs' motions to supplement the preliminary injunction record. *C.f. EEOC v. Peabody W. Coal Co.*, 773 F.3d 977, 990 (9th Cir. 2015) (holding that district court's denial of a motion to supplement the preliminary injunction record was not an abuse of discretion because the supplemental evidence was irrelevant to the issues properly before the court).

60     FELLOWSHIP OF CHRISTIAN ATHLETES V. SAN JOSE USD

The EAA prohibits public secondary schools from denying equal access to student-initiated clubs based on the content of speech at club meetings. 20 U.S.C. § 4071. Congress enacted the EAA to extend a Supreme Court decision establishing free-speech rights for student clubs on college campuses to public secondary schools. *See Bd. of Educ. of Westside Cmty. Schs. v. Mergens By & Through Mergens*, 496 U.S. 226, 235 (1990). The EAA directly applies here. Additionally, the fundamental problem with the District's treatment of FCA applies to ideological student clubs generally, not just religious clubs. Resolving this case on free-speech grounds recognizes that broader reality. Thus, I join Parts I–II, III.A., IV, and VI–VII of the court's opinion and otherwise concur in the judgment because I would reverse the district court's denial of a preliminary injunction in favor of FCA because FCA is likely to succeed on the merits of its EAA and First Amendment free-speech claims.

## I.     BACKGROUND

### A.  FCA's Mission & Organization

FCA is a national Christian ministry organization that was founded in 1954 (FCA National). Its mission is "to lead every coach and athlete into a growing relationship with Jesus Christ and His church." FCA has over 20,000 ministry groups worldwide, including 7,000 local chapters operating at middle schools, high schools, and colleges across the United States. FCA's method for accomplishing its mission is "to make disciples through . . . engaging, equipping and empowering coaches and athletes to know and grow in Christ and lead others to do the same." FCA chapter events include religious discussions, service projects, prayer times, worship, weekly meetings, and Bible studies.

The FCA chapter at Pioneer in San Jose, California (Pioneer FCA), is an affiliate of FCA National that was recognized by the District as an Associated Student Body (ASB) approved student organization beginning in the early 2000s. Pioneer FCA hosts leadership meetings "focused on prayer, equipping student leaders for ministry, and planning ministry events," and "whole-chapter events," where the group hosts a "well-known professional" or college athlete "to share about their own faith journeys and provide inspiration to students." The chapter events begin by welcoming the participants and explaining FCA's mission, followed by an icebreaker and Bible teaching or a "Christian message from guest speakers," and concludes with a discussion of the Christian beliefs that were taught, and a prayer.

All students are welcome to participate in these FCA events and become members of FCA. But FCA has faith-based eligibility criteria for its student leaders. FCA's student leaders are responsible for ensuring that club meetings are conducted in a manner consistent with FCA's faith and for coordinating the content, format, timing, and location of such meetings. They lead FCA meetings and Bible studies, prayer, worship, and religious teachings; identify topics and speakers for events; "minister to their peers individually"; and "communicate FCA's message when interacting with" various staff and students at their schools. Further, FCA leaders are formally deemed "FCA Representatives," with a "core function" of "religious ministry" through their expression, messaging, and modeling of FCA's faith-based beliefs.

Given these responsibilities, FCA provides religious training for its student leaders about FCA's vision, values, and ministry. The training equips student leaders "to study

the Bible, lead a campus huddle, and share their testimonies with others," and teaches them how to structure and lead meetings. These trainings also cover "worship, prayer, Bible teaching, mentoring," and teaching the "mission and vision of FCA."

As part of ensuring that FCA's student leaders are equipped to fulfill their "spiritual roles" and adequately carry out FCA's mission, FCA requires prospective student leaders to fill out applications describing their spiritual commitment, personally affirm FCA's Statement of Faith, and agree to follow FCA's Sexual Purity Statement. Specific beliefs that FCA student leaders must affirm include that "every person should be treated with love, dignity, and respect"; that the Bible is the "Word of God"; that "Jesus Christ is God"; and that "God instituted marriage between one man and one woman as the foundation of the family and the basic structure of human society." FCA's Sexual Purity Statement further professes:

> God desires His children to lead pure lives of holiness. The Bible teaches that the appropriate place for sexual expression is in the context of a marriage relationship. The biblical description of marriage is one man and one woman in a lifelong commitment.

In addition to affirming these beliefs and agreeing to follow FCA's Sexual Purity Statement, student leaders must also acknowledge that they will be "held to a higher standard of biblical lifestyle and conduct" and that they are required to "do their best to live and conduct themselves in accordance with biblical values." And they must affirm they will "not subscribe to or promote any religious beliefs

inconsistent with [FCA's] beliefs." FCA asserts that "[h]aving student leaders who refuse[] to personally accept FCA's religious beliefs would compromise the integrity of the group and the leaders, undercut the group's mission and message, and harm [its] ability to express [its] Christian beliefs."

## B.  ASB Program

The ASB program overseen by the District allows students to form after-school clubs and was developed to provide a forum for students to "learn how to be leaders; how to engage with some of the democratic principles that align with their own personal interests; how to be members of a community; [and] how to be welcoming and inclusive." ASB clubs must be student-initiated, and their meetings may not be run or controlled by school employees or agents. And while ASB clubs all have faculty advisors, District staff may not be directly involved in religious activities. ASB-recognized clubs are included in the school yearbook and official school-club lists, receive priority access to school meeting spaces, have access to ASB accounts, and can run and receive support for ASB-approved fundraisers. Non-ASB clubs are allowed to use school facilities to meet, but they do not receive the benefits afforded to ASB-recognized clubs.

The District recognizes as ASB-approved clubs a wide variety of student groups formed for various purposes. ASB-approved clubs include the Harry Potter Club, Communism Club, Shrek Club, Girls Who Code, and Chess Club. Each club sets the criteria for their members and leaders. For example, the South Asian Heritage club "prioritize[s]" acceptance of South Asian members. The Senior Women club limits its membership to "seniors who identify as

female." And the Big Sister Little Sister club limits membership to females. According to Herbert Espiritu, the principal at Pioneer, Big Sister Little Sister "was something of a mentorship for [Pioneer's] freshmen students who are females to be mentored by . . . senior female students." "Girl Talk of Pioneer High School" also limited its membership to "female students."

## C. FCA's Derecognition

FCA clubs had been ASB-recognized at three District high schools, including Pioneer, since the early 2000s. But in April 2019, Pioneer social studies teacher Peter Glasser brought a version of FCA's Statement of Faith and Sexual Purity Statement to Principal Espiritu's attention,[1] stating that one of Glasser's students was "very upset about the anti-gay prerequisites" reflected in what Glasser called FCA's "pledge." Glasser asked Principal Espiritu if he could "please discuss how to approach [FCA's] leadership." Glasser explained that FCA's viewpoint on "LGBTQ+ identity" troubled him. Principal Espiritu stated that he would discuss the matter with administration members and the club's leaders.

A few days after Glasser's email, FCA National employee Rigo Lopez told Principal Espiritu that FCA leaders had informed him about "conversation[s] happening

---

[1] Student leaders of Pioneer FCA informed Glasser that the Statement of Faith and Sexual Purity Statement he had obtained were not accurate reflections of the statements used by Pioneer FCA. The documents that Glasser obtained and forwarded to Principal Espiritu are slightly different from the versions that FCA provided. But both versions include FCA's viewpoint that marriage and sexual intimacy are meant to be between a man and a woman, which is what Glasser referred to as "anti-gay prerequisites."

on Pioneer's campus right now regarding FCA's Sexual Purity Policy." Lopez informed Principal Espiritu that the policy pertained only to "those wanting to serve in a leadership/officer capacity (student or adult) within FCA."

Shortly thereafter, Glasser emailed Principal Espiritu with some follow-up thoughts that Glasser had about FCA's views:

> I feel that there's only one thing to say that will protect our students who are so victimized by religious views that discriminate against them: I am an adult on your campus, and these views are bullshit to me. They have no validity. . . . I'm not willing to be the enabler for this kind of "religious freedom" anymore.

Principal Espiritu and Glasser subsequently participated in a school leadership committee meeting where they discussed FCA. The meeting minutes reflect that Principal Espiritu stated the FCA "pledge" defied Pioneer's "core values" and that the committee needed to take a "united stance." Principal Espiritu subsequently consulted with District officials, including Deputy Superintendent Stephen McMahon, who advised that if FCA discriminated in its leadership eligibility on the basis of sexual orientation, FCA would be in direct violation of the District's nondiscrimination policy. The District's nondiscrimination policy prohibited discrimination based on "perceived ethnic group, religion, gender, gender identity, gender expression, color, race, ancestry, national origin, and physical or mental disability, age or sexual orientation."

66    FELLOWSHIP OF CHRISTIAN ATHLETES V. SAN JOSE USD

In May 2019, Principal Espiritu informed Pioneer FCA's student leaders that FCA would no longer be an ASB-recognized club. FCA was derecognized because the District determined that FCA's student leadership criteria discriminated on the basis of sexual orientation because "a student could not be an officer of [FCA] if they were homosexual."**[2]** Principal Espiritu testified that FCA can become an ASB-recognized club again only if it does not require its leaders to agree to abide by the Sexual Purity Statement. And an article in Pioneer's school newspaper quoted Principal Espiritu as stating that FCA's Sexual Purity Statement "is of a discriminatory nature" and the school "decided that we are no longer going to be affiliated with them."

According to some District officials, this was the first time that the District had revoked ASB recognition for *any* club. Though this was not the first time that the District had, in its discretion, singled out groups for additional scrutiny.

---

[2] There are some inconsistencies in the record regarding which specific FCA statements factored into the District's derecognition decision or could factor into the District's future decisions regarding FCA's ASB status. For example, Principal Espiritu testified during his deposition that the decision was based on FCA's Sexual Purity Statement, which was sent to him by Glasser. But Deputy Superintendent McMahon stated there were "multiple versions" of the Statement of Faith that he viewed "over the course of time" and that he recalled as meaning "being homosexual and being an officer of FCA were mutually exclusive." Principal Espiritu testified both that it was sufficient to deny FCA recognition simply because the Sexual Purity Statement existed at all, even if FCA did not require its leaders to affirm it, and that FCA may be recognized again if it does not require its leaders to affirm the statement. The District's deposition testimony is that both FCA's requirement that its leaders affirm a belief in Christianity, and that it affirm marriage is between a man and a woman, violate its nondiscrimination policy.

For example, Principal Espiritu testified that factors he may look at when determining whether to grant ASB-approval to a student group include whether the group "foster[s] a safe sense of belonging" and whether it is something "positive" or something "controversial." Around 2016 or 2017, students wanted to form a "Make America Great Again" group. But according to Principal Espiritu, "that was a controversial topic" at the time, so he and other school officials approached the student leaders involved with that group to see if "they would reconsider the name of the club because it was creating an environment that students didn't feel safe here on campus." Principal Espiritu further explained that in identifying which groups may be deemed "controversial," he "rel[ies] heavily on [the] pulse of our stakeholders, especially our students and staff, and what is happening in the world outside of us." As an example, he stated that if a student group supported police officers, that could be "controversial in 2020 or 2021" and he may have a conversation with such a hypothetical group to see if they "would reconsider, you know, their purpose." Though he did note that he also tries to rely on "District policies" and guidance from school counsel.

Both Principal Espiritu and Pioneer Activities Director Michelle Mayhew are responsible for overseeing and approving ASB applications. Mayhew testified that student leaders are in general responsible for determining a group's interests and purpose and are the "face of the club." The District also recognizes that "student leaders [are] important for kind of setting the direction and tenor of the group," and that a "fairly typical manifestation of leadership of a club" is that the leader "help[s] communicate kind of the message and purpose of a student club."

After FCA was derecognized, the District relegated FCA to a made-for-FCA "student interest group" category, which permitted FCA to advertise and meet at the school, participate in club rush, and post flyers and announcements on campus. But as a non-ASB-recognized club, FCA no longer had access to ASB benefits, which include priority access to school meeting spaces and inclusion in the yearbook and official school-club lists. FCA was denied ASB recognition for the 2019–2020 school year, and students organized and held protests outside of FCA's meetings.

### D. The District's New Policy

In April 2020, two Pioneer FCA student leaders and FCA National sued the District and certain school officials. Amid—and because of—the litigation, the District adopted a "new" non-discrimination policy. The District describes its new policy as an "All-Comers Policy" that requires all clubs to allow any student to become a member or leader of the club "regardless of his or her status or beliefs." The District also created an "ASB Affirmation Form" that all ASB clubs must submit. Clubs seeking ASB recognition must affirm that they will allow any student to "seek or hold leadership positions . . . regardless of his status or beliefs."

The COVID-19 pandemic disrupted school activities for the 2020–2021 school year. But in anticipation of the 2021–2022 school year, the District trained its activities directors and site administrators on its revised ASB-recognition process, amended the ASB application, and created standardized application forms and club constitutions requiring ASB-recognized clubs to affirm that they would abide by the District's All-Comers Policy. All ASB-approved clubs in 2021–2022 were supposed to sign the

affirmation agreeing to follow the All-Comers Policy and adopt constitutions prohibiting discrimination in club membership and leadership.

ASB clubs are expressly permitted, however, to adopt what the District deems "non-discriminatory criteria" for club membership and leadership. And Mayhew, who shares responsibility for applying the All-Comers Policy with Principal Espiritu, testified that under the All-Comers Policy, ASB clubs may continue to limit their membership or leadership based on various criteria, including gender identity, age, political affiliation, or "good moral character."

### E. District Court Decision

FCA sought a preliminary injunction requiring the District to reinstate FCA as an ASB-recognized club pending the outcome of this litigation. The district court denied FCA's motion, concluding that FCA was unlikely to succeed on the merits of its claims. Specifically, the district court concluded that FCA was not likely to succeed on its EAA claim because *Truth v. Kent School District* held that school nondiscrimination policies are facially content neutral and do not implicate any rights a student group "might enjoy under the Act" "to the extent [the nondiscrimination policies] proscribe" the group's "general membership restrictions." 542 F.3d 634, 647 (9th Cir. 2008), *overruled on other grounds by Los Angeles County v. Humphries*, 562 U.S. 29 (2010). The district court recognized that *Truth* dealt only with membership, not leadership, restrictions. But the district court concluded *Truth* nonetheless applied to FCA's leadership restrictions because the District's policy was similar to the policy at issue in *Truth* and because the policy prohibits discriminatory conduct, not speech. The district

court also concluded that FCA failed to establish that the District selectively enforces its policy.

Additionally, the district court concluded that FCA was unlikely to succeed on its First Amendment free-speech and freedom-of-association claims. Guided by *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010), and *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 804–05 (9th Cir. 2011), the district court held that the District's nondiscrimination policy is reasonable in light of the purpose of the ASB program and the policy is content and viewpoint neutral. The district court reasoned that the policy's purpose is to ensure the school's resources are "open to all" and is therefore "unrelated to the suppression of expression." The district court rejected FCA's argument that the policy's exceptions for non-discriminatory criteria make it content or viewpoint based.

Finally, the district court concluded that FCA was unlikely to succeed on its First Amendment free exercise claim. The district court rejected FCA's argument that, as the Second Circuit has held, student leaders of religious student groups are critical to controlling the expressive content of group meetings. *See Hsu v. Roslyn Union Free Sch. Dist.*, 85 F.3d 839, 856–62 (2d Cir. 1996). The district court found *Hsu* unpersuasive, explaining that *Martinez* and *Alpha Delta* upheld nondiscrimination policies applicable to both members and leaders.

## II.     DISCUSSION

### A.  Standard of Review

The district court's denial of FCA's motion for a preliminary injunction is reviewed for an abuse of discretion. *See S.C. by K.G. v. Lincoln County Sch. Dist.*, 16 F.4th 587,

FELLOWSHIP OF CHRISTIAN ATHLETES V. SAN JOSE USD    71

591 (9th Cir. 2021). But the district court's legal conclusions are reviewed de novo. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam).

## B.  Equal Access Act

FCA alleges that the District violated the EAA by refusing to recognize FCA as an official ASB club because it requires its student leaders (but not its members) to affirm various religious beliefs, including that marriage and sexual intimacy are meant to be between a man and a woman. FCA argues that the District's application of its nondiscrimination policy is unlawfully content-based because regulating who can serve as a group's leader "inescapably regulates the content of" the group's message. The District disagrees, arguing that its nondiscrimination policy is neutral and generally applicable and that *Martinez* forecloses this argument.

The EAA prohibits public secondary schools that receive federal funds and provide a "limited open forum" from "deny[ing] equal access or a fair opportunity to, or discriminat[ing] against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). If a school is subject to the EAA, a plaintiff asserting a violation of the Act must prove: "1) a denial of equal access, or fair opportunity, or discrimination; 2) that is based on the 'content of the speech' at its meetings." *Truth*, 542 F.3d at 645.

Congress enacted the EAA to extend to public secondary schools the protection afforded to university students in *Widmar v. Vincent*, 454 U.S. 263 (1981). *See Mergens*, 496

U.S. at 235. In *Widmar*, the Supreme Court held that a university violated students' right to free speech by prohibiting them from using university facilities to engage in "religious worship and discussion" when other student groups were allowed to use school facilities. 454 U.S. at 269–77. Given this origin, "Congress clearly sought to prohibit schools from discriminating on the basis of the content of a student group's speech," *Mergens*, 496 U.S. at 241, particularly "religious speech," *id.* at 239. As a result, the Supreme Court has instructed that the EAA is to be interpreted broadly. *Id.*

Even though Congress was motivated to enact the EAA by the Court's analysis of the First Amendment right to free speech, First Amendment jurisprudence informs, but does not govern, EAA claims. That is, the First Amendment and the EAA are not coextensive. For example, the limited-public-forum doctrine applies in determining whether a school has an obligation to grant the full benefits of club recognition to a student group under the First Amendment. *See Martinez*, 561 U.S. at 680–85. But Congress used a different standard in the EAA—"limited open forum"— which it uniquely defined. *See Mergens*, 496 U.S. at 241–42; *see also* 20 U.S.C. § 4071(b). Courts must apply Congress's definition when deciding claims brought under the EAA. *See Mergens*, 496 U.S. at 241–42.

Additionally, under the First Amendment, if a school has provided a limited public forum, a restriction on speech is invalid only if it: (1) is unreasonable in light of the "forum's function and 'all the surrounding circumstances,'" or (2) discriminates based on viewpoint. *See Martinez*, 561 U.S. at 685 (citation omitted). But a school subject to the EAA is *categorically* prohibited from discriminating based on the content of a group's speech, regardless of whether the

school's policy or regulation is reasonable. *See* 20 U.S.C. § 4071(a) (providing, without exception, that a school may not deny equal access "on the basis of the . . . content of the speech at [club] meetings"); *see also Mergens*, 496 U.S. at 236, 241 (explaining that where obligations under the EAA are triggered, "the school may not deny . . . clubs, on the basis of the content of their speech, equal access," and to avoid its EAA obligations, a school may either close the forum or reject federal funding). And content discrimination (the EAA's standard) and viewpoint discrimination (the First Amendment standard) are not the same thing. *See Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter.").

In this case, the parties agree that the EAA applies and that the ASB program constitutes a "limited open forum" under the Act. Thus, in determining whether FCA is likely to succeed on its EAA claim, we must decide whether the District (1) denied FCA equal access, (2) "based on the 'content of [FCA's] speech.'" *Truth*, 542 F.3d at 645.

### 1. Equal Access

Whether the District denied FCA equal access is easily resolved. A student club is denied equal access within the meaning of the EAA when it is denied the benefits of official recognition and other clubs are receiving those benefits. *See Mergens*, 496 U.S. at 247; *see also Prince v. Jacoby*, 303 F.3d 1074, 1086–87 (9th Cir. 2002) (discussing *Mergens* and holding that "to the extent that [a] school allows ASB clubs [certain benefits], it cannot then discriminate against . . . clubs that seek the same [benefits]"). Here, it is undisputed that the District denied—and intends to continue to deny—

ASB recognition to FCA because of its faith-based eligibility criteria for its student leaders. This is a denial of equal access under the EAA. *See Mergens*, 496 U.S. at 247. The District does not argue otherwise, focusing only on whether its application of its nondiscrimination policy[3] is content based.

### 2.  Content-Based Regulation

Now we get to the heart of the matter: did the District deny FCA equal access because of the "content of [FCA's] speech"? *See* 20 U.S.C. § 4071(a).

The EAA does not define "content of the speech." *See id.*; *see also Truth*, 542 F.3d at 645. But "that phrase has a particular meaning in First Amendment jurisprudence." *Truth*, 542 U.S. at 645. As discussed, First Amendment jurisprudence is a useful tool in this part of the EAA analysis given that the EAA "extended the reasoning" of one of the Supreme Court's First Amendment free-speech cases. *See Mergens*, 496 U.S. at 235; *see also Truth*, 542 F.3d at 645–46 (explaining that "[w]here there may be uncertainty [regarding the meaning of the EAA], . . . we rely on . . . cases deciding analogous issues under the First Amendment"); *see also Hsu*, 85 F.3d at 855–57 (adopting a similar approach, reasoning that "since the Act creates an analog to the First Amendment's default rule banning content-based speech discrimination, cases discussing the meaning of 'speech' in First Amendment jurisprudence are also interpretive tools for understanding the Act").

Looking to the First Amendment, then, under the Free Speech Clause a regulation or policy is content based where

---

[3] As the court explains, the "new" All-Comers Policy and the previous nondiscrimination policy are indistinguishable for purposes of analyzing the merits of FCA's claims.

it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. A policy may be content based where the policy itself contains content-based distinctions or because the policy cannot be justified without reference to speech content. *See id.* at 163–64. Discrimination against a specific subject matter "is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169. In other words, the government may not "single[] out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter." *Id.* For example, the Supreme Court in *Reed* held that a sign regulation was content based because it defined various categories of signs based on the type of information they conveyed and subjected each category to different treatment. *Id.* at 164. The Court explained that this scheme was facially content discriminatory because determining which regulation applied "depend[ed] entirely on the communicative content of the sign." *Id.*

The District argues that its nondiscrimination policy is not content based because it prohibits conduct, not speech. In making this distinction, it relies primarily on *Martinez*, where the Court stated that an all-comers policy "aim[ed] at *the act* of rejecting would-be group members without reference to the reasons motivating that behavior" and that the school's "desire to redress the perceived harms of exclusionary membership policies provide[d] an adequate explanation for its all-comers condition over and above mere disagreement with any student group's beliefs or biases." 561 U.S. at 696 (alterations adopted) (internal quotation marks and citation omitted). This discussion in *Martinez* is not controlling here for at least two reasons.

First, *Martinez*'s conclusion that the policy at issue in that case was content neutral was based on a *factual* stipulation the parties entered into that was different from the policy language itself. *See id.* at 675–76; *see also id.* at 707, 715 (Alito, J., dissenting) (explaining that *Martinez* failed to "address the constitutionality of the very different policy that Hastings invoked when it denied CLS's application for registration" by relying on the joint stipulation). Like here, the school policy *as written* prevented discrimination based on certain categories such as race, religion, disability, age, and sexual orientation. *Id.* at 670–71, 675. But the parties stipulated that the school did not have just a nondiscrimination policy, it had an all-comers policy, because the school "require[d] that registered student organizations allow *any* student to participate, become a member, or seek leadership positions in the organization, regardless of [her] status or beliefs." *Id.* at 675 (second alteration in original); *see also id.* at 676–78. The Court specifically noted that the school did "not pick and choose which organizations must comply with the [all-comers] policy on the basis of viewpoint," *id.* at 695 n.25, and that it was "hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers," *id.* at 694. The Court therefore concluded that it was appropriate to disregard prior cases where schools "singled out organizations for disfavored treatment because of their points of view." *Id.* at 694.

Those are not the facts on the ground here. District officials do pick and choose which clubs must comply with the policy and which clubs are exempted from the policy based on the nature and content of the clubs' selection

criteria.[4] *See Reed*, 576 U.S. at 163–64 (holding that a regulation is content based where it subjects different "categories to different restrictions"). Pioneer's Activities Director testified that ASB clubs could limit their membership based on some discriminatory criteria, including gender identity, age, political affiliation, and "moral character." And this is not just a theoretical possibility—school officials across the District did exercise their discretion to effectively grant exemptions to some clubs based on these criteria. For example, the District recognized the South Asian Heritage club as an ASB club despite that club stating it would "prioritize" acceptance of South Asian members. And the Senior Women club was recognized even though its membership was limited to "seniors who identify as female." Likewise, the Big Sister Little Sister's club constitution limited membership to females but was nonetheless ASB-recognized because, according to Principal Espiritu, "it was something of a mentorship for our freshman students who are females to be mentored by . . . senior female students." "Girl Talk of Pioneer High School" was also ASB recognized despite its club constitution stating that membership was limited to "female students."

Likewise, the record shows that clubs the District deems "controversial" are singled out for closer scrutiny or—in FCA's case—outright denial of ASB approval. Students seeking to form a "Make America Great Again" club were confronted by District officials asking them to reconsider the

---

[4] As discussed below, there are numerous examples in the record evincing the District's past and likely future selective enforcement. The record therefore does not support the district court's finding to the contrary, rendering the district court's finding clear error. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (discussing standard of review).

club name because in the District's view, "it was creating an environment that students didn't feel safe" in and because the District considers whether a group is "something positive" when determining whether to approve it. Principal Espiritu further explained that he may discourage other "controversial" clubs. For example, he testified that if students wanted to form a club supporting police officers, he may speak to them about "reconsider[ing] . . . their purpose" given recent controversy surrounding that issue.

The District's All-Comers Policy allows student groups to adopt what the District considers to be "non-discriminatory criteria regarding being a member [or] leader." "The restrictions in the [District's policy] that apply to any given [leadership criteria] thus depend entirely on the" content of the criteria, *Reed*, 576 U.S. at 164, which is fundamentally different than the stipulated *categorical* all-comers policy at issue in *Martinez*. Affinity-affiliation requirements may be fine, but FCA's faith-based requirement is not. This is textbook content discrimination.[5] *See id.* For this reason, different than in *Martinez*, where the school did "not pick and choose which organizations must comply with the policy," 561 U.S. at 695 n.25, disregarding cases addressing schools that "singled out organizations for disfavored treatment because of their points of view," *id.* at 694, is not appropriate here.

---

[5] As the court concludes, our holding in *Alpha Delta* that a policy is content neutral so long as the *purpose* of the policy alone has a benign motive, 648 F.3d at 801, is inconsistent with *Reed*, 576 U.S. 155, and is no longer good law. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc), *overruled on other grounds by Sanchez v. Mayorkas*, 141 S. Ct. 1809 (2021).

Second, the religious club in *Martinez* imposed faith-based criteria for both members and leaders. *Id.* at 672–73. The Court focused its viewpoint- and content-neutrality analysis on open *membership*; it did not address the relevance of ideology-based leadership criteria.[6] *See id.* at 694–97. But here, FCA imposes faith-based requirements only on its student leaders; membership in FCA is open to all. This is a distinction with a difference—regulating who can lead and speak for a group uniquely impacts the group's operation and speech. And the Court's failure to grapple with the implications of leadership criteria indicates that it did not consider that issue. *See id.* at 678–97.

*Martinez* did reject concerns that a student club could be vulnerable to "hostile takeovers" if they "must open their arms to all," reasoning that students self-select based on their interests and would "not endeavor en masse to join—let alone seek leadership positions in—groups pursuing missions wholly at odds with their personal beliefs." *Id.* at 692–93. The Court's discussion of this issue relates to membership criteria, which, again, is not at issue here. But to the extent it is relevant, whether a group is at risk of a "hostile takeover" if it cannot control who serves as its *leader* is different from whether the group's ability to control the content of its speech is undermined as a general matter. The Constitution's concern about content-based regulation and limiting an expressive group's ability to choose its leader is not limited to *complete* frustration of expression, as

---

[6] The Court did not even reference the Second Circuit's decision in *Hsu*, which concluded that a school's decision to deny recognition to a religious club was based on the club's speech content, where the club imposed religious requirements only on its officers, 85 F.3d at 856–59.

evidenced by several of the Court's First Amendment cases arising in varied contexts.

For example, in *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston*, the Court recognized that expressive groups have a right to control the content of their expression. 515 U.S. 557 (1995). There, the organizers of a St. Patrick's Day parade were prohibited from excluding an Irish gay pride group based on a state nondiscrimination law, which the Court held was a violation of the First Amendment. *Id.* at 561–66, 572–75. The Court reasoned that the ability to select which groups march in a parade impacts the overall message of the parade—in other words, the parade organizers' speech. *See id.* at 574–75. Thus, applying an antidiscrimination law to prevent the organizers from limiting who could participate in the parade "essentially require[d] [the organizers] to alter the expressive content of their parade." *Id.* at 572–73.

This concern about the ability to control the content of one's speech is particularly consequential where government regulation impacts who an ideological group can select as its leader. It is axiomatic that "[w]ho speaks on [a group's] behalf . . . colors *what* [message] is conveyed." *Martinez*, 561 U.S. at 680; *see also Reed*, 576 U.S. at 170 (explaining that speaker-based restrictions "are all too often simply a means to control content"). And the Supreme Court has recognized this in more than one context.

A pair of First Amendment right-of-association cases demonstrate that ideological leadership restrictions, more than membership restrictions, govern the content of a group's speech. In *Roberts v. United States Jaycees*, the Court addressed whether prohibiting the Jaycees from excluding female members under a state nondiscrimination

law violated the group's right of association. 468 U.S. 609 (1984). The Court recognized that prohibiting a group from limiting who can be a member of the group "may impair the ability of the original members to express only those views that brought them together." *Id.* at 623. But nonetheless, the Court held that the state's "compelling interest in eradicating discrimination against its female citizens justifie[d] the impact that application of the statute to the Jaycees may have on the male members' associational freedoms." *Id.* But in *Boy Scouts of America v. Dale*, the Court addressed whether a state nondiscrimination law could prohibit the Boy Scouts from refusing to accept homosexual assistant scoutmasters. 530 U.S. 640 (2000). The Court concluded that requiring the Boy Scouts to accept homosexual assistant scoutmasters "significantly burden[ed] the Boy Scouts' desire to not 'promote homosexual conduct as a legitimate form of behavior'" and violated its right to expressive association. *Id.* at 653–659. The Boy Scouts' ability to disseminate its chosen message was affected by regulation of who it must accept as leaders because "the First Amendment protects the Boy Scouts' *method* of expression," including its desire that its "*leaders* . . . avoid questions of sexuality and teach only by example" by embodying the Boy Scouts' values in their own life. *Id.* at 655 (emphases added).

An obvious distinction between *Roberts* and *Boy Scouts of America* is that the latter dealt with regulation of the group's *leadership* and the former dealt only with regulation of a group's *membership*. Indeed, this distinction was well articulated by Judge Landau of the New Jersey Court of Appeals in *Boy Scouts of America* before the case reached the Supreme Court. Judge Landau noted that the case presented "two separate issues, restriction of membership and restriction of *leadership*," and that by forcing the Boy

Scouts to allow homosexuals "to serve as . . . volunteer *leader*[*s*], we force them equally to endorse [such leader's] symbolic, if not openly articulated, message." *Dale v. Boy Scouts of Am.*, 308 N.J. Super. 516, 562–63 (App. Div. 1998) (Landau, J., concurring and dissenting) (emphases added).

The influence that group leaders have on the content of the group's expression was also recognized by the Court in its adoption of the ministerial exception, which prevents generally applicable employment-discrimination laws from governing "the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 188 (2012). In *Hosanna-Tabor*, a teacher at a Lutheran church-operated school and the Equal Employment Opportunity Commission brought a disability-discrimination lawsuit after she was terminated. *Id.* at 178–80. The church invoked the ministerial exception and argued that the suit was barred by the First Amendment because it concerned an employment relationship between a religious institution and its minister. *Id.* at 180. Detailing the historical backdrop leading to adoption of the First Amendment's Religion Clauses, the Court explained that these provisions "ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices." *Id.* at 182–84. "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Id.* at 184. The Court therefore concluded that the ministerial exception, rooted in the Religion Clauses, applied to bar the teacher's lawsuit because she was held out as a minister and her job duties included communicating religious ideology, and the

church had constitutionally protected autonomy to select its own ministers. *Id.* at 190–94.

Following this decision, in *Our Lady of Guadalupe School v. Morrisey-Berru* the Court rejected a rigid application of the factors it had identified in *Hosanna-Tabor* for determining who qualifies as a "minister" under the ministerial exception because "[w]hat matters, at bottom, is what [the individual] does." 140 S. Ct. 2049, 2064 (2020). The Court explained that control over religious leadership is vital because without it, "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Id.* at 2060. Because religious expression and exercise can be manipulated or wholly undermined by those directing the group's activity, any attempt "*even to influence*" who serves in such roles runs afoul of the Constitution. *See id.* (emphasis added).

I do not suggest that right-of-association or ministerial-exception cases directly control whether the District's actions in this case are content based for purposes of the EAA. But First Amendment jurisprudence is a useful tool in this context. *See Truth*, 542 U.S. at 645. And the principles discussed in these cases about the influence of leaders in expressive groups are not inherently limited to the specific contexts in which they arose. Taking a holistic view of the Court's decisions in this area, two relevant principles emerge. First, a policy that regulates based on subject matter is content based. *See Reed*, 576 U.S. at 163–64. And second, an ideological group's ability to control who can serve as its leader and speak on its behalf directly correlates to the content of the group's speech. *See Hurley*, 515 U.S. at 572–75 (requiring parade organizers to include certain marchers in the parade infringed on group's ability to control its

message and therefore violated the group's First Amendment rights); *see also Boy Scouts of Am.*, 530 U.S. at 653–56 (holding that requiring Boy Scouts to accept a gay assistant scoutmaster would "interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs"); *Our Lady of Guadalupe*, 140 S. Ct. at 2060 (explaining that a religious group's ability to communicate its message and maintain its mission depends on its ability to select its ministers without state interference). Thus, it is not a leap to conclude that regulating a group's ability to impose belief-based or ideology-based eligibility criteria specifically for its leaders is a content-based restriction. *See Reed*, 576 U.S. at 170 ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content." (alteration and citation omitted)).

Applying these principles to the present case demonstrates that the District's actions are content based because it refuses to recognize FCA as an ASB club because FCA requires its student leaders to subscribe to specific religious beliefs. The responsibility of student-club leaders generally is significant because ASB clubs must be student-initiated and their meetings may not be run or controlled by school employees or agents. But these responsibilities are even more pronounced in religious clubs, because while ASB clubs have faculty advisors, faculty involvement in religious clubs is limited to "a non-participatory capacity." *See* 20 U.S.C. § 4071(c)(3) ("[E]mployees or agents of the school or government [may be] present at religious meetings only in a nonparticipatory capacity"); *see also Hsu*, 85 F.3d at 861 (explaining that because of this provision in the EAA, "political clubs and chess clubs may have faculty sponsors to promote institutional stability, help guarantee that new leaders are committed to the club's cause, and ensure that the

club remains true to its purpose, [but] religious clubs do not have that protection").

Specific to FCA, student leaders are responsible for "lead[ing] and participat[ing] in prayer, worship, and religious teaching," "help[ing] decide the content of meetings," "select[ing] guest speakers and identify[ing] religious topics to cover," and "communicat[ing] FCA's message when interacting with administrators, staff, faculty, and students at their schools." Of course, given that these responsibilities are tied to FCA's expression, FCA requires students wanting to perform these functions to affirm agreement with FCA's religious tenets and agree to hold themselves "to a higher standard of biblical lifestyle and conduct" and "do their best to live and conduct themselves in accordance with biblical values." *Cf. Boy Scouts of Am.*, 530 U.S. at 649 (explaining that Boy Scout values found in the Scout Oath included "[t]o do my duty to God and my country" and "[t]o keep myself . . . morally straight"). Likewise, FCA's requirement that its student leaders "not . . . subscribe to or promote any religious beliefs inconsistent with [FCA's] beliefs" clearly correlates to FCA's ability to fulfill its purpose—ministry. *Cf. id.* at 655 ("[T]he First Amendment protects the Boy Scouts' method of expression," including by having Scout leaders "avoid questions of sexuality and teach only by example[.]"). FCA's student leaders directly govern operation of the club and the content of its expression, and FCA's faith-based student-leadership requirement is intended to preserve "the content and credibility of [FCA's] religio[us] message." *See Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring).

The District refused to recognize FCA as an ASB club because it believes FCA's faith-based leadership criteria violate the District's policy preventing discrimination based

on sexual orientation. The District's argument that it is
regulating FCA's discriminatory *actions*, not its beliefs and
speech related to homosexuality, falls flat. FCA membership
is open to all, and the District concedes that "student leaders
[are] important for . . . setting the direction and tenor of the
group" and that student leaders "help communicate . . . the
message and purpose of a student club." In arguing that its
application of its nondiscrimination policy is content neutral,
the District ignores, or deems irrelevant, the reality (which it
accepts) that influencing who leads an expressive group
necessarily influences the expression of the group. And
applicable here, the Supreme Court has aptly noted that "a
wayward minister's preaching, teaching, and counseling"
could undermine a religious group's "tenets and lead the
congregation away from the faith." *Our Lady of Guadalupe*
140 S. Ct. at 2060.

This point was further pressed by amici in this case. The
Jewish Coalition for Religious Liberty explained that a
religious group's leaders may help fulfill the group's
purpose by, for example, ensuring that religiously acceptable
food is served or ensuring proper observance of religious
rituals and holidays. *See* Brief of the Jewish Coalition for
Religious Liberty as Amicus Curiae in Support of Plaintiffs-
Appellants, Dkt. No. 114, at 4, 14–19. This amicus further
notes that not only is selecting a leader who follows the
tenets of the religion necessary to ensuring that the group
properly observes its religious traditions and practices, it
also impacts the group's ability to attract additional
members. *See id.* at 12, 16. Professor Michael McConnell
further explains that Christian students looking to practice
their faith and find religious mentorship would not be
attracted to a Christian student group led by an atheist. *See*
Brief for Amicus Curiae Professor Michael W. McConnell

in Support of Plaintiffs-Appellants, Dkt. No. 117, at 12. The same would be true for any other ideological group. Preventing a group formed around an ideology from requiring its leaders to espouse the group's ideology is a content-based regulation because it undermines the group's ability to control its identity and messaging, i.e., its speech.

This court has already recognized that leadership selectivity is "readily distinguishable" from membership selectivity. *See Truth*, 542 F.3d at 647. In *Truth*, we held that the key feature distinguishing that case from *Hsu* was that the club at issue in *Truth* restricted "*general* membership." *See id.* The Second Circuit in *Hsu* had held that plaintiffs were likely to prevail on their EAA claim where the school refused to recognize a religious club that required only its officers to be "professed Christians" because it violated the school's nondiscrimination policy. 85 F.3d at 849, 859–62. *Hsu* rejected the argument that the school's refusal to recognize the club was based on the club's "'act' of excluding non-Christians from leadership" because restricting "people of other religions from conducting its meetings" was a choice the club made to "protect the expressive content of the meetings."[7] *Id.* at 856–59.

We have not previously confronted a case like this or like *Hsu* where a student club discriminates only in its leadership eligibility. *See Truth*, 542 F.3d at 647 (distinguishing *Hsu* because "we [we]re only concerned with [plaintiff]'s

---

[7] *Hsu* reasoned that the leadership requirement was "defensible" only to club officers whose duties related to running the club's "programs" such as "leading Christian prayers and devotions," including the "President, Vice-President, and Music Coordinator of the club." *Id.* at 858. Even accepting that limitation, FCA's leadership eligibility criteria is defensible because, as discussed, FCA leaders are tasked with overseeing all aspects of the club's meetings and its worship activities.

*general* membership requirements"); *see also Alpha Delta*, 648 F.3d at 795–96 (addressing claims by group that required its "*members* and officers profess a specific religious belief" (emphasis added)). With this narrower issue now squarely before us, I would join the Second Circuit and conclude that when a school applies its nondiscrimination policy to a student club that limits only who can serve as a club leader because of the club's ideological leadership criteria, such application is impermissibly content based. *See Hsu*, 85 F.3d at 856–59.

In sum, this case does not involve a categorical all-comers policy like that at issue in *Martinez*, and First Amendment jurisprudence establishes that regulating who can serve as the leader of ideological groups directly implicates the content of the group's speech. Thus, FCA is likely to succeed in establishing that the District denied FCA equal access to the ASB program *because of the content of FCA's speech* in violation of the EAA.

## C. First Amendment Free Speech

Because FCA is likely to succeed on its EAA claim, there is no need to address any of its constitutional claims. *See Mergens*, 496 U.S. at 247 (holding that where a case can be decided under the EAA, a court need not decide whether the First Amendment "requires the same result"); *see also Blum v. Bacon*, 457 U.S. 132, 137 (1982) ("[O]rdinarily we first address the statutory argument in order to avoid unnecessary resolution of the constitutional issue."). But where First Amendment free-speech jurisprudence informs the EAA analysis and the analyses of these two claims is similar, I briefly address the constitutional claim.

"The framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will

and to speak as you think.'" *303 Creative LLC v. Elenis*, 143
S. Ct. 2298, 2310 (2023) (citing *Boy Scouts of Am.*, 530 U.S.
at 660–61). The First Amendment's speech "protections
belong to all, including to speakers whose motives others
may find misinformed or offensive." *Id.* at 2317; *see also id.*
at 2312. The Supreme Court has thus espoused a
"commitment to protect[] the speech rights of all comers, no
matter how controversial—or even repugnant—many may
find the message." *Id.* at 2320. And it has "recognized that"
antidiscrimination laws are not "immune from the demands
of the Constitution," however noble the goals of such laws
may be. *Id.* at 2315.

As discussed above, First Amendment free-speech and
freedom-of-expressive-association challenges related to
regulation of student-run clubs are analyzed under the
Supreme Court's limited-public-forum doctrine. *See
Martinez*, 561 U.S. at 679–80. Under this framework, a
policy or regulation is permissible if it is (1) reasonable in
light of the forum's function and surrounding circumstances,
*and* (2) viewpoint neutral. *Id.* at 685. I address only the
second issue.

The government engages in viewpoint discrimination
where it targets "not subject matter, but particular views
taken by speakers on a subject." *Rosenberger v. Rector &
Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). In other
words, viewpoint discrimination is a "blatant" or "egregious
form of content discrimination." *Id.* A law disfavoring ideas
or messages the government finds offensive is viewpoint

90   FELLOWSHIP OF CHRISTIAN ATHLETES V. SAN JOSE USD

discriminatory. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299–301 (2019).**[8]**

For example, in *Rosenberger*, the founder of a magazine with a "Christian viewpoint" brought a First Amendment free speech claim against the University of Virginia after it declined to provide student-activity-fee funding to the publication because it was a "religious activity" not entitled to such funding under the University's guidelines. 515 U.S. at 823–27. The Supreme Court held that the funding denial was impermissible viewpoint discrimination because the University selected "for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831. The Court further explained that "[r]eligion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered. The prohibited perspective, not the general subject matter, resulted in the [funding] refusal." *Id.* And in *Iancu*, the Court held that the Lanham Act's prohibition against registering "immoral or scandalous" trademarks was viewpoint discriminatory because it "allow[ed] registration of [trade]marks when their messages accord[ed] with, but not when their messages def[ied], society's sense of decency or propriety," and distinguished between ideas "inducing

---

[8] Further, the government may engage in viewpoint discrimination where it selectively enforces a neutral policy or law because it disagrees with a message being expressed; choosing not to apply the policy to one view, while using it to "silenc[e] another is quintessential viewpoint discrimination." *Frederick Douglass Found., Inc. v. D.C.*, ___ F.4th ___, No. 21-7108, 2023 WL 5209556, at *10 (D.C. Cir. Aug. 15, 2023); *see also Truth*, 542 F.3d at 650–51 (recognizing that a facially neutral policy may violate the First Amendment where it is selectively applied).

societal nods of approval and those provoking offense and condemnation." 139 S. Ct. at 2300.

Considering these precedents, the District's selective application of its nondiscrimination policy is viewpoint discriminatory. Some clubs, like the Big Sister Little Sister's club, were allowed to impose discriminatory criteria where they were seen positively as "something of a mentorship." This remained true even after the District adopted is "All-Comers Policy"—the Senior Women club was granted ASB recognition even though it limits it members based on gender and age. But FCA was not recognized because its faith-based leadership criteria were viewed as nefarious. *See Rosenberger*, 515 U.S. at 831 (holding a school's actions were viewpoint discriminatory where a student group was denied funding based on having a "prohibited perspective"). This is evidenced by, among other things, Glasser's statement to Principal Espiritu that the views expressed in FCA's Sexual Purity Statement "[we]re bullshit to" him, and Principal Espiritu stating that FCA's Sexual Purity Statement defied Pioneer's "core values" and Pioneer needed to take a "united stance" against such views. *See id.* And Principal Espiritu's approach to managing student clubs indicates viewpoint discrimination occurred where he described that he had and would continue to single out clubs with a purpose he deemed "controversial."

In short, the record presented here indicates that the District is impermissibly picking and choosing which viewpoints are acceptable and which are not under the pretext of prohibiting "discriminatory acts." *See id.* (holding that a school may not select a student group "for disfavored treatment" because of the group's viewpoint); *cf. Martinez*, 561 U.S. at 695 n.25 (concluding that viewpoint discrimination was not an issue where the school did not

"pick and choose which organizations must comply with the policy"). Thus, FCA is likely to succeed in showing that the District has selectively enforced its policy against FCA and may continue to selectively enforce its policy against FCA and other clubs whose messages the District determines "provok[e] offense and condemnation," *Iancu,* 139 S. Ct. at 2300, but not against clubs whose views "accord with" and do not "defy, [the District's] sense of decency or propriety," *id.*

## III.    CONCLUSION

The height of irony is that the District excluded FCA students from fully participating in the ASB program in the name of preventing discrimination to purportedly ensure that all students feel welcome. In doing so, the District selectively enforced its nondiscrimination policy to benefit viewpoints that it favors to the detriment of viewpoints that it disfavors. The suggestion that *Martinez*'s approval of a true all-comers policy applies here is therefore baseless. Moreover, the District targeted the content of FCA's speech by excluding FCA from equal participation in the ASB program because FCA requires student leaders—who implement FCA's ministry purpose—to affirm specific religious beliefs. FCA has met all the elements for obtaining a preliminary injunction, and the district court erred in concluding otherwise.

M. SMITH, Circuit Judge, concurring in part and dissenting in part, with whom Chief Circuit Judge MURGUIA and Circuit Judge SUNG join with respect to Part II:

I agree that the plaintiffs are entitled to a preliminary injunction because the District treats religious activities differently than secular ones, in violation of the Supreme Court's decision in *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam).  I write separately because the majority opinion sweeps well beyond what is needed to resolve this case and imprudently addresses open questions of law upon an underdeveloped, preliminary-injunction record—even though doing so has no impact on the relief to which the plaintiffs are entitled.     Separately, I dissent as to the majority's holding that plaintiffs would be likely to succeed on a facial challenge to the District's all-comers policy under the Free Speech Clause.

I.

This case has an unusual posture for an en banc decision: We are tasked only with determining whether, at this early stage of the litigation, the plaintiffs are entitled to a preliminary injunction.  To do so, we need only determine that they are likely to prevail on *one* of their claims.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1139 (9th Cir. 2011) ("not reach[ing]" the plaintiff's remaining claims after finding a likelihood of success on the first).

This is a clear-cut differential-treatment case.  Religion-burdening government action is subject to strict scrutiny "whenever [it] treat[s] *any* comparable secular activity more favorably than religious exercise."  *Tandon*, 141 S. Ct. at 1296.  As both the en banc majority and panel majority explain, it is apparent from the record before us that the

District treated similarly situated secular student
organizations "more favorably than" FCA without a
compelling reason to do so. *See* Majority Opinion V.B;
*Fellowship of Christian Athletes v. San Jose Unified Sch.
Dist. Bd. of Educ.*, 46 F.4th 1075, 1092–98 (9th Cir. 2022)
(vacated). Accordingly, I would stop my analysis there—
since that conclusion is sufficient to support a preliminary
injunction.   The en banc majority goes on, however, to
decide several open questions of law even though doing so
is unnecessary to resolve this case.

First, the majority opinion holds in Section V.A that
pursuant to *Fulton v. City of Philadelphia*, 141 S. Ct. 1868
(2021), an alleged practice of—as opposed to a "formal
mechanism" for—providing individualized exemptions for
secular activities is sufficient to trigger strict scrutiny. In
*Fulton*, the Court examined "a contractual provision that
prohibited adoption agencies from discriminating against
prospective adoptive parents . . . 'unless an exception is
granted by the Commissioner . . . in his/her sole discretion.'"
*Tingley v. Ferguson*, 47 F.4th 1055, 1088 (9th Cir. 2022)
(quoting *Fulton* 141 S. Ct. at 1878). The Court held that
"[t]he creation of a formal mechanism for granting
exceptions renders a policy not generally applicable" and
therefore subject to strict scrutiny. *Fulton*, 141 S. Ct. at
1879.

Interpreting *Fulton*, a panel of our court rejected its
application in a case where it found no "formal mechanism"
for exceptions existed, because there was no "provision in
the [applicable] law" for such exceptions. *Tingley*, 47 F.4th
at 1088. Now the majority concludes that *Fulton* applies to
this case, even though there are no provisions about
exceptions in either the nondiscrimination or all-comers
policies, and without analyzing the District's *written* equity

policy. In so doing, the majority seemingly overrules *Tingley*'s text-based approach sub silentio.

Second, the majority opinion holds in section V.C that *Masterpiece Cakeshop* statement-based claims are cognizable beyond the formal adjudication context in which that case arose. *See Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1730 (2018) ("[T]he remarks were made . . . by an adjudicatory body deciding a particular case"). Again, in *Tingley*, we were careful to note that *Masterpiece Cakeshop* encompassed only those comments made by members of a formal, adjudicatory body. *See Tingley*, 47 F.4th at 1086–87. Here, the panel expands the reach of *Masterpiece Cakeshop* despite acknowledging that "none of the[] statements [at issue here] were made during an actual adjudication," but are nonetheless worth evaluating for hostility—again sub silentio overruling *Tingley*. Worse yet, it does so on a preliminary-injunction record, and while acknowledging that "there is some confusion" at this stage of the litigation as to who the decisionmakers behind FCA's derecognition were—because "the district court made no findings in this regard." Indeed, the words *Masterpiece Cakeshop* never even appear in the district court's order because it never addressed that claim in the first place.

I express no view on the merits of these holdings; instead, I balk at reaching these issues in the first place. Given the amount of our court's resources that go into hearing a case en banc, I understand the impulse to want to make more of a case than is required. But even when sitting en banc, our role is limited to adjudicating the issues necessary to resolving the disputes before us—and I believe we should resist the siren song beckoning us to do otherwise. In deciding whether the plaintiffs are entitled to a

preliminary injunction in this case, I would reverse the district court only on *Tandon* differential-treatment grounds.

## II.

Though the body of the majority's opinion focuses on Free Exercise issues, in a footnote, the majority also holds that plaintiffs are likely to succeed on their Free Speech claim. Although the footnote does not distinguish between facial and as-applied challenges, it can only be read to hold that plaintiffs are likely to succeed on a facial challenge—a conclusion with which I respectfully disagree.

Footnote eight states that plaintiffs are likely to succeed because *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011), has been abrogated by *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). In *Alpha Delta*, we held that a nondiscrimination policy, as written, did not discriminate on viewpoint in part because it was not implemented "for the purpose of suppressing Plaintiffs' viewpoint." 648 F.3d at 801. Then in *Reed*, the Supreme Court held that "the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech"—i.e., its purpose for a regulation—cannot shield it from strict scrutiny if it is "content based on its face." 576 U.S. at 165. Therefore, according to the majority, "even if the District were correct that there was no intent to suppress FCA's religious viewpoint . . . the District's intent is irrelevant in the Free Speech analysis."

The majority, however, never holds that the all-comers policy in this case (or for that matter, the nondiscrimination policy in *Alpha Delta*) is "content based on its face," like the policy in *Reed* was. *See Reed*, 576 U.S. at 166 ("[W]e have repeatedly considered whether a law is content neutral on its

face *before* turning to the law's justification or purpose.") (emphasis in original).

Moreover, the majority ignores a Supreme Court decision that rejected a free speech facial challenge to an all-comers policy very similar to the one in this case. In *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010), the Supreme Court explained that the proper framework for assessing restrictions in limited public forums is to determine whether they are (1) reasonable, and (2) do not "discriminate against speech on the basis of … *viewpoint*." *Id.* at 685 (emphasis added); *see Reed*, 576 U.S. at 169 (distinguishing between content and viewpoint discrimination). Pursuant to that framework, the Court held that the all-comers policy in that case was not only viewpoint-neutral, but "textbook viewpoint neutral." *Martinez*, 561 U.S. at 695. And, as the majority acknowledges, the all-comers policy here is "modeled after the version upheld by the Supreme Court in *Martinez*."[1]

To the extent the majority believes that *Martinez* is no longer good law, it should say so outright. Since I am unaware of any opinions of the Supreme Court overruling *Martinez*, I respectfully dissent. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (explaining that only the Supreme Court may "overrule[] its own decisions")

---

[1] In discussing plaintiffs' *free exercise* (as opposed to speech) claims, the majority suggests that "the stipulated facts in *Martinez* providing for an exceptionless policy are critically distinct from the discretion the District retains when applying the non-discrimination policies in this case." But the "discretion" the majority refers to does not appear on the face of the all-comers policy, which policy is almost identical to the one stipulated to by the parties in *Martinez*. Instead, the discretion is derived from the District's actual enforcement of the policy vis-à-vis its other policies, which would only be relevant to an as-applied challenge.

SUNG, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Pioneer FCA has representational standing, but for different reasons. I agree with Chief Judge Murguia that the declarations Plaintiffs submitted in support of their motion for injunctive relief, alone, are too sparse to establish standing. However, I agree with the majority that we may grant Plaintiffs' motion to supplement the record on standing, because we did so under similar circumstances in *Teamsters Local Union No. 117 v. Washington Dep't of Corrections*, 789 F.3d 979, 985-86 (9th Cir. 2015). Therefore, I concur in the grant of Plaintiffs' motion, Dkt. No. 98. Further, I find that "the record as supplemented on appeal reflects the bare minimum necessary to satisfy the threshold requirement of standing." *Id*.

I conclude, however, that FCA National does not have direct organizational standing to pursue prospective injunctive relief, for the reasons stated by Chief Judge Murguia in her dissent.

Because I conclude that Pioneer FCA has representational standing, I reach the merits of the district court's preliminary injunction decision. On the merits, I conclude that the district court did not abuse its discretion in refusing to enjoin the San José Unified School District from uniformly applying its nondiscrimination policy to student groups in the then-upcoming school year, for the reasons stated by Chief Judge Murguia in her dissent.

I agree with Chief Judge Murguia's rigorous analysis of the record and law in Parts I, II.B, II.C.2, III.A, and III.B of her dissent, and I join those parts in full. I also largely agree

with Chief Judge Murguia's analysis of Pioneer FCA's representational standing in Part II.C.1 of her dissent, but I do not join that part for the reasons stated above. I also share Chief Judge Murguia's concerns about the majority's decision, as expressed in Part IV of her dissent, and I join that part except for the last sentence regarding jurisdiction. I also agree with and join Part II of Judge M. Smith's partial concurrence and partial dissent.

---

MURGUIA, Chief Circuit Judge, dissenting, with whom Circuit Judge SUNG joins with respect to Parts I, II.B, II.C.2, III.A, III.B, and IV (except for the last sentence):

This case presents challenging constitutional questions of a significant nature. But this appeal requires us only to decide a narrow issue with respect to those questions: whether the district court abused its discretion in refusing to enjoin the San José Unified School District from uniformly applying its nondiscrimination policy to student groups in the then-upcoming school year. Rather than properly considering that issue, the majority hands down a sweeping opinion with no defined limiting principle that ignores our standard of review and carte-blanche adopts Plaintiffs' version of disputed facts.

But even before resolving the limited appeal before us, we must have jurisdiction to do so. We do not. I would dismiss this appeal because Plaintiffs fail to make the necessary "clear showing" of Article III standing. The majority concludes otherwise only by ignoring unambiguous Ninth Circuit and Supreme Court precedent. I respectfully dissent.

I.

I begin by highlighting that the majority overlooks our standard of review and procedural posture. We review the denial of a preliminary injunction for an abuse of discretion. *Olson v. California*, 62 F.4th 1206, 1218 (9th Cir. 2023). In so doing, we review the district court's findings of fact for clear error. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). A factual finding is clearly erroneous when it is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)). And, notably, our review of a district court's denial of a preliminary injunction is "limited and deferential." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc); *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1087–88 (9th Cir. 1989) (emphasizing the "very limited" scope of our review of the denial of a preliminary injunction). In reviewing the district court's preliminary-injunction decision, we "will not reverse the district court's order simply because we would have reached a different result. . . . [We are] not empowered to substitute [our] judgment for that of the [district court]." *Zepeda v. I.N.S.*, 753 F.2d 719, 725 (9th Cir. 1983). The majority pays only lip service to these standards, reciting them but not applying them, the consequences of which I discuss below.

A.

The Fellowship of Christian Athletes (FCA) is an international religious ministry with thousands of student chapters at middle schools, high schools, and colleges across the United States. FCA's stated mission is "to lead every

coach and athlete into a growing relationship with Jesus Christ and His church." To become a recognized student leader of an FCA student chapter, a student must affirmatively state their agreement with a "Statement of Faith" and must agree to abide by and conform their conduct to a "Sexual Purity Statement." Under these Statements, prospective FCA student leaders must agree that sexual intimacy should only occur between a man and a woman within the confines of a heterosexual marriage.[1]

Specifically, the Statement of Faith reads in relevant part:

> We believe God's design for sexual intimacy is to be expressed only within the context of

---

[1] For good reason, the Supreme Court has

> declined to distinguish between status and conduct in [contexts where individuals are excluded "on the basis of a conjunction of conduct and the belief that the conduct is not wrong."] *See Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination." (emphasis added)); *id.,* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class."); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

*Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010) (alteration in original).

> marriage. God instituted marriage between one man and one woman as the foundation of the family and the basic structure of human society. For this reason, we believe that marriage is exclusively the union of one man and one woman.

And the Sexual Purity Statement states:

> God desires His children to lead pure lives of holiness. The Bible teaches that the appropriate place for sexual expression is in the context of a marriage relationship. The biblical description of marriage is one man and one woman in a lifelong commitment.

> While upholding God's standard of holiness, FCA strongly affirms God's love and redemptive power in the individual who chooses to follow Him. FCA's desire is to encourage individuals to trust in Jesus and turn away from any impure lifestyle.[2]

---

[2] The version of the Sexual Purity Statement first brought to Defendants' attention in the spring of 2019 read:

> God desires his children to lead pure lives of holiness. The Bible is clear in teaching on sexual sin including sex outside of marriage and homosexual acts. Neither heterosexual sex outside of marriage nor any homosexual act constitute an alternative lifestyle acceptable to God.

B.

Every fall, student clubs at high schools across the San José Unified School District apply for Associated Student Body (ASB) recognition. The ASB program enhances students' sense of belonging and school spirit, creates a forum for students to gather around shared interests, and promotes self-governance. ASB-recognized student clubs receive certain benefits, like inclusion in the school yearbook; access to an ASB financial account, where the club can deposit and withdraw funds; an official campus advisor; and priority access to campus meeting space. ASB clubs do not receive school funding. Students must apply for ASB recognition on behalf of the prospective club.

Starting in the early 2000s, and until the spring of 2019, three of the District's six high schools—Willow Glen, Leland, and Pioneer—had ASB-recognized FCA student chapters. During that time, the District was unaware that FCA restricted leadership by requiring student leaders to affirm the Statement of Faith and Sexual Purity Statement.

In April 2019, three Pioneer students complained to Pioneer staff about FCA's student leadership requirements. After a Pioneer teacher alerted Principal Herb Espiritu to the complaints, Principal Espiritu contacted the District for guidance. The District determined that FCA's leadership restrictions violated the District's nondiscrimination policies, which require District activities and programs to be free from discrimination based on, among other things,

religion and sexual orientation.**³**   As a result, the District advised that FCA clubs were ineligible for ASB recognition.

At Pioneer, Principal Espiritu informed FCA's student leaders that FCA could no longer operate as an ASB club

---

³ One relevant part of the District's nondiscrimination policy (Board Policy 0410) states:

> The Governing Board is committed to equal opportunity for all individuals in district programs and activities.   District programs, and activities, and practices shall be free from discrimination based on religion, gender, gender identity and expression, race, color, religion, ancestry, national origin, immigration status, ethnic group, pregnancy, marital or parental status, physical or mental disability, sexual orientation or the perception of one or more of such characteristics.   The Board shall promote programs which ensure that any discriminatory practices are eliminated in all district activities.

Another section of the District's policy (Board Policy 5145.3) provides:

> All district programs and activities within a school under the jurisdiction of the superintendent of the school district shall be free from discrimination, including harassment, with respect to the actual or perceived ethnic group, religion, gender, gender identity, gender expression, color, race, ancestry, national origin, and physical or mental disability, age or sexual orientation. The Governing Board desires to provide a safe school environment that allows all students equal access to District programs and activities regardless of actual or perceived ethnicity, religion, gender, gender identity, gender expression, color, race, ancestry, nation origin, physical or mental disability, sexual orientation, or any other classification protected by law.

because the District's nondiscrimination policy forbade "sponsor[ing] programs or activities with discriminatory practices." FCA was therefore not recognized as an ASB student club for the remainder of the 2018–19 school year or for the 2019–20 school year.

The District allowed FCA student chapters to operate as "student interest groups" even without ASB recognition. Student interest groups can advertise and meet at school, participate in club rush and school events, and use the auditorium for club meetings and activities.

During the 2020–21 school year, due to the COVID-19 pandemic, Pioneer granted provisional ASB approval to all student clubs, including Pioneer FCA. Pioneer FCA was the only FCA student chapter in the District that operated during the 2020–21 school year; the chapters at the two other District schools (Willow Glen and Leland) had dissolved. The Pioneer students who led Pioneer FCA in the 2020–21 school year graduated in 2021.

As the 2021–22 school year approached, the District created a new application process for prospective ASB clubs, featuring an "All-Comers Policy" that requires all clubs "to permit any student to become a member or leader." In conjunction with this new ASB-approval process, the District issued guidelines and trained its activities directors on the process. Under the new process, any club seeking ASB recognition must complete and sign an "ASB Affirmation Form," which includes confirming the club's conformance with the District's nondiscrimination policies. The club must affirm that it will "[a]llow any currently enrolled student at the school to participate in, become a member of, and seek or hold leadership positions in the organization, regardless of his or her status or beliefs." The

form allows the adoption of "non-discriminatory criteria" regarding being a member or leader, such as "regular attendance" and "participation" in events and activities. District guidance explained that the ASB Affirmation Form is to be "implemented and construed in accordance" with the Supreme Court's decision in *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010), which upheld the constitutionality of a similar all-comers policy. All ASB-approved clubs were also required to adopt constitutions prohibiting discrimination in club membership and leadership.

Consistent with this new approval process, any student club that signed the affirmation form and adopted a requisite constitution was granted ASB recognition in the 2021–22 school year. Likewise, the District clarified that any club that followed this process would be approved for the 2022–23 school year.

No FCA student applied for ASB recognition at any District school during the 2021–22 school year. And Pioneer FCA declined an invitation to host a table at Pioneer's club rush in the fall of 2021.

C.

In April 2020—before Pioneer provisionally recognized all student groups for the 2020–21 school year—Plaintiffs FCA National and two Pioneer seniors, Charlotte Klarke and Elizabeth Sinclair, sued the District and several District officials, seeking injunctive relief, declaratory relief, and damages. Soon after, they filed an amended complaint, bringing constitutional claims primarily under the First Amendment, and a statutory claim under the Equal Access Act. Defendants moved to dismiss. The district court granted the motion in part, dismissing with prejudice Klarke

and Sinclair's claims for prospective relief because those claims became moot when the students graduated in June 2020. *See Roe v. San Jose Unified Sch. Dist. Bd.*, No. 20-CV-02798-LHK, 2021 WL 292035, at \*19 (N.D. Cal. Jan. 28, 2021). Klarke and Sinclair's claims for retrospective damages stemming from alleged past violations of their rights remain pending. *Id.* The district court also concluded that FCA National failed to allege its own organizational or associational standing and dismissed its claims without prejudice. Finally, the district court dismissed with prejudice Plaintiffs' facial challenges to the District's policies. *Id.*

Plaintiffs filed the operative complaint in July 2021, adding Pioneer FCA as a plaintiff. Plaintiffs soon moved for a preliminary injunction, in which they sought an order requiring the District to recognize Pioneer FCA as an ASB student group. In support of their motion for preliminary injunction, Plaintiffs submitted six declarations between July 2021 and May 2022 from FCA National employee Rigoberto Lopez. Defendants again moved to dismiss, arguing that FCA National and Pioneer FCA lacked Article III standing for the requested prospective injunctive relief. The district court failed to rule on that motion.

During discovery, Defendants agreed not to depose any current or former FCA-affiliated students, and FCA stipulated that it would neither call any FCA-affiliated students or former students at trial nor use previously unsubmitted testimony or statements of such students in connection with any motion in the case.

The district court denied the preliminary-injunction motion in June 2022. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, No. 20-CV-

02798-HSG, 2022 WL 1786574, at \*1 (N.D. Cal. June 1, 2022). In its order, the district court made specific factual findings that the District did not selectively enforce the All-Comers Policy and that the District did not have any discretion to allow student clubs to discriminate. *See id.* at \*9–12. Plaintiffs timely appealed the denial of the preliminary injunction.

On appeal, Defendants again argued that Plaintiffs lacked Article III standing for injunctive relief. They asserted that Plaintiffs failed to show that any District student intended to seek ASB recognition for an FCA club for the coming school year or would seek recognition if the District's Policy were enjoined. Defendants thus contended that Plaintiffs were not likely to suffer any future harm, a necessary requisite of standing at the preliminary-injunction stage.

In August 2022, a three-judge panel of our Court heard oral argument. Less than two weeks later, Plaintiffs filed a Federal Rule of Appellate Procedure 28(j) letter seeking to insert new evidence into the record. Specifically, they requested to submit evidence that two Pioneer students— N.M. and B.C.—were interested in applying for ASB recognition of an FCA club for the then-upcoming 2022–23 school year. In a written order, the panel unanimously refused to consider this "eleventh-hour filing."[4]

---

[4] In rejecting Plaintiffs' request, the panel quoted then-Judge Gorsuch's opinion in *Niemi v. Lasshofer*, 728 F.3d 1252, 1262 (10th Cir. 2013) (Gorsuch, J.):

> Allowing a party to convert [Rule 28(j)] to an entirely new and different purpose—allowing Rule 28(j) letters to be used to introduce any sort of new issue

That same day, the same panel reversed the district court's denial of the preliminary injunction in a divided decision. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F.4th 1075 (9th Cir. 2022), *vacated by* 59 F.4th 997 (9th Cir. 2023). The panel majority concluded that both FCA National and Pioneer FCA had standing for prospective relief. 46 F.4th at 1088–91. On the merits, the majority concluded that Plaintiffs were likely to succeed on their selective-enforcement free-exercise claims and that the remaining preliminary-injunction factors supported granting the requested injunctive relief. *Id.* at 1092–99. The majority directed the district court to enter an injunction that ordered the District to grant ASB recognition to FCA student groups. *Id.* at 1099.

The panel dissent concluded that Plaintiffs could not establish Article III standing for prospective relief and, as a result, the appeal should be dismissed for lack of jurisdiction. *Id.* at 1103 (Christen, J., dissenting). The dissent explained:

> Because the District's nondiscrimination policy cannot cause a real or immediately

---

after briefing is complete—risks leaving opponents with no opportunity (at least if they abide the rules of appellate procedure) for a proper response; it risks an improvident opinion from this court by tasking us with the job of issuing an opinion without the full benefits of the adversarial process; and it invites an unsavory degree of tactical sandbagging by litigants in future cases: why bother pursuing a potentially winning issue at the outset when you can wait to introduce it at the last second and leave your opponent without the chance to respond?

> impending injury to FCA if no students apply
> for ASB recognition, FCA cannot establish
> standing without evidence that a Pioneer
> FCA student has applied, or intends to apply,
> for ASB recognition for the upcoming school
> year.  FCA failed to make that showing.

*Id.*

Defendants petitioned for rehearing en banc.  While their petition was pending, Plaintiffs again sought to introduce new evidence, this time by moving to supplement the record on appeal.  The proffered evidence allegedly showed that after the three-judge panel's decision, N.M. and B.C. submitted a student-club application for Pioneer FCA, and the District then reinstated Pioneer FCA's ASB status for one year.[5]  Plaintiffs claimed that this evidence confirmed that Plaintiffs' claims were "not moot" because it showed that Pioneer FCA exists and needs permanent injunctive relief.

A majority of active members of this Court then voted to rehear the case en banc, so the panel opinion was vacated. 59 F.4th at 998.  After we heard oral argument in March 2023, a majority of the en banc court voted to issue an injunction—similar to the one the three-judge panel had

---

[5] Plaintiffs' motion to supplement prompted a volley of responses and replies.  Going into en banc oral argument, there were three pending motions to supplement the record on appeal, two from Plaintiffs and one from Defendants.  Defendants cross-moved for leave to supplement the record with evidence that "while two students signed a club application, they were not, and are not, actually committed to organizing a club." Defendants also asked to supplement the record with evidence related to the merits.  Plaintiffs opposed the cross-motion and moved to supplement the record with additional jurisdictional evidence.

instructed the district court to issue—pending resolution of the appeal. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 64 F.4th 1024, 1025 (9th Cir. 2023) (en banc). I dissented from that order. *Id.* (Murguia, C.J., dissenting).

II.

Before reaching the merits of the district court's preliminary-injunction decision, we must assure ourselves that Plaintiffs have standing and that jurisdiction otherwise exists. *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021). So, like the majority, I begin by addressing whether Plaintiffs meet the "irreducible constitutional minimum" of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Unlike the majority, to make this determination, I would act in accordance with our regular practice and precedent and consider only the record that existed before the district court. *See Lowry v. Barnhart*, 329 F.3d 1019, 1024–25 (9th Cir. 2003) ("Save in unusual circumstances, we consider only the district court record on appeal.").

Based on the record before the district court, Plaintiffs lack standing for prospective injunctive relief. Plaintiffs do not establish that any District student intended to apply for ASB recognition for an FCA club during the then-upcoming 2022–23 school year, or would have done so if the District's Policy were enjoined. Without that evidence, Plaintiffs cannot show injury in fact and so they do not meet their standing burden. I would dismiss the appeal for lack of jurisdiction.

A.

As a preliminary matter, I would deny all pending motions to supplement the record on appeal. After the three-judge panel reversed the district court and while Defendants' petition for rehearing en banc was pending, Plaintiffs moved to supplement the record on appeal with evidence purportedly related to our jurisdiction.[6]   Specifically, Plaintiffs' motion proffered extra-record evidence allegedly showing that N.M. and B.C. applied for ASB recognition for a Pioneer FCA club for the 2022–23 school year.

But "[o]nly in extraordinary situations should the record on appeal be supplemented with material that was not before the district court." *Barilla v. Ervin*, 886 F.2d 1514, 1521 n.7 (9th Cir. 1989); *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1126 n.7 (9th Cir. 2020) (rejecting attempt to insert into the record a statement submitted to our Court "*for the first time* during the pendency of the appeal" because "[d]ocuments or facts not presented to the district court are not part of the record on appeal" (citation omitted)); Fed. R. App. P. 10(a) (explaining that the record on appeal consists of "papers and exhibits filed in the district court," "the transcript of proceedings," and "docket entries").  We have stressed that "[t]his limitation is fundamental." *Lowry*, 329 F.3d at 1024. That said, there are rare "exceptions to [this] general rule," including that we may supplement the record on appeal where "developments [might] render a controversy moot and thus divest us of jurisdiction." *Id.*

---

[6] This was Plaintiffs' second attempt to introduce extra-record evidence, the first being the post-panel-argument Rule 28(j) letter that the three-judge panel unanimously rejected.

Here, Plaintiffs argue that supplementation of the record is permitted because the proffered evidence shows that Plaintiffs' claims are not moot. Plaintiffs are confused. As Defendants argue and both the three-judge panel majority and dissent recognized, the relevant justiciability issue here is standing, not mootness. Plaintiffs' cited authority on mootness therefore has no application here.

"A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (cleaned up). But a plaintiff must have established Article III standing in the first place for a case to remain a live controversy (and thus not moot). *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 174 (2000) (warning courts not to incorrectly conflate standing and mootness and emphasizing a court's "obligation to assure" that the plaintiffs "had Article III standing" even where the case was not moot); *cf. id.* at 191 ("Standing admits of no . . . exception; if a plaintiff lacks standing at the time the action commences, . . . the complainant [is not entitled] to a federal judicial forum.").

And here, as I discuss in detail below, Plaintiffs fail to make the mandatory threshold showing of standing. The majority grants Plaintiffs' motion to supplement only by accepting Plaintiffs' flawed mootness invitation. Viewing the jurisdictional issue as what it is—a question of standing—the majority's decision to supplement the record cannot withstand scrutiny. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 483 n.6 (9th Cir. 2011) (emphasizing that standing "cannot be created

retroactively").[7]   Because our precedent does not allow a
party to supplement the record in these circumstances or to
devise standing on appeal with extra-record evidence, I
would deny the motions to supplement.

B.

To establish Article III standing, a plaintiff bears the
burden of showing that (1) it "suffered an injury in fact, *i.e.*,
one that is sufficiently 'concrete and particularized,' and
'actual or imminent, not conjectural or hypothetical,' (2) the
injury is 'fairly traceable' to the challenged conduct, and (3)
the injury is 'likely' to be 'redressed by a favorable
decision.'" *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007)
(quoting *Lujan*, 504 U.S. at 560–61).   Because standing is
"an indispensable part" of the plaintiff's case, each element
"must be supported in the same way as any other matter on
which the plaintiff bears the burden of proof, *i.e.*, with the
manner and degree of evidence required at the successive
stages of the litigation." *Lujan*, 504 U.S. at 561.

At the preliminary-injunction stage, the plaintiff must
make a "clear showing" of each of these elements. *Townley
v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).   To do so, the
plaintiff "may rely on the allegations in their Complaint and
whatever other evidence they submitted in support of their
[preliminary-injunction] motion." *City & Cnty. of San
Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d

---

[7] *Teamsters Local Union No. 117 v. Washington Department of
Corrections*, 789 F.3d 979 (9th Cir. 2015), does not help Plaintiffs here.
In that summary-judgment appeal, our Court considered supplemental
affidavits about a longstanding, six-year-old policy that the district court
had considered in "multiple proceedings." 789 F.3d at 986.   In contrast,
Plaintiffs' proffered declarations concern new events that occurred after
the district court denied the motion for injunctive relief.

773, 787 (9th Cir. 2019) (quoting *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (per curiam)).

When a plaintiff seeks prospective injunctive relief, it cannot rely solely on past injury and instead must demonstrate "a sufficient likelihood that [it] will again be wronged in a similar way" and a "real and immediate threat of repeated injury." *Bates*, 511 F.3d at 985 (first quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); and then quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). The Supreme Court has explained that "past wrongs do not in themselves amount to [a] real and immediate threat of injury," unless accompanied by "continuing, present adverse effects." *Lyons,* 461 U.S. at 102–03 (citation omitted).[8] "Threatened injury must be *certainly impending* to constitute injury in fact," and "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

C.

Plaintiffs assert two theories of Article III standing: that Pioneer FCA has representational standing and that FCA National has direct organizational standing. Under representational standing, an organization may bring suit on behalf of its members based on injuries to its members, whether or not the organization itself has suffered an injury. *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105 (9th Cir. 2006). Under direct organizational standing, an organization may bring suit in its own right to challenge an action that causes it direct injury. *E. Bay Sanctuary*

---

[8] Past injuries are redressed by damages, and Plaintiffs' damages claims remain pending irrespective of any prospective remedy granted today. *See Roe*, 2021 WL 292035, at \*19.

*Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021). Confined to the proper record on appeal—the record before the district court, neither Pioneer FCA nor FCA National has standing for the prospective injunctive relief they request here.

1.

Under the representational standing doctrine, Pioneer FCA has standing to bring suit on behalf of its members if "(1) at least one of its members would have standing to sue in his own right, (2) the interests the suit seeks to vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fleck & Assocs., Inc.*, 471 F.3d at 1105–06. The parties dispute only whether the first prong is met.

For a Pioneer FCA member to have standing for prospective relief in his own right, he needs to suffer the threat of a sufficiently concrete and imminent future injury. ASB clubs are comprised only of students, and only students may apply for ASB recognition. So, if Plaintiffs fail to establish that any Pioneer FCA student intended to apply for ASB recognition for the 2022–23 school year or would have applied in the absence of the District's Policy, they cannot clearly show a prospective injury.

Plaintiffs seeking injunctive relief must make a "clear showing" of imminent future injury through detailed and specific evidence. *Townley*, 722 F.3d at 1133 (citing *Lujan*, 504 U.S. at 561). That demand has teeth; the Supreme Court has regularly dismissed appeals because plaintiffs failed to meet their burden. *See, e.g.*, *Lujan*, 504 U.S. at 565 (concluding that affidavits reflecting plaintiff-organization members' "inten[t]" to engage in activity that would be

affected by the defendant's action were "simply not enough" for Article III standing because "'some day' intentions . . . do not support a finding of . . . 'actual or imminent' injury"); *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (holding that plaintiff-organization did not establish Article III standing for injunctive relief where the organization failed to show that its members would be affected by the actions it sought to enjoin); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (rejecting plaintiffs' claim of Article III standing because the affidavits failed to establish "firm intention" that plaintiff-organization's member would return to location affected by challenged government action; finding "vague desire" insufficient to satisfy the requirement of imminent injury).

We, too, have concluded that the lack of a concrete plan or firm intention makes a plaintiff's claim of injury too speculative for Article III standing. *See, e.g.*, *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) (rejecting as insufficient to support standing a declaration that did not establish member's "concrete plans" to return to affected location); *Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (no Article III standing for prospective relief where plaintiff failed to articulate, with sufficient detail, his concrete plans or intent to violate government action); *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (explaining that a "general intent" to take a future action "does not rise to the level of an articulated, concrete plan" and that for plaintiffs to establish Article III standing for prospective relief, they must specify "when, . . . where, or under what circumstances"). A recent case of ours, *Yazzie v. Hobbs*, is particularly instructive in this regard. 977 F.3d 964 (9th Cir. 2020) (per curiam). There, we affirmed the denial of a preliminary injunction

involving a vote-by-mail deadline. *Id.* at 969. The complaint alleged that the plaintiffs faced myriad challenges to voting by mail. *Id.* at 965. But because none of the plaintiffs established an intent to vote by mail in the upcoming election, we concluded that the plaintiffs lacked Article III standing. *Id.* at 966. The plaintiffs' "general" allegations and intent did not constitute concrete and particularized injury and instead "epitomize[d] speculative injury." *Id.* at 967 (quoting *Townley*, 722 F.3d at 1133).

Applying this precedent, Pioneer FCA cannot meet its burden here. No District students sought ASB recognition for an FCA club for the 2021–22 school year. And Plaintiffs fail to adequately show that any student firmly intended or had concrete plans to apply for ASB recognition in the 2022–23 school year or that any would have applied in the absence of the District's Policy. *See id.* ("What is missing for [the plaintiffs] is any allegation or showing as to, at a bare minimum, whether any of the plaintiffs intend to" engage in conduct covered by the injunction that plaintiffs seek.). This dooms Pioneer FCA's standing for prospective relief.

Plaintiffs' standing argument rests on declarations that Plaintiffs submitted in support of their motion for injunctive relief. Plaintiffs assert that these declarations, all from FCA National employee Rigoberto Lopez, sufficiently demonstrate that two Pioneer students—N.M. and B.C.—intended to apply for ASB recognition during the 2022–23 school year. Plaintiffs are wrong. Lopez's declarations fall far short of establishing the necessary "clear showing" of a concrete and particularized injury.

The declarations do not state or otherwise clearly show that N.M. or B.C. intended to apply for ASB recognition. In the September 2021 declaration cited by the majority, Lopez

stated broadly that "Pioneer FCA's leadership will apply for ASB recognition" if an injunction were granted. Contrary to the majority's telling, this assertion was not related to N.M. and does nothing to establish her intent to apply for ASB recognition. At that point in September 2021, N.M. was not a leader of Pioneer FCA, nor does the record indicate that she had concrete plans to become one. The majority also unpersuasively relies upon Lopez's statements in a May 2022 declaration that N.M. and B.C. were confirmed as Pioneer FCA's leadership for the 2022–23 school year. But that declaration does not mention, let alone detail, N.M. or B.C.'s plans or desires to apply for ASB recognition. According to the majority, the undetailed declarations nonetheless make it "apparent" that at least one Pioneer FCA student leader has standing to seek forward-looking relief. Supreme Court precedent, and ours in turn, demands more. The general and conclusory statements from Lopez are insufficient to establish a student's "concrete plans" or "firm intentions" to apply for ASB recognition. *Summers*, 555 U.S. at 496.

There are additional reasons that Lopez's declarations cannot surmount Plaintiffs' standing burden. To start, the declarations are speculative hearsay. True, courts may exercise discretion to consider hearsay in deciding whether to issue a preliminary injunction. *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc). But that discretion—stemming from the "urgency" of obtaining a preliminary injunction, which may "necessitate[] a prompt determination and make[] it difficult to obtain affidavits from persons who would be competent to testify at trial"—has no role to play here. *Flynt Distrib. Co. Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

There was no urgency in this case; indeed, neither Plaintiffs nor the majority intimate as much. Plaintiffs' motion for a preliminary injunction was pending before the district court for ten months. *See Fellowship of Christian Athletes*, 2022 WL 1786574, at \*1. During that time, Plaintiffs never presented any evidence from students establishing their intent to apply for ASB recognition. The majority brushes aside that reality as unimportant, reasoning that the parties' joint stipulation preventing testimony from non-party students barred Plaintiffs from introducing such evidence. This argument is lacking for two reasons.

First, Plaintiffs' motion was pending for seven months *before* the parties entered the joint stipulation about student testimony. During that time, Plaintiffs could have supported their motion with declarations or other evidence from non-party students. But they did not. Second, Plaintiffs cannot skirt their burden to establish a jurisdictional requirement by hiding behind a discovery stipulation. A discovery stipulation cannot trump Article III of the Constitution. *See Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) ("As a jurisdictional requirement, standing to litigate cannot be waived or forfeited.").

On top of this, there is reason to doubt the credibility of the Lopez declarations. We have warned that at this stage of litigation, courts should give inadmissible hearsay only the weight to which it is entitled and consider it only when "do[ing] so serves the purpose of preventing irreparable harm before trial." *Flynt*, 734 F.2d at 1394; *see Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (rejecting affidavits submitted in support of a motion for a preliminary injunction because the affidavits were "conclusory and without sufficient support in facts"). This appeal demonstrates why we put limited emphasis on

inadmissible evidence, as the record here reveals cracks in Lopez's statements. For example, when Lopez was deposed in February 2022, he walked back and qualified statements he made in the September and October 2021 declarations. Notably, in the September 2021 declaration, he stated that N.M. was "fearful" of seeking ASB recognition. Later, during his deposition, Lopez clarified that it was he—not N.M.—who had concerns about the ASB application. The majority, however, unquestionably credits the veracity of the declarations.

In sum, the record does not specifically show that a Pioneer student intended to apply for ASB recognition in the 2022–23 school year or would apply in the absence of the All-Comers Policy. And without that, Pioneer FCA has no standing for prospective relief. *See Lujan*, 504 U.S. at 563 (no Article III standing where organization failed to submit affidavits "showing, through specific facts . . . that one or more of [its] members would . . . be 'directly' affected" by the allegedly illegal activity).**[9]**

2.

Plaintiffs' alternative standing theory fares no better. FCA National has direct organizational standing for prospective relief only if Plaintiffs can demonstrate that the District's behavior will "frustrate[] [FCA National's]

---

[9] Citing *Truth v. Kent School District*, the majority also suggests that Pioneer FCA may demonstrate imminent injury in this case on the basis that the District had a written policy and Pioneer FCA's injury stems from that policy. *See* 542 F.3d 634, 642 (9th Cir. 2008), *overruled on other grounds by Los Angeles County v. Humphries*, 562 U.S. 29 (2010). But unlike *Truth*, Plaintiffs here fail to establish that any student would apply for club recognition. The existence of a written policy therefore cannot alone confer standing in this case.

mission and cause[] it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant*, 993 F.3d at 663. They have not done so.

Plaintiffs' direct organizational theory of standing fails because Plaintiffs rely on allegations of past actions to demonstrate that FCA National has standing to seek future injunctive relief. For example, they allege that FCA National diverted resources in response to the District's decision to derecognize FCA in 2019. The majority makes a similar mistake, concluding that FCA National has organizational standing because FCA National "*has diverted*" staff time and energy and the District's denial of ASB recognition *"has undoubtedly hampered*" FCA National's ability to engage in its mission. While past diversion of resources and past frustration of FCA National's mission may support standing for damages, they do not support standing for prospective relief. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages).").

Plaintiffs cite no cases to support their argument that they meet this theory of standing, and the cases invoked by the majority are inapposite because they do not involve injunctive relief. *See* Majority Opinion at 33–34 (citing *Sabra v. Maricopa Cnty. Cmty. Coll. Dist*., 44 F.4th 867, 879 (9th Cir. 2022) (motion-to-dismiss stage involving plaintiff seeking damages); *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1166 (9th Cir. 2013) (summary-judgment stage in which organizations had standing to seek damages for past harm after plaintiffs voluntarily dismissed claims for injunctive relief); *Fair*

*Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (default judgment for damages); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 (9th Cir. 2001) (summary-judgment stage involving plaintiff seeking damages)).  The question here is not whether a frustrated mission or diverted resources can serve as a compensable injury (they can), but rather whether FCA National has made a clear showing that its resources will be diverted or its mission will be frustrated *going forward*.  The answer to that question—the only question that matters—is "no."  This conclusion is bolstered by the fact that Plaintiffs have not shown that any student would have applied for ASB recognition in the first place.  That point undercuts any argument that FCA National will "devote significant time and resources" to assist students— there are no such students to assist.

\* \* \*

Because neither Pioneer FCA nor FCA National have Article III standing for forward-looking relief, I would dismiss Plaintiffs' appeal for lack of jurisdiction.

### III.

Because I would dismiss this appeal, I would not reach the merits.  *See Equity Lifestyle Props., Inc. v. County of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008) ("The jurisdictional question of standing precedes, and does not require, analysis of the merits.").  But I write briefly further to touch on several of the legal errors and factual misrepresentations the majority makes on the merits.

### A.

The majority holds that Plaintiffs are likely to succeed on their free-exercise claims for three separate reasons.  Not only does the majority err in each of its free-exercise

analyses, but it improperly goes far beyond what is needed
to resolve this preliminary-injunction appeal.  The sweeping
nature of the majority opinion flies in the face of judicial
restraint, particularly at this preliminary stage where the
record is underdeveloped.  *See, e.g.*, *Wash. State Grange v.
Wash. State Republican Party*, 552 U.S. 442, 450 (2008)
(holding that courts should neither "anticipate a question of
constitutional law in advance of the necessity of deciding it"
nor "formulate a rule of constitutional law broader than is
required by the precise facts to which it is to be applied")
(citation omitted); *All. for the Wild Rockies*, 632 F.3d at 1139
(reversing denial of preliminary injunction on one claim
without reaching the merits of plaintiff's other claims); *cf.
Pearson v. Callahan*, 555 U.S. 223, 234 (2009) (reiterating
that judicial restraint cautions courts to avoid reaching
constitutional questions when they are unnecessary to the
disposition of a case).[10]

1.

The majority's first free-exercise error is that it
improperly expands the Supreme Court's decision in *Fulton
v. City of Philadelphia*, 141 S. Ct. 1868 (2021).  In *Fulton*,
the Supreme Court explained that a law is not generally
applicable, thus triggering strict scrutiny, if there is a "formal
mechanism for granting exceptions" that "'invite[s]' the
government to consider the particular reasons for a person's
conduct" and whether they "are worthy of solicitude."  141

---

[10] On this point, I fully agree with Judge M. Smith's statement in his
partial concurrence and partial dissent: "[T]he majority opinion sweeps
well beyond what is needed to resolve this case and imprudently
addresses open questions of law upon an underdeveloped, preliminary-
injunction record—even though doing so has no impact on the relief to
which the [majority concludes that] plaintiffs are entitled."

S. Ct. at 1877, 1879 (quoting *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 884 (1990)).  Here, the All-Comers Policy provides that all clubs must allow all students to participate "regardless of his or her status or beliefs."  The Policy does not contain any written provision allowing the District to grant exceptions to this blanket nondiscrimination rule.

In this important regard, the Policy in this case is unlike the policy in *Fulton*.  In *Fulton*, the Supreme Court held that the City of Philadelphia violated the Free Exercise Clause when it refused to contract with Catholic Social Services (CSS) unless CSS agreed to certify same-sex couples as foster parents.  *Id.* at 1874.  But there, the City's contract with foster-care agencies included a written provision giving a city official "sole discretion" to make exceptions to the contract's nondiscrimination rule.  *Id.* at 1878–79.  The Court explained that "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable."  *Id.* at 1879.  And because the sole-discretion provision "'invite[d]' the government to decide which reasons for not complying with the [nondiscrimination] policy [were] worthy of solicitude," it did not qualify as generally applicable.  *Id.* (quoting *Smith*, 494 U.S. at 884).

*Fulton* was a narrow ruling hinging on the City's "inclusion of a formal system" of discretionary exceptions.[11]  *Id.* at 1878.  In fact, we have since recognized the decision's critical emphasis on an express grant of discretion, *i.e.*, a

___

[11] Justice Alito's *Fulton* concurrence highlights the limited nature of the *Fulton* majority's holding.  Justice Alito reasoned that to comply with the ruling, the City could merely remove the contractual phrase conferring discretionary power, *i.e.*, the "formal" mechanism.  *Fulton*, 141 S. Ct. at 1887 (Alito, J., concurring in the judgment).

formal mechanism. *See Tingley v. Ferguson*, 47 F.4th 1055, 1088 (9th Cir. 2022) (holding that a statute was generally applicable in part because it lacked any provision providing a formal discretionary mechanism for individual exceptions).

Here, there is no formal mechanism for granting exceptions to the All-Comers Policy. Indeed, no one asserts that the All-Comers Policy expressly provides the District with discretion to waive nondiscrimination requirements. Instead, Plaintiffs and the majority focus on the District's alleged "exercise[]" of discretion. But nothing in *Fulton* suggests that it applies to an informal practice untethered to a formal mechanism. The majority's *Fulton* analysis operates from a faulty premise and is therefore unpersuasive.[12]

2.

Next, the majority's analysis of whether the District treated any comparable secular group more favorably than FCA is also flawed. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (explaining that a law is not generally applicable if it treats comparable secular activity more favorably than religious activity). The majority concludes that the District triggered strict scrutiny under *Tandon* by selectively enforcing its Policy only against FCA and not other student groups. But the majority's *Tandon* discussion

---

[12] To the extent the majority asserts that the text of the Policy grants impermissible discretion to the District because the Policy permits student groups to restrict membership based on "non-discriminatory criteria," the majority is incorrect. On its face, the All-Comers Policy's non-discriminatory-criteria provision is plainly unlike the *Fulton* provision, which formally gave discretion to discriminate.

involves a misapprehension of the record and the district court's factual findings.

Specifically, the majority points to the Girls' Circle, the Big Sister/Little Sister Club, and the Senior Women's Club as examples of secular clubs that the District allowed to discriminate. The district court, however, made specific factual findings about each of these groups, finding "no[] clear proof that the District allows" clubs to violate its Policy or that the clubs actually do discriminate. *See Fellowship of Christian Athletes*, 2022 WL 1786574, at \*1.

The district court's findings as to these groups are neither illogical, implausible, nor without support in inferences that may be drawn from the facts in the record. The district court cited deposition testimony from Principal Espiritu that if a male student wanted to join the Big Sister/Little Sister club, the group would need "to be inclusive and consider it." And the district court found, based on record evidence, that the Girls' Circle was never an approved ASB student group. As for the Senior Women's Club, the district court recognized that the club constitution simultaneously stated both that its members are "students who are seniors who identify as female" and also that "[a]ny currently enrolled student in the School shall be eligible for membership." Acknowledging the arguable "tension" between these statements, the district court found that the preliminary record did not establish that the District allows discrimination in violation of the newly-adopted All-Comers Policy. Both the record and our caselaw support this finding. *See Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 803–04 (9th Cir. 2011) (no selective enforcement where "groups were approved inadvertently because of administrative oversight," or where "groups have, despite the language in their applications, agreed to abide by the nondiscrimination policy"). Notably,

because Plaintiffs' claims are for prospective relief, what matters for this appeal is not the *past* application of earlier ASB approval processes but instead the *future* application of the All-Comers Policy.

3.

Finally, in determining that the Policy triggers strict scrutiny because it is not neutral, the majority makes both legal and factual errors. It is a basic and vital constitutional principle that the government cannot act with animosity toward religion. *See Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018) (explaining that a law is not neutral when the government acts in a manner intolerant of religious beliefs); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532–33 (1993) (same). The majority's discussion on this issue overreads Supreme Court caselaw and misapplies it to the facts here.[13]

Properly understood, *Masterpiece Cakeshop*, upon which the majority relies, supports Defendants' position, not Plaintiffs'. 138 S. Ct. 1719. In *Masterpiece Cakeshop*, the Supreme Court concluded that the Colorado Civil Rights Commission violated a baker's free-exercise rights by conducting an adjudicatory proceeding infected with bias

---

[13] As the majority acknowledges, the district court did not address Plaintiffs' religious-animus claim, so we have no relevant factual findings to review. And the majority concedes that there is, at the least, "some confusion" as to who had the "final say on derecognition." Given the majority's concession that the record is at best murky, it begs the question why the majority unnecessarily reaches Plaintiffs' religious-animus claim at all. *See, e.g., All. for the Wild Rockies*, 632 F.3d at 1139 (reversing denial of preliminary injunction on one claim without reaching the merits of plaintiff's other claims).

against the baker's religious beliefs. *Id.* at 1732. The "elements of a clear and impermissible hostility" in *Masterpiece Cakeshop* consisted of on-the-record statements made by decision-makers at a formal, public hearing without objection from other decision-makers. *Id.* at 1729. The Court was careful to limit its holding to contexts in which the decision-makers made hostile remarks during the adjudication at issue. *Id.* at 1730 (distinguishing between individual statements made by lawmakers and comments made in the "very different context" of "an adjudicatory body deciding a particular case").

Our Court recently considered *Masterpiece Cakeshop* when rejecting a plaintiff's claim that a law penalizing the practice of conversion therapy on minors violated the plaintiff's free-exercise rights. *Tingley*, 47 F.4th 1055. In *Tingley v. Ferguson*, we recognized that the Supreme Court in *Masterpiece Cakeshop* made a critical distinction between "hostile comments made by an adjudicatory body when deciding a case in front of it, and comments made by a legislative body when debating a bill." *Id.* at 1086. And we concluded that the plaintiff had not established a free-exercise violation in part because the allegedly hostile comments "did not take place in an adjudicative context" like the commission hearing in *Masterpiece Cakeshop*. *Id.* at 1087.

Yet the majority today expands *Masterpiece Cakeshop* far beyond the adjudicative context. In finding antireligious animus in this case, the majority focuses on statements from two teachers on Pioneer's Climate Committee, likening the Committee to the Civil Rights Commission in *Masterpiece Cakeshop*. Frankly, the attempted comparison is odd. In all significant respects, Pioneer's Climate Committee—a group of teachers and staff from one high school in the District—

is distinguishable from the Colorado Civil Rights Commission—a formal adjudicatory body.

The Climate Committee, comprised of Pioneer teachers and staff who "address how the school functions in terms of its . . . emotional and psychological climate," is not a decision-making body.[14]  The Climate Committee lacks independent authority to make decisions, and critically, it had no role over the ASB recognition or derecognition of student clubs, including FCA.  Nor did the individual teachers and staff on the Climate Committee hold relevant decision-making authority.

The record instead supports a finding that the decision to derecognize FCA at District schools came from District officials.  The majority implicitly recognizes this but argues that without the Climate Committee, "there is no indication that any other group or administrative body within the District would have . . . ultimately called for [FCA's] derecognition."  The theory, apparently, is that the Climate Committee made an animus-ridden recommendation to the District that the District then ratified.  But neither Plaintiffs nor the majority identify any evidence of the Climate Committee's involvement in determining or advising on FCA's ASB status.

The majority first refers to a Climate Committee meeting in which Committee members expressed their opinions that FCA's Statement of Faith went against the school's core values.  But no one asserts that that meeting determined or recommended derecognition, and there is no evidence that

---

[14] The majority wrongly implies that the Climate Committee was made up of District employees and staff from schools other than Pioneer.  To the contrary, the Climate Committee consisted only of Pioneer staff.

the District decision-makers even knew of the Climate Committee's existence, let alone of the content of the Committee's discussions.

The majority next cites scattered comments from two teachers on the Climate Committee that were made in contexts other than Committee meetings.    Far from "[p]ublic, on-the-record comments" by an adjudicatory body, however, isolated statements by individual teachers are closer to "stray comments from [state] legislators speaking for themselves," which do not give rise to a free-exercise violation. *Id.* at 1086–87. It is factually and legally inappropriate in this case to impute comments of individual teachers onto the District.   Doing so risks making a school district responsible for the words of each of its teachers and staff.    That conclusion would be untenable for school districts, which often consist of hundreds, if not thousands, of teachers. *See* Brief for California School Boards Association and its Education Legal Alliance as Amicus Curiae in Support of Petition for Rehearing or Rehearing En Banc, Dkt. No. 94, at 13 & n.5.

The majority also improperly attempts to empower the Climate Committee by asserting that the Committee influenced Principal Espiritu, who the majority suggests was really the ultimate decision-maker.**[15]** It is by no means clear,

---

[15] In any event, Plaintiffs misapprehend the record with respect to Principal Espiritu's statements.    And the majority adopts Plaintiffs' misapprehensions.   For example, Plaintiffs assert that Principal Espiritu said that FCA's religious beliefs were "of a discriminatory nature."   Not true.    Principal Espiritu actually said that FCA's "*pledge* is of a discriminatory nature." Another example: Plaintiffs assert that Principal "Espiritu himself admitted that the mere existence of FCA's religious beliefs was sufficient in his mind to deny FCA recognition."   Again, not

based on this record, that Principal Espiritu had the final say on FCA's recognition status. After receiving complaints about FCA's leadership requirements, Principal Espiritu consulted District officials for guidance on whether the requirements violated the District's nondiscrimination policy. In response, the District explained that all ASB clubs needed to accept students in a manner consistent with the District's policies. The District further instructed Principal Espiritu to derecognize any club that violated the District's nondiscrimination policy and informed Principal Espiritu that a club that barred from leadership any students who engaged in "homosexual activity" fell in this category. The District specifically communicated to Principal Espiritu that FCA's leadership requirements impermissibly discriminated based on sexual orientation and instructed Pioneer to derecognize FCA. Principal Espiritu apparently then acted in accordance with this guidance. Indeed, the majority recognizes as much when discussing the factual background of the case, explaining that it was the District who "decided to strip [FCA] of its ASB approval."

All that to say, the majority transforms the Climate Committee into an adjudicatory body akin to the Colorado Civil Rights Commission when, by all accounts, it was not one. Given that the Committee was merely a group of teachers and staff lacking decision-making authority, Plaintiffs' claim of animus collapses.

B.

The majority's merits errors do not end with Plaintiffs' free-exercise claims; I join Part II of Judge M. Smith's

true. Principal Espiritu testified that the existence of the Sexual Purity Statement may have been sufficient to violate the discrimination policy.

partial dissent and partial concurrence in which he dissents
from the majority's holding that Plaintiffs are likely to
succeed on their free-speech claim.  I agree with Judge M.
Smith that to reach this conclusion, the majority wrongly and
unnecessarily overrules our free-speech precedent, *Alpha
Delta*, 648 F.3d at 801, and ignores binding Supreme Court
precedent, *Martinez*, 561 U.S. at 695.

## IV.

From top to bottom, the majority bypasses the "limited
and deferential" review we must give a district court's denial
of a preliminary injunction.  *Sw. Voter Registration Educ.
Project*, 344 F.3d at 918.  The result is an expansive opinion
focused on past harms and based only in one party's telling
of a complex, disputed, and underdeveloped record.  And the
majority sets forth no limiting principle to the permission it
gives to school clubs to exclude students based on any
number of protected classes.  Under the majority's decision,
for example, are all religious student clubs exempt from a
uniformly applied nondiscrimination policy?    Would a
public secondary school be forced to officially recognize a
religious student club that required its members or leaders to
adhere to racist, sexist, or xenophobic beliefs, or excluded
students based on their race or gender?  *See 303 Creative
LLC v. Elenis*, 143 S. Ct. 2298, 2342 (2023) (Sotomayor, J.,
dissenting) ("How quickly we forget that opposition to
interracial marriage was often because "'Almighty God . . .
did not intend for the races to mix.'" (quoting *Loving v.
Virginia*, 388 U.S. 1, 3 (1967))).  The majority goes out of
its way to open doors without any consideration to or
discussion of what is behind them.

And unfortunately, to reach this sweeping result, the
majority waters down Article III, ignoring controlling

precedent that demands a "clear showing" of standing at this preliminary procedural posture.     Because we lack jurisdiction over this appeal, I respectfully dissent.